UNITED STATES DISTRICT COURTT
DISTRICT OF NEW JERSEY
_____X                  **Case No. _____**

JAMES H. BRADY,

            *Plaintiff*,                                        **COMPLAINT AND**
                                                                      **JURY DEMAND**
    *v.*

GEOFFREY S. BERMAN,

          *Defendant.*

_____X


Plaintiff James H. Brady complains as follows:

## PRELIMINARY STATEMENT

1.    This Complaint seeks damages personally from GEOFFREY S.

BERMAN, who is the United States attorney for the Southern District of

New York and resident of New Jersey for the following causes of action: 1)

Violation of Due Process Pursuant to the Fifth and Fourteenth Amendments;

42 U.S.C §1983 2) Civil Conspiracy Pursuant to 42 U.S.C §1983; 3)

Conspiracy to Interfere with Civil Rights 42 U.S.C. §1985; 4) Civil RICO

18 U.S.C. §1961; 5) Defamation (Reputational Risk & Defamation of

Liberty); 6) Cohesive Censorship and Retaliation Campaign; 7) Prima Facie

Tort; 8) Aiding and Abetting Fraud; 9) Failure to Intervene; 10) Violation of

Plaintiff's First Amendment Right to File a Complaint; 11) Retaliation in

violation of Equal Protection under 1983; 12) Unjust Enrichment; 13) Fifth Amendment Due Process; 14) The Fourteenth Amendment Substantive Due Process Claim; 15) Violation of Procedural Due Process; 16) Civil Conspiracy; 17) Equal Protection Violation; 18) Defamation of Liberty; 19) Defamation Per Se; 20) Prima Facie Tort Under Section 42 U.S.C. §1983; 21) Gross Negligence; 22) Failure to Supervise; 23) 42 U.S.C. §1985 Conspiracy to Interfere with Civil Rights; 24) 42 U.S.C. §1986 Action to Neglect to Prevent; 25) Intentional Infliction of Emotional Distress; 26) Failure to Protect; 27) Violation of Victim and Witness Protection Act of 1982; 28) Criminal Indifference to Civil Obligations, 29) Mail Fraud §1962 under Racketeering and Corrupt Organizations Act; and 30) Wire Fraud §1962 under Racketeering and Corrupt Organizations Act.

2.      While it might seem unfathomable that the man entrusted to be the United States Attorney for the Southern District of New York could be guilty of these charges, the evidence in this complaint proves the charges against Mr. Berman are untenable to deny.

## **PARTIES**

3.      Defendant Geoffrey S. Berman is a resident of New Jersey and resides at 345 Brooks BND, Princeton, NJ 08542.

4.      Defendant Geoffrey S. Berman is a 60-year-old man.

2

5.     Since April 2018, Mr. Berman has been the United States Attorney for the Southern District of New York.

6.     Mr. Berman is a long-time partner and major shareholder at the law firm Greenberg Traurig LLP.

7.     Plaintiff James H. Brady ("Brady") is a 57 year old white, Catholic married male, who resides at 510 Sicomac Avenue, Wyckoff, New Jersey 07481, with his wife Jane Brady.

8.     Plaintiff and his wife Jane have been married for 30 years. Together they have three grown daughters.

9.     In 2012, Mr. Brady created the website www.bullyjudges.com to catalogue the corruption he has uncovered in the New York State Court System after Greenberg Traurig partner Deirdre Carson's first failed attempt to help the Co-op Board to steal the development rights she knew were contractually appurtenant to James and Jane Brady's 12th Floor and Roof Unit Apartment   .

10.     From 2013 through 2018 Greenberg Traurig Partners of Mr. Berman's have asked State and Federal Judges to punish Plaintiff for the creation of the website www.bullyjudges.com.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28

U.S.C. § 1332 because Defendant is a citizen of the State of New Jersey, and

pursuant to the federal question arising out of the Fourteenth Amendment's

Equal Protection Clause and under 28 U.S.C. §1983 as a civil action for

deprivation of rights.

12.     The federal court has jurisdiction over civil rights complaints

pursuant to 28 U.S.C. §1343 (a)(3).

13.     This court has supplemental jurisdiction over any claims that

may be raised based on state law under 28 U.S.C. §1367, and which arise

out of the same "common nucleus of operative facts." *United Mine Workers

v. Gibbs,* 383 U.S. 715 (1966).

14.     As a *pro se* petitioner, Plaintiff ask the court to construe this

pleading liberally when establishing whether it has met the federal

requirement of the well-pleaded rule. *Hall v. Bellmon,* 935 F.2d. 1106

(1991).

## COMPLAINT

15.     On October 24, 2006, James H. Brady and his wife Jane Brady

purchased the block of shares and proprietary lease to the most valuable

commercial co-op apartment in New York City at the time because it

included 190,000 square feet of air rights pursuant to the 2005 creation of

the Hudson Yards District of Manhattan, and pursuant to the Seventh

Paragraph Footnote to the Schedule of Units in the 1980 Amended Offering

Plan (Exhibit 1):

> "Seventh Paragraph - NEW- The 12th Floor and Roof Unit Shall have, in addition to the utilization of the roof, the right to construct or extend structures on the roof or above the same, to the extent that may from time to time be permitted under applicable law."

16.     In 2006, Mr. Berman's Greenberg Traurig fellow partner

Deirdre Carson had the air rights contractually appurtenant to Plaintiffs' 12th

Floor and Roof Unit appraised at $44 million after being hired by the Co-op

Board to appraise them.

17.     As this Complaint will prove with specificity, since October

2007, Greenberg Traurig partners have engaged in four different civil

conspiracies against Plaintiff to steal the air rights appurtenant to Plaintiff's

12th Floor and Roof Unit apartment.

18.     On September 5, 2018, Plaintiff and his wife were forced to

lose their livelihood and sell the Unit in order to pay over $500,000 to

attorneys, including Greenberg Traurig, who stole the air rights contractually

appurtenant to Plaintiff's former co-op apartment.

19.     In an effort to retaliate and destroy Plaintiff, Mr. Berman

participated and colluded in a second scheme in which Plaintiff was forced

to pay over $1.7 million on September 5, 2018 on a personal guarantee when Mr. Berman knew that there was never an adjudicated that the landlord was entitled to a penny, and that as a matter of law and public policy the personal guarantees were voided by the landlord's unlawful actions and inactions after the leases and personal guarantees were signed that destroyed the building's Certificate of Occupancy and made Plaintiff's meeting halls valueless as assets and illegal to occupy.  (Exhibit 2).

20.    Mr. Berman condoned, participated, and was instrumental in carrying out these crimes and constitutional violations.

21.    These actions and inactions by Mr. Berman were his express role in the Civil RICO and civil conspiracy meant to destroy Plaintiff and his family.

22.    Even when sued in District Court in his official capacity on September 17, 2018, Mr. Berman still refused to permit Plaintiff to file a criminal complaint with his Office, which is a clear violation of Plaintiff's First Amendment rights.

23.    A review of the Docket Sheet of *James H. Brady v. Geoffrey S. Berman, U.S. Attorney for the Southern District of New York*, District Court Southern District of New York, 18-CV-8459 (VEC) (BCM), shows that Mr. Berman does not dispute that these crimes took place.

24.     The only thing Plaintiff was seeking in that Complaint was to

exercise his First Amendment right to file a criminal complaint with Mr.

Berman's Office.

25.     Plaintiff's September 17, 2018 Complaint describes the relief

Plaintiff was seeking and the basis of the claims against Mr. Berman:

> Petitioner needs the protection of the United States Attorney for the
> Southern District of New York, Hon. Geoffrey S. Berman, for two
> admitted crimes that took place under color of law.  Without a
> Mandatory Injunction, Petitioner's guaranteed constitutional rights for
> equal protection under the law will continue to be deprived.
>
> The first admitted crime was admitted to by NYS Supreme Court
> Justice Shirley Kornreich on September 10, 2014 when she admitted
> that in her July 15, 2014 decision she deliberately took out all 40
> words in the contract and replaced them with 70 different words that
> void what the contract and higher February 11, 2010 Appellate
> Division decision say on their face.  She further does not deny that she
> issued $500,000 in sanctions to pay the attorneys and make me too
> weak to fight back against her unlawful actions that were done for the
> sake of then politically connected.
>
> The second undisputed crime was committed by Supreme Court
> Justice Barry Ostrager, Appellate Division, First Department judges
> Peter Tom, Barbara Kapnick, Richard Andrias, and Troy Webber, and
> the NYS Court of Appeals deliberately refused to apply the law to the
> admitted and proven facts that voided the personal guarantees in
> another effort to retaliate and punish Petitioner for his years-long
> effort of seeking to disclose their corrupt conduct.

26.     On June 4, 2019, Plaintiff offered to settle the case with Mr.

Berman if would simply be permitted him to file a complaint with the Office

of the United States Attorney.

27.     Plaintiff's letter, filed by the court on June 6, 2019, follows in

its entirety:

June 4, 2019

James H. Brady
510 Sicomac Ave.
Wyckoff, NJ 07481

Honorable Barbara C. Moses
New York Southern District Court
Thurgood  Marshall United States Courthouse
40 Foley Square
New York NY 10007

Re: *James H. Brady v. Geoffrey S. Berman*, Index: 1:18-cv-08459

Dear Honorable Judge Moses:


I am writing requesting that the Court issue a Settlement Conference
in the above-named case pursuant to Rule 16 of the Federal Rules of
Civil Procedure.

All I am requesting for settlement is that the United States Attorney
for the Southern District of New York agree to grant me my First
Amendment right to file a complaint with his office that is followed
by a written Determination that is based on the facts and evidence.

Federal case law is clear that a private citizen who is the victim of a
crime has a First Amendment right to file a criminal complaint with
the appropriate government agency.  That right is distinct from the
discretion the agency has in making a determination whether to
prosecute or not.  But the law enforcement or government agency

must make an actual "Determination" that can be reviewed and if necessary appealed or challenged in court.

"Undoubtedly, Plaintiffs are correct when they state that they have a First Amendment right to file complaints with the government. *Hogan v. County of Lewis*, 929 F.Supp 2d 130 (District Court ND NY 2013).

"It is axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to petition government for the redress of grievances." *Lott v. Andrews Ctr.,*259 F.Supp.2d 564, 568 (E.D.Tex.2003).

"The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Jackson v. N.Y. State,* 381 F.Supp.2d 80, 89 (N.D.N.Y.2005).

Rule 16 of the Federal Rules of Civil Procedure states that:  "A settlement conference is appropriate at any time.  It may be held in conjunction with a pretrial or discovery conference, although various objectives of pretrial management, such as moving the case toward trial, may not always be compatible with settlement negotiations, and thus a separate settlement conference may be desirable. See 6 Wright & Miller, *Federal Practice and Procedure: Civil* §1522, at p. 751 (1971)."

Rule 1 of the Federal Rules of Civil Procedure requires that disputes be resolved in a manner that is just, speedy and inexpensive.  "Courts have an obligation to vigorously explore efforts to reduce litigation costs through settlement." *In re Tobacco Litig*., 192 F.R.D. 90, 95 (E.D.N.Y. 2000) (describing court's duty to take affirmative action assisting the parties in all possible settlement options).

"The purpose of the settlement conference is to try to settle a case before the hearing or trial." *American Bar Association*.

A Settlement Conference now will accomplish precisely what the law is intended to do, to facilitate a settlement that does not require the time and expense of a trial.  I urge the Court to schedule a Settlement

Conference as soon as possible so this case, which has sat dormant for months, may be resolved.

Sincerely,

_____

James H. Brady

28.     On June 10, 2019 Magistrate Judge Moses endorsed the

settlement letter offer submitted by Brady. (Exhibit 3).

29.     In a June 13, 2019 letter to the court through Assistant U.S.

Attorney Rachael L. Doud, Mr. Berman does not dispute his knowledge of

these crimes, but instead admits that it would not be "fruitful for him"

personally to protect Plaintiff from these crimes in clear violation of

Plaintiff's First Amendment rights to seek redress for grievances. (Exhibit

4).

June 13, 2019 VIA ECF

Honorable Barbara Moses
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street New York, New York 10007-1312

Re: *James H. Brady v. Geoffrey S. Berman, United States Attorney for the Southern District of New York*, 18 Civ. 8459 (VEC) (BCM)

Dear Judge Moses:

I write on behalf of Geoffrey S. Berman, United States Attorney for the Southern District of New York, the defendant in the above-

referenced case ("Defendant"), in response to the Court's Order dated June 10, 2019, directing Defendant to file a response to Plaintiff's June 4, 2019, letter by June 11, 2019. (Dkt. No. 25.) I apologize for the late response—I did not initially see the response deadline.

In his June 4, 2019, letter, which was docketed on June 6, 2019 (Dkt. No. 24), Plaintiff requests that the Court schedule a settlement conference at which Plaintiff intends to request a settlement "that the United States Attorney for the Southern District of New York agree to grant [Plaintiff] his First Amendment right to file a complaint with his office that is followed by a written Determination that is based on the facts and evidence." (Dkt. No. 25.)

On November 11, 2018, Defendant moved to dismiss Plaintiff's complaint on the grounds that a portion of the case is barred by the pre-suit injunction entered in *Brady v. Goldman*, 18 Civ. 8459 (S.D.N.Y.), the Court lacks subject matter jurisdiction over the action, and the complaint fails to state a plausible claim to relief. (Dkt. No. 10.) Defendant's motion remains pending.

Because, *inter alia*, the Court lacks jurisdiction to provide Plaintiff the relief he seeks, and for similar reasons the relief Plaintiff proposes as a settlement is improper, Defendant does not believe a settlement conference would be fruitful.

We thank the Court for its consideration of this issue.
Respectfully submitted,
GEOFFREY S. BERMAN
United States Attorney Southern District of New York
*Defendant*

By: /s/ Rachael L. Doud
RACHAEL L. DOUD
Assistant United States Attorney
86 Chambers Street, Third Floor New York, New York 10007
Tel.: (212) 637-3274 Fax: (212) 637-2686 rachael.doud@usdoj.gov

28.     This letter shows Mr. Berman's direct involvement with this Civil RICO scheme.  Mr. Berman is fighting tooth and nail rather than allow Plaintiff to file a criminal complaint.

29.     The papers Mr. Berman submitted in his *Motion to Dismiss* were electronically filed with the court and mailed to Plaintiff at his home, which was Mail Fraud pursuant to 18 U.S.C. 1341 under the Racketeering and Corrupt Organizations Act; and Wire Fraud pursuant to 18 U.S.C. 1343 under Racketeering and Corrupt Organizations Act.

30.     Plaintiff lives in New Jersey and the papers were sent from New York State across state lines.  The documents were meant to suppress the crime, were meant to retaliate against Plaintiff, and were an abuse of power by Mr. Berman.

31.     Magistrate Judge Moses reversed herself and denied the settlement proposal she had endorsed on June 10, 2019 after receiving the June 13, 2019 letter from Assistant U.S. Attorney Rachel Doud.

32.     On August 2, 2019, Magistrate Judge Moses issued a scathing *Report and Recommendation* that completely moved away from the two issues that were before her, which was: 1) addressing Mr. Berman's refusal to permit Plaintiff to file a criminal complaint; and 2) Mr. Berman's refusal

to provide documents that Brady is entitled to have under Freedom of Information Laws. **(Exhibit 5)**.

33.     The August 2, 2019 *Report & Recommendation* shows something happened between the time she was reasonable on June 10, 2019, to when she attacked Plaintiff with slanderous false personal attacks that even if true, would still not permit Mr. Berman to deprive Plaintiff of his First Amendment right to file a complaint and seek redress from his office.

34.     The total flip in Magistrate Judge Moses disposition proves that Mr. Berman went out of his way to dirty Magistrate Judge Barbara Moses, who issued a *Report & Recommendation* on August 2, 2019 in which went out her way to slander and libel Mr. Brady with claims she knew were false, and together with Defendant conspired to assert that the filing injunction in the air rights prevented *any* claims in *any* matter.

35.     This was a scheme between Magistrate Judge Moses and Mr. Berman to prevent any redress for the outrageous and criminal acts inflicted on Plaintiff under color of law on September 5, 2018.

36.     In a September 18, 2019 decision, Judge Valerie Caproni issued her own *Order*, which did not adopt any of the false claims and personal attacks made against Brady, but didn't dispute the claims either, leaving Plaintiff slandered and libeled.  **(Exhibit 6)**.

13

37.     Neither Magistrate Judge Moses' *Report & Recommendation* nor Judge Caproni's *Order* disputed that these crimes took place.

38.     Mr. Berman's *Motion to Dismiss*, Magistrate Judge Moses' *Report and Recommendation*, and Judge Caproni's Decision together prove they colluded to bury the fact that the whole purpose of filing the complaint in District Court was to allow Plaintiff to file a criminal complaint with the U.S. Attorney.

39.     The whole reason behind Plaintiff's complaint was ignored and avoided because it is untenable for a court to come up with a way to justify denying a constitutional right to file a complaint.

40.     These schemes serve as Plaintiff's best proof of the charges against Mr. Berman.  Mail and Wire Fraud are being used to commit the crimes of Mr. Berman's partners at Greenberg Traurig.

41.     Before September 5, 2018 Plaintiff sent over a dozen letters to Mr. Berman's Office and the Washington and New York Branches of the FBI and Department of Justice pleading to prevent these crimes from taking place and every plead for help was ignored in concert in an identical pattern of conduct.

42.     One of the last pleads for justice and protection from irreversible harm was sent to Chief Judge Janet DiFiore and Michael Garcia

14

on August 15, 2018 with a copy sent to Mr. Berman on August 16, 2018

demanding that he take appropriate action to stop these retaliation scandals

from destroying Plaintiff's life and livelihood.

43.     Plaintiff sent Mr. Berman an email on August 16, 2018 that

proves Defendant's personal knowledge of this scheme in which he was

participating in with Chief Judge Janet DiFiore and Michael Garcia.

> From: **Jim Brady** <bradyny@gmail.com>
> Date: Thu, Aug 16, 2018 at 1:31 PM
> Subject: A copy of a letter that was sent to NY State Chief Judge
> DiFiore and Justice Michael Garcia providing Judicial Corruption
> To: <Rod.Rosenstein@usdoj.gov>, <Geoffrey.Berman@usdoj.gov>,
> <Jeffrey.Sessions@usdoj.gov>

> To whomever it may concern from the United States Department of
> Justice,

> Enclosed is a letter that I will be sending to Chief Judge DiFiore and
> Justice Michael Garcia.

> I have two matters that need your immediate attention.  Chief Judge
> DiFiore and Justice Michael Garcia have already ignored over a dozen
> letters that I have sent to them, and this must stop now.  They are both
> former prosecutors and on September 5, 2018 I will be forced to pay
> $2.3 million dollars because of the corruption and retaliation schemes
> of Supreme Court Judge Shirley Kornreich, Supreme Court Judge
> Barry Ostrager, and certain New York Appellate Division First
> Department Justices.

> The first crime pertains to the criminal scheme to replace my offering
> plan contract and a higher February 11, 2010 Appellate Division, First
> Department decision with Supreme Court Justice Shirley Kornreich's
> July 15, 2014 decision which voided the rights these pieces of
> material evidence proved were appurtenant to my apartment, and her

decision issued $500,000 in sanctions that I'm forced to pay on September 5, 2018 if this scandal is not stopped.

The second retaliation scandal is forcing me to pay $1.7 million dollar judgment against me because Supreme Court Judge Barry Ostrager and the Appellate Division, First Department Justices refuse to apply this Court's binding law that voided the personal guarantees as a matter of law and public policy, because the landlord increased and changed the risk after the personal guarantees were signed, by turning his garment factory building into an illegal office building that destroyed the certificate of occupancy after the leases were signed.

All of this is discussed in detail in the letter attached.

You must do something immediately, as it is your duty to protect me from those who are corrupt in power.

Please contact me no later than Thursday, August 23, 2018, to arrange a meeting with me as the victim of very serious crimes. You can contact me by email at bradyny@gmail.com or by phone at 201-923-5511.

Sincerely,


_/ S /_____

James H. Brady


44.    The email to Mr. Berman included an 11-page letter dated August 15, 2018 **(Exhibit 7)** detailing with specificity the crimes that were taking place.  The first few paragraphs of the letter summarize the retaliation fraud schemes against Mr. Brady:

Dear Chief Judge DiFiore and Justice Michael Garcia:

I have two matters that need your immediate attention. You have already ignored over a dozen letters that have been sent to you, and

16

that must stop now. You are both former prosecutors and on September 5, 2018 I will be forced to pay $2.3 million dollars because of the corruption and retaliation schemes of Supreme Court Judge Shirley Kornreich, Supreme Court Judge Barry Ostrager, and certain New York Appellate Division, First Department Justices.

The first crime pertains to the criminal scheme to replace my offering plan contract and a higher February 11, 2010 Appellate Division, First Department decision with Supreme Court Justice Shirley Kornreich's July 15, 2014 decision which voided the rights these pieces of material evidence proved were appurtenant to my apartment, and her decision issued $500,000 in sanctions that I'm forced to pay on September 5, 2018 if this scandal is not stopped.

The second retaliation scandal is forcing me to pay $1.7 million dollar judgment against me because Supreme Court Judge Barry Ostrager and the Appellate Division, First Department Justices refuse to apply this Court's binding law that voided the personal guarantees as a matter of law and public policy, because the landlord increased and changed the risk after the personal guarantees were signed, by turning his garment factory building into an illegal office building that destroyed the certificate of occupancy after the leases were signed. The retaliation scheme is clear as day when you review the Oral Argument Archives on the Appellate Division's website for May 16, 2018 starting at 25 minutes. The video proves these justices colluded in a scheme to sit silent and not ask or answer a single question, and they refuse to apply the law that voids personal guarantees to the facts.

You must now address both of these issues. You two former prosecutors must address these crimes immediately.


45.    In concert with State Actors Chief Judge DiFiore and Associate Judge Michael Garcia, Mr. Berman was completely unresponsive to these pleas for his protection from the criminal and unconstitutional retaliation schemes against Plaintiff that was meant to punish and destroy him.

46.    Mr. Berman, like Chief Judge Janet DiFiore and Michael Garcia, was completely unresponsive to Plaintiff because the destruction of Plaintiff and his family was the exact outcome these three perpetrators and others were seeking in their conspiracy.

47.    Plaintiff also sent multiple letters to New York City and State agencies pleading for help but in identical patterns of conduct, Mr. Berman and Federal agencies ignored in concert every single one of Plaintiff's letters completely and never responded to Plaintiff's pleas for protection.

48.    All of these pleas for help were completely ignored, which was Mr. Berman's part in the Civil RICO and Civil Conspiracy masterminded by Greenberg Traurig partners Deirdre Carson, Daniel Milstein, Roy Taub and Steven Sinatra.

49.    The identical pattern of conduct proves collusion between local, state and Federal government actors in New York and Mr. Berman is the top law enforcement Official in the State of New York.

50.     The complete stonewalling by local, state and Federal agencies proves the exact same patterns of conduct of ignoring their oath of Office and the constitutional rights of every person to be treated evenly.

51.     Mr. Berman and the Office of the United States Attorney for the Southern District of New York have a custom and practice of discarding the constitutional rights of white Catholics.

52.     As this *Complaint* shows with irrefutable proof, at the same exact time Mr. Berman was issuing press releases about his offices efforts to fix wrongs against Jews by the Nazis 80 years ago, he was in on the retaliatory Civil RICO and Civil Conspiracy that he knew was meant to destroy a Catholic family.

53.     This *Complaint* proves Mr. Berman colluded with his Greenberg Traurig partners and a number of New York State judges to help powerful Manhattan Developers and their politically-connected attorneys get away stealing $70-90 million in development rights that everyone understands were contractually appurtenant to Plaintiff's "12th Floor and Roof Unit" commercial co-op apartment in the Hudson Yards District of New York.

54.     Mr. Berman was also part of the retaliatory conspiracy in which Plaintiff was forced to pay over $1.7 million on a personal guarantee to (1) a landlord who admitted himself he was not owed a penny; and (2) without there ever being an adjudication on the issue of whether Plaintiff was liable under the Personal Guarantees.

55.     Mr. Berman saw on film from May 16, 2018 Appellate Division, First Department Archives that the Justices came in with a scheme to sit silent and refused answer the Yes or No question of whether the personal guarantees were voided since they knew it was undisputed by the landlord Phillippe Ifrah from IGS Realty that his subsequent illegal actions voided the Personal Guarantees as a matter of law and public policy. (The film is also available at www.bullyjudges.com.)

56.     Mr. Berman had an opportunity to prevent the irreparable harm and crimes against Plaintiff from taking place but instead he deliberately permitted irreversible harm, along with every other government agency who had a civil obligation to respond.

57.     Mr. Berman is being sued in his individual capacity because he was, and still is, under color of state law, in collusion with state and federal actors to make sure the perpetrators of the crimes against Plaintiff, including his partners as Greenberg Traurig, are never held accountable for the Civil Conspiracy and Civil RICO against Plaintiff.

58.     While Mr. Berman is the United States Attorney for the Southern District of New York he is also a key perpetrator in the destructive criminal and unconstitutional schemes that caused irreversible harm to

Plaintiff and his family as a result of Mr. Berman's criminal indifference to his civil obligations.

59.     With prejudiced and hateful intent, Mr. Berman participated in these unconstitutional and unlawful crimes against Plaintiff.

60.     In a scheme orchestrated by Mr. Berman's Greenberg Traurig Partners, New York State judges ignored and essentially replaced Plaintiff's Offering Plan contract (Exhibit 1) and certain rights affirmed as being his in a final February 11, 2010 Appellate Division decision (Exhibit 8), with a final, lower court Supreme Court decision of July 15, 2014 (Exhibit 9) that voided the rights these two pieces of evidence stated belong to Plaintiff's 12th Floor and Roof Unit.

61.     Worse, Mr. Berman went along with the fact that the unlawful and unconstitutional lower Supreme Court July 15, 2014 Decision sanctioned Plaintiff to pay the perpetrators and their attorneys, including Greenberg Traurig attorneys, over $500,000.00 in Sanctions on September 5, 2018 that were meant to destroy Plaintiff and his family.

62.     The unlawful and unconstitutional sanctions are only found in the lower July 15, 2014 court decision, and were issued by Judge Shirley Kornreich at the directive of Mr. Berman's Greenberg Traurig partners Steven Sinatra, Daniel Millstein and Roy Taub.

21

63.     The Seventh Paragraph Footnote to the Schedule of Units in the

Amended 1980 Offering Plan for 450 West 31st Owners Corp in Manhattan,

reads as follows (Exhibit 1):

> "Seventh Paragraph - NEW- The 12th Floor and Roof Unit Shall have,
> in addition to the utilization of the roof, the right to construct or
> extend structures on the roof or above the same, to the extent that may
> from time to time be permitted under applicable law."

64.     The Appellate Division, First Department, February 11, 2010

Decision concludes with the following words (Exhibit 8):

> Pursuant to paragraph 7, that plaintiffs have the right to construct or
> extend structures upon the roof or above the same to the extent that
> may from time to time be permitted under applicable law,
> unanimously affirmed, without costs.

65.     The July 15, 2014 lower Supreme Court Decision reads as

follows (Exhibit 9):

> "It has already been adjudged that while the owners of the
> unit *may* have the right to erect additional structures on the roof, that
> right does not entitle them to use any floor area in doing so (Prior
> Action, decision and order, Mar 13, 2009 at *2 & *4-*5 ["Nothing
> herein shall be construed as holding that plaintiffs have the right to
> use all or any part of the TDRs in connection with such construction
> or extension"] *Brady v 450 W. 31st St. Owner's Corp.*, 70 AD3d 469,
> 470 [1st Dept 2010] [holding that the offering plan "reserves for
> plaintiffs the right.... to construct or extend structures on the roof that
> may be built without the use of the building's development rights."]"

66.     The above evidence proves the lower Supreme Court Judge

Shirley Kornreich completely unlawful and unconstitutional rewrote

Plaintiff's Offering Plan contract and a higher Court Decision, and wrote a whole new contract piecemeal by using different parts of past decisions.

67.     Every word of the original contract and the rights affirmed to be Plaintiff's in the higher Appellate Division, First Department, February 11, 2010 decision are gone and replaced with 70 of Judge Kornreich's own words in her lower, July 15, 2014 Supreme Court decision.

68.     The rewriting of an offering plan contract and higher court decision was clearly a crime and blatant disregard for authority of a higher court decision that governs over a lower court, *Delgado v City of New York*, 144 AD3d 46 (1st Dept. 2016):

> An appellate court's resolution of an issue on a prior appeal constitutes the law of the case and is binding on the Supreme Court, as well as on the appellate court, and operates to foreclose re-examination of the question absent a showing of subsequent evidence or change of law." (*Kenney v. City of New York*, 74 A.D.3d 630, 630–631, 903 N.Y.S.2d 53 [2010], quoting *J–Mar Serv. Ctr., Inc. v. Mahoney, Connor & Hussey*, 45 A.D.3d 809, 847 N.Y.S.2d 130 [2007]).

> Indeed, even of the orders by the state court were wrongfully procured, as the plaintiff alleges, the orders remain in full force and effect until they are reversed or modified by an appropriate state court. *Sharp v. State of New York*, 2007 U.S. Dist. Lexis 63539 (EDNY 2007).

69.     Based on the above law, it is not disputable that Plaintiff's higher Appellate Court February 11, 2010 decision never went away and always remained the governing decision, which is why the issue is always

completely avoided by all the perpetrators, including Mr. Berman, NYS Court of Appeals Chief Judge Janet DiFiore and Associate Judge Michael Garcia.

70.    Mr. Berman colluded with New York State Supreme Court Judge Barry Ostrager, Appellate Division, First Department judges Peter Tom, Richard Andrias, Barbara Kapnick, and Judge Troy K. Weber, and Chief Judge Janet DiFiore and Associate Judge Michael Garcia in a second unlawful and unconstitutional retaliation scandal that forced Plaintiff to sell his 12th Floor and Roof Unit Apartment on September 5, 2018 to pay a landlord $1,700,000.00 who had destroyed Plaintiff's three meeting hall businesses without any court every adjudicating that the landlord was owed a penny.

71.    What makes that crime so repulsive is the fact that the landlord himself knows he was not entitled to a penny under the law and under public policy based on his own admitted unlawful acts after the leases and Personal Guarantees were signed in 2002 and 2003.

72.    In the personal guarantee case, Mr. Berman knows that on June 23, 2015 Plaintiff was threatened by brand new Supreme Court Judge Barry Ostrager to accept the landlord's $50,000.00 offer to pay Plaintiff to settle

but Plaintiff refused to accept the threat to settle because the counterclaims damages caused by the landlord's illegal acts were in the millions of dollars.

73.     The May 16, 2018 video of the Oral Arguments Archives before the Appellate Division, First Department (starting at 25 minutes), which was shown to Defendant Mr. Berman, shows that the judges sat silent because they refused to answer or adjudicate the issue of whether the Personal Guarantees were enforceable because they would have had to rule in Plaintiff's favor.

74.     This fact is also clearly shown on the bullyjudges.com website.

75.     Mr. Berman saw by looking at the May 16, 2018 Oral Argument Archives that the panel of Judges were acting with a criminal indifference to their civil obligations when they refused to answer the Yes or No question that they had a mandated duty to answer as "Yes" the personal guarantees were voided as a matter of law and public policy by the landlords subsequent unlawful conduct that destroyed the buildings certificate of occupancy that was vital for Plaintiff's meeting hall use.

76.     In other words, Mr. Berman knew, and these judges knew, that the intent of not adjudicating the issue was unconstitutional and scheme to destroy Plaintiff and that is what it did.

77.    As Mr. Berman knows Plaintiff lost his livelihood and had his life destroyed because the New York State Judges refused to answer two separate Yes or No questions that could only be answered in Plaintiff's favor.

78.    Mr. Berman also knows the NYS Court of Appeals under Chief Justice Janet DiFiore also refused to answer these two questions.

79.    The first question being Yes: the higher Appellate Division, First Department decision of February 11, 2010 governs over the lower court July 15, 2014 decision.

80.    The second question being Yes:  The Personal Guarantees were voided as a matter of law and public policy by the landlord's subsequent actions that voided the building's Certificate of Occupancy.

81.    Mr. Berman knows the **May 16, 2018 video** proves conclusively that Judges Peter Tom, Richard Andrias, Barbara Kapnick, and Judge Troy K. Weber had a scheme in which they refused to ask or answer a single question, and refused to adjudicate with a Yes or No answer the express issues of the Personal Guarantees enforceability because they knew the personal guarantees were voided as a matter of law and public policy be the landlords subsequent unlawful conduct.

82.     Answering the question of whether or not the personal guarantees were voided or not was a mandated, constitutional duty that the New York State Courts deliberately violated to force Plaintiff to pay IGS Realty over $1.7 million on September 5, 2018.

83.     Mr. Berman knows the May 16, 2018 video proves conclusively that these four judges had a meeting of the minds to refuse to answer the Yes or No question of whether the Personal Guarantees were voided by the Landlord's subsequent illegal actions after the leases were signed because they wanted to see Plaintiff destroyed by having to pay a landlord over $1.7 million dollars (Exhibit 2) when they knew he was not entitled to a penny as a matter of law and public policy.

84.     Mr. Berman knows Judge Richard Andrias, Judge Barbara Kapnick, Judge Troy K. Weber and Judge Tom are the same Judges who are in on the crime of ignoring the fact that Plaintiff's Offering Plan contract (Exhibit 1) and higher February 11, 2010 Appellate Division, First Department decision (Exhibit 8) were being ignored and only the lower July 15, 2014 Supreme Court Decision (Exhibit 9) is being recognized by these Judges as part of a Civil RICO and Civil Conspiracy masterminded by Mr. Berman's Greenberg Traurig partners.

85.     Mr. Berman also knows that the January 17, 2018 Oral Argument Archives (found on BullyJudges.com) shows conclusively that the judges from the Appellate Division were in on the scheme of having their own decision replaced with the lower court decision that replaced the rights the Appellate Division said Plaintiff had.

86.     There is a clear difference between acting as judges and people performing criminal acts.  The video proves that the judges were acting with criminal indifference to their civil obligations.

87.     Even a dog can tell the difference between being tripped over and being kicked.

88.     In the January 17, 2018 video, Mr. Berman saw that as part of a scheme to use up the few minutes of time allotted to Plaintiff, Judge Andrias was deliberately asking questions unrelated to the issues of the case.

89.     Silence is the name of the game.

90.     Despite the fact that Plaintiff was clearly entitled under the First Amendment to file a criminal complaint Mr. Berman has instructed his personnel, in collusion with local and state law enforcement officials, to completely ignore every single complaint and plead for help filed by Plaintiff.

91.    Every time Plaintiff demands an acknowledgement that his Offering Plan Contract and higher court decision governs, the reply he receives is silence from all law enforcement officials and the word "Denied" to every motion that the issue be adjudicated by the State Courts.

92.    As Mr. Berman knows, at all levels, the New York Judiciary refused to adjudicate this express issue before them because the only answer was "YES" the Personal Guarantees were void as a matter of law and public policy.

93.    As Mr. Berman knows, the videos on the from Appellate Division, First Department Archives prove, the First Department Judges were also retaliating against Plaintiff for exercising his First Amendment right to create the website BullyJudges.com. that exposed their corruption

94.    As Mr. Berman knows, it was his partners at Greenberg Traurig, and attorneys hired to represent Greenberg Traurig Attorneys that told State and Federal Judges about website and directed  the New York State and New York Federal Judges to punish Plaintiff for the creation of the website jullyjudges.com

95.    As Mr. Berman knows, and the evidence proves, New York State and New York Federal Judges were following the express directives of Mr. Berman's Greenberg Traurig partners and attorneys hired by Greenberg

Traurig when they used identical defamatory claims against Plaintiff that were used to justify filing injunctions against plaintiff in both State and federal Courts in New York.

96.     The clear and obvious purpose of the filing injunction against Plaintiff is so that no one is ever held accountable for the Civil RICO and Civil Conspiracy against Plaintiff

97.     As Mr. Berman knows it was Greenberg Traurig Attorneys that masterminded a retaliation scheme that included asking for and obtaining the $500,000 in sanctions, Plaintiff was forced to pay Greenberg Traurig and other politically-connected law firms and their politically-connected clients on September 5, 2018.

98.     At the directive of Mr. Berman's Greenberg Traurig Partners, the Second Circuit Judges refused to say which decision governs and rather the Court of Appeals for the Second Circuit affirmed a filing injunction that had been corruptly asked for and obtained by Mr. Berman's partners at Greenberg Traurig in the case _Brady v. Goldman_, 18 Civ. 8459 (S.D.N.Y.), by District Court Judge George Daniels on February 3, 2017, which states:

> "Plaintiff is hereby enjoined against filing new actions in the Southern District of New York that relate in any way to the cooperative's air rights appurtenant to his cooperative unit at 450 West 31st Street, New York, New York, or the conduct of any attorney, judicial officer, government official, or other third party in relation to such rights. This

injunction should be broadly construed to bar the filing without leave of this Court of *any* case, against *any* defendant that has as a factual predicate the cooperative's air rights appurtenant to Plaintiff's penthouse unit, or *any* of the collateral actions that have arisen from it."

99.   On its face, the filing injunction was unlawful and unconstitutional.  In the same decision in which Judge Daniels issued a filing injunction, he acknowledges twice in the same paragraph that the air rights were appurtenant to Plaintiff's co-operative apartment.

100.   On its face, the filing injunction was issued to silence Plaintiff and prevent him from seeking any damages from any of the perpetrators in court.

101.   The fact that Plaintiff has now had to go to the Second Circuit Court of Appeals to argue for his First Amendment right to file a criminal complaint shows the total corruption and violations that Plaintiff is subjected to by law enforcement and by local state and federal actors while Mr. Berman has been the United States Attorney for the Southern District of New York.

102.   Mr. Berman's *Reply Memorandum in Further Support of Motion to Dismiss,* filed February 14, 2019 (Document No. 21) in <u>*Brady v.* *Berman*</u>, 18-CV-8459 (VEC) shows the U.S. Attorney returned to again

arguing that the filing injunction could be used to prevent Plaintiff from filing a complaint with the U.S. Attorney.

103.   Magistrate Judge Moses's *Report and Recommendation,* and Judge Caproni's September 18, 2019 decision must be unconstitutional because no court can make a determination to deprive any citizen of a guaranteed First Amendment right to file a criminal complaint seeking redress of a grievance.

104.   In Mr. Berman's June 13, 2019 letter (Exhibit 4), Ms. Doud does not dispute the criminal deprivation of his civil duties, and admits that performing his civil obligations would not be "fruitful for him personally."

## THE THIRTEEN YEAR-LONG AIR RIGHTS CIVIL CONSPIRACY THAT GREENBERG TRAURIG ATTORNEYS ORCHESTRATED

105.   The rest of the *Complaint* shows three other times where Mr. Berman's Greenberg Traurig Partners used their control over the New York Courts to have them repeatedly do their bidding and repeatedly engage in unlawful and unconstitutional conduct so that no one is ever held accountable for the retaliatory Civil RICO and Civil Conspiracies against Plaintiff.

**2007-2010**

106.   On October 24, 2006, James H. Brady and his wife Jane Brady purchased the most valuable commercial co-op apartment in New York City at the time because it included 190,000 square feet of air rights pursuant to the 2005 creation of the Hudson Yards District of Manhattan, and pursuant to the Seventh Paragraph Footnote to the Schedule of Units in the 1980 Amended Offering Plan.

107.   The Seventh Paragraph Footnote to the Schedule of Units reads as follows:

> "Seventh Paragraph-NEW- The 12th Floor and roof Unit shall have, in addition to the utilization of the roof, the right to construct or extend structures on the roof, or above the same, to the extent that may from time to time be permitted under applicable law."

108.   The Bradys went under contract to purchase the block of shares in 2005.  In that same year, this 12th Floor and Roof Unit became the most valuable commercial apartment in New York City because zoning changed with the creation of the Hudson Yards District, and suddenly, pursuant to the Seventh Paragraph Footnote to the Schedule of Units, the 12th Floor and Roof Unit had a 190,000 square feet of additional development rights appurtenant to the unit for its exclusive use.

109.   In 2006, the Co-op Board had these additional development rights appraised for $44 million by Mr. Berman's fellow partner Deirdre Carson.

110.   In 2006, Extell Development expressed interest in purchasing these additional development rights.  In 2006, the Co-op Board hired a land use attorney named Deirdre Carson, who is a partner at Greenberg Traurig, to negotiate the sale to Extell.  Ms. Carson charges $1000/hour for her services.

111.   Ms. Carson participated in a scheme with the Co-op Board and their attorney Vincent Hanley when they tried to sell the rights they knew were appurtenant to the Brady's Unit without paying them or obtaining a waiver.  A closing date was scheduled for November 2007.  Even when caught by Mr. Brady in October 2007, they continued in their scheme to sell the development rights without a waiver from the Bradys.

112.   When sued in New York State Supreme Court, Ms. Carson and the other law firms involved were originally successful in their plead to allow the sale to take place.  Although Judge Marcy Friedman had no fear in her repeated attempts to rewrite the contract, the attempts were unlawful and were internally inconsistent.

113.   Extell Development initially went along with the fraud scheme but then abandoned that position and demanded their money back from Ms. Carson and Greenberg Traurig because of their breach of contract for stating they could sell the development rights though they were appurtenant to the Brady's apartment.

114.   That the Offering Plan contract was a conveyance for the utilization of the premise's development rights was perfectly understood by the parties to the contract.  Franklin Snitow, Extell's litigation counsel, stated in his "Affirmation for Defendants Extell Dev. Corp.", et al., March 18, 2008, p. 2 ¶ 3 (Index 1.):

> The intent is evidenced in the decision of the original owner of the 12th floor unit to build an 1,800 square foot penthouse on the roof." **Thus, the intent of the Amendment is clear on its face.**" (R: 310).

115.   Similarly, Stanley Kaufman, litigation attorney for the Co-op, stated in "Defendant's Reply Memorandum of Law," April 14, 2008, p.5,

> **The clear intent** was to grant the 12th floor unit owner some latitude in adding **additional space, or structures**, so long as in doing so, the owner did not violate the local building code, **zoning regulations, or other ordinances**.

116.   And further:

> The clear and logical meaning of the added footnote number 7 of the Second Amendment was to grant 12th floor owner some latitude *in adding additional structures*, so long as in doing so, the owner did not endanger anyone else's health or safety or violate the building Code, *zoning laws or any other laws or ordinances*." (*Ibid*. p. 28).

117.   Stanley Kaufman, wrote in his "Affirmation in Opposition to Plaintiff's Motion for Reargument":

> In the early 1980s, the sponsor's principal, Arthur Green, who at the time occupied the 12th floor, constructed a penthouse addition (an addition what was completely illegal at the time, but legalized years later by the co-op [R 759]). In fact, the Bradys alleged in their Amended Complaint that at a time when the Building had no available development rights, Arthur Green "exercised the rights of the 12th floor to build by constructing a 1,800 square foot penthouse on the roof…" (R67 at par. 23, 24).   ***As evidenced by the sponsor's own conduct, paragraph 7 of the Second Amendment was probably designed to give the then owner of the 12th floor (which happened to be the sponsor's principal) the right to build additional space for himself, which he did;*** not to give the owner of the 12th floor unit the benefit of receiving enormously valuable development rights resulting many years later from some then completely unforeseeable future rezoning.

118.   These admission by the attorneys for the Co-op constitute judicial admissions pursuant to New York Law:

> Facts admitted by a party's pleadings constitute formal judicial admissions. Formal judicial admissions are conclusive of the facts admitted in the action in which they are made.   *Zegarowicz v. Rzpatti*, 67 A.D.3d 672, 674-675 (2d Dept 2009).

> "A formal judicial admission dispenses with the production of evidence by conceding, for the purposes of the litigation, the truth of a fact alleged by the adversary." *People v. Brown*, 98 N.Y.2d 226, 232 (2002).

119.   The admissions made by Mr. Kaufman and Snitow prove that there was never a dispute between the parties as to the meaning and intent of the contract provision.  It was Judge Marcy Friedman who created herself a false illusion of a conflict where there was no conflict.

**Extell Offered Plaintiff $2.5 Million to Settle the Case**

120.   In April 2008, Extell Development called James H. Brady and expressed their disgust at the unlawful conduct of Deirdre Carson and the Co-op in this scheme and offered the Bradys $2.5 million to waive their rights to the development rights.

121.   At the May 6, 2008 settlement talks, Justice Friedman ordered Extell to take that offer off the table and replace it with a $500,000 by the Co-op Board, and stated that Mr. Brady "would be sorry" if he did not take the offer.

122.   Unable to obtain title insurance on the air rights due to the Brady's pending claims, Extell gave Owners Corp. an ultimatum to either resolve the claims or terminate the sales contract.  In a May 12, 2008 letter (Exhibit 10), Extell's attorney, Gita Gandhi, wrote to Deirdre Carson:

> As you know, the Closing under the referenced Contract was scheduled for a time of the essence Closing on November 23, 2007. As a result of the claims made by James and Jane Brady against Seller, Seller was unable to deliver title to the Excess Development Rights in accordance with the terms of the Contract on such date and as such, Developer was forced to adjourn Closing on the parties'

assumption that there would be a quick resolution of such claims. Unfortunately, the claims are still not resolved.

The letter sets a new closing date of May 23, 2008 by which time Owners Corp. must deliver clean title or else:

Seller shall then direct Escrow Agent to return the Deposit Monies to Developer, and upon Developer's receipt of the Deposit Monies, the Contract will be deemed terminated and of no further force or effect.

123.    In her May 22, 2008 response to the letter (Exhibit 11) from Extell's attorney, Mr. Berman's fellow partner Deirdre Carson, does not deny the validity of the Brady's claim.  Rather, she says that it was not a precondition to the closing of the sale that Owners Corp. deliver clean title.

We do not agree that our client is in breach of its obligations with respect to the delivery of the property set forth Section 7.1 of the Contract.  There is no longer any *lis pendens* or temporary restraining order in effect that would prohibit the transfer of title or would preclude a title company from issuing a development rights endorsement in the form annexed to the Contract with respect to the Declaration, the ZLDA and the transaction contemplated by the Contract.

Representatives of Extell have told us that they would be able to obtain the requisite title insurance at a closing under the Contract; however, Extell's lenders would not agree to fund the purchase while the litigation between the Coop and Mr. Brady remains pending. Since it is not a condition to closing that the Coop satisfy Extell's lenders, there is no breach under Section 7.1 of the Contract and the Coop remains ready, willing and able to close. (…)

In the alternative, the Coop is prepared to leave the Contract in effect and await the outcome of the litigation, so that your lender will have the comfort it seeks.

124.   Mr. Brady declined the Co-op's offer and Extell soon after returned their deposit and abandoned the deal once they learned the Co-op could not transfer clear title, meaning Mr. Brady was successful in preventing the sale of the air rights to Extell, which had been the purpose of his litigation, which means he did not "lose" the 2008 suit against Extell and the Co-op Board.

125.   Mr. Brady was successful since the primary purpose of the litigation effort was to prevent the sale of the air rights appurtenant to his apartment from being sold to Extell Development.

126.   This fact is fully admitted to by the co-op litigation counsel, Stanley Kaufman, in a subsequent Affirmation in opposition to *Appellant's Motion for Resettlement and/or Clarification*, April 2, 2013, Index No. 603741/2007.

> "At the time that the Bradys commenced this law suit in 2007, Owners Corp. was in contract to sell a portion of its transferable development rights to an entity affiliated with Extell Development Company ("Extell"). While the parties' respective motions for summary judgment were pending, Extell terminated the contract based upon its assertion that Owners Corp. was unable to deliver title to the development rights free and clear of all claims."

**127.**   The above admissions prove that the whole exercise of litigating was a sham.  It came down to how corrupt the court would be for the benefit of Greenberg Traurig.

**Justice Friedman's July 2, 2008 Decision**

128.   On July 1, 2008, Justice Friedman held a phone conference with my attorney and the attorneys for Extell and the Co-op in which she said she was going to grant the Co-op summary judgment.

129.   The very next day, on July 2, 2008, Margaret Dale of Proskeur Rose, Plaintiff's then attorney, wrote Justice Friedman urging her not to abuse her power and act unlawfully:

> No authority, whether statutory or precedential, allows a court to ignore or overrule clear and unambiguous terms in an offering plan.  In this case, the Court cannot ignore that the new 7th paragraph of the Second Amendment further describes what is included as part of the 12th Floor and Roof Unit.  The Court cannot ignore that all of the rights to the space above the Building's roof belong to, and is part of, the 12th Floor and Roof Unit. The rights to all of the space above the Building's roof has been conveyed to the 12th Floor and Roof Unit **to the extent that is "permitted by applicable law"** – not just the 25,000 square feet that the Defendant Cooperative Corp. reserved for itself.  Such language was inserted into the Offering Plan for a reason, and none of the Defendants presents any alternative meaning to the plain language.  No authority, whether statutory or precedential, allows a co-op to seize part of a shareholder's unit without consent.  **No authority, whether statutory or precedential, allows a court to completely disregard multiple experts' undisputed testimony that states that the proposed sale to Extell violates and destroys Plaintiff's rights.**

130.   Notwithstanding the absence of any legal authority or rationale, Justice Friedman on July 2, 2008 issued the first Supreme Court decision

rewriting Mr. Brady's contract. Justice Friedman first states in the July 2, 2008 decision that:

> The threshold issue on these motions is therefore whether this paragraph should be construed as conferring air rights upon plaintiffs.

> It is undisputed that air rights existed and were well known in the real estate community in 1980 when the Offering Plan was amended to add paragraph 7. Had the parties, who were sophisticated business people, intended to convey or reserve air rights to the 12th floor and roof units, they could easily have expressly so provided.

> Indeed, plaintiffs themselves do not take the position that they are the owners of the air rights. They clarify that they "do not contend that the 12th Floor and Roof Unit can sell or transfer these [TDR] rights to adjoining landowners, but do contend that the Cooperative Corporation cannot sell or transfer these rights to anyone without plaintiffs' consent." (Brady Aff. In Support of Cross-Motion ["Brady Aff."], ¶ 51.)

> While plaintiffs thus do not dispute that the Cooperative Corporation is the owner of the TDRs, they contend that they "control" the development rights by virtue of paragraph 7 of the amended Offering Plan.

> The court finds that paragraph 7 is not ambiguous, and that it gives plaintiffs the right to build structures on or above the roof but does not convey air rights to plaintiffs.

131.   Justice Friedman's decision is deliberately vague and created a controversy that did not exist. Prior to the decision, the parties agreed that the Offering Plan conveyed the utilization of the air rights to the 12th Floor and Roof Unit.

132.   By the time Justice Friedman issued the July 2, 2018 decision, Extell had already backed out of the deal because they could not get the Waiver from Plaintiff.

133.   First Justice Friedman affirms the conveyance of the utilization of the air rights to the 12th Floor and Roof Unite when she states that the Offering Plan "gives plaintiffs the right to build structures on or above the roof." That is the definition of air rights.

134.   But on the other hand, Justice Friedman disingenuously turns the issue into who owns the air rights, which, as the decision states, Plaintiff had never argued.

135.   Plaintiff has always maintained that the Seventh Paragraph Footnote does not convey ownership of the air rights, but clearly conveys the exclusive right to utilize the air rights.

136.   The only way Justice Friedman could come to this conclusion was to disregard my undisputed expert testimony and replace the words "to the extent that may from time to time be permitted under applicable law," with the words "*BUT* does not convey air rights to plaintiffs" in a contract she had just ruled unambiguous.

137.   Justice Friedman's corruption of the original contract created an internal inconsistency in the decision, since the right to construct or extend

structures on or above the roof is the exact definition of air rights.  As the court stated:  "it gives plaintiffs the right to build structures on or above the roof."

138.   The only thing Extell could do with the court's July 2, 2008 decision was use it to prove that the Co-op was in breach of contract for not disclosing that the premise's air rights had already been conveyed to and reserved for the exclusive use of the 12th Floor and Roof Unit.  Extell subsequently got its deposit back from the Co-op and walked away from the deal.

139.   Justice Friedman also states that had the parties "intended to convey or reserve air rights to the 12th floor and roof units, they could easily have expressly so provided."

140.   The parties did in fact expressly state so, as evidence from the admissions made by opposing counsel.

141.   Franklin Snitow, Extell's litigation counsel, stated in his "Affirmation for Defendants Extell Dev. Corp.", et al., March 18, 2008, p. 2 ¶ 3 (Index 1.):

> The intent is evidenced in the decision of the original owner of the 12th floor unit to build an 1,800 square foot penthouse on the roof." **Thus, the intent of the Amendment is clear on its face.**" (R: 310).

142.   Similarly, Stanley Kaufman, litigation attorney for the Co-op, stated in "Defendant's Reply Memorandum of Law," April 14, 2008, p.5,

> **The clear intent** was to grant the 12th floor unit owner some latitude in adding **additional space, or structures**, so long as in doing so, the owner did not violate the local building code, **zoning regulations, or other ordinances**.

143.   And further:

> The clear and logical meaning of the added footnote number 7 of the Second Amendment was to grant 12th floor owner some latitude _in adding additional structures_, so long as in doing so, the owner did not endanger anyone else's health or safety or violate the building Code, _zoning laws or any other laws or ordinances_." (_Ibid_. p. 28).

144.   Stanley Kaufman, wrote in his "Affirmation in Opposition to Plaintiff's _Motion for Reargument_":

> In the early 1980s, the sponsor's principal, Arthur Green, who at the time occupied the 12th floor, constructed a penthouse addition (an addition what was completely illegal at the time, but legalized years later by the co-op [R 759]). In fact, the Brady's alleged in their Amended Complaint that at a time when the Building had no available development rights, Arthur Green "exercised the rights of the 12th floor to build by constructing a 1,800 square foot penthouse on the roof…" (R67 at par. 23, 24). **_As evidenced by the sponsor's own conduct, paragraph 7 of the Second Amendment was probably designed to give the then owner of the 12th floor (which happened to be the sponsor's principal) the right to build additional space for himself, which he did_**

145.   The point with Mr. Kaufman's admission above is that it didn't matter what Justice Marcy Friedman said or didn't say, because the

contract is the contract, and no matter what Justice Marcy Friedman says, she's not allowed to re-write the contract to void what it said on its face.

146.   Having ruled the contract was unambiguous, Justice Friedman had a duty to enforce the contract as written.  Instead, Justice Friedman has the habit of not admitting the meaning of their own words.

147.   Justice Friedman had no problem doing any of this to a white Catholic as she would never be held accountable for her crimes.  Mr. Berman, the Greenberg Traurig shareholder and U.S. Attorney, would ensure that she remain on the bench collecting a salary and job security, pension, and health care, as she destroyed the life of Plaintiff and his family.

148.   The corrupt Mr. Berman and his corrupt predecessors have permitted Justice Marcy Friedman to remain on the bench and continue to be as corrupt she likes 13 years after it was proven that she repeatedly re-writes contracts, and gets to be as corrupt as she wishes.

149.   This is not equal protection under the law, when somebody is blatantly abusing her powers and stealing through her powers because she knows local, state, and federal law enforcement will do nothing about it.

150.   It is not equal justice when the victim is ignored, and in this case, when local, state, and federal law enforcement actively participates in covering the crime and actively litigates against the victim as this complaint proves was done over and over again.

**Plaintiff's *Motion for Reargument* and Justice Friedman's March 13, 2009 Decision**

151.   In October 2008, Plaintiff made a motion for reargument to clarify and resettle Justice Friedman's inconsistent and contradictory July 2, 2008 decision.

152.   Plaintiff did not lose the litigation pursuant to Judge Friedman's July 2, 2008 decision.  The decision was nonsensical and internally inconsistent.  That was Plaintiff seeking a re-argument.

153.   During the October 16, 2008 Oral Arguments, the court had acknowledged reading a *New York Post* article from the previous day, October 15, 2008, showing that Extell Development Corp. abandoned the purchase of the air rights as a result of their inability to obtain a waiver from Mr. Brady.

154.   *The New York Post* article also included an independent expert who verified that the Seventh Paragraph Footnote was a broad grant of rights to Plaintiff's unit, and that at the very least a waiver would be needed.  The article is printed in full below:

> The site of **James Gandolfini**'s wedding reception and the premiere party for the television series "Lipstick Jungle" is now fighting for its rights – air rights, that is.

**Jim Brady**, owner of the rooftop entertainment space, Studio 450 in Hudson Yards, is embroiled in a legal battle with his commercial co-op and Extell Development over who owns the penthouse unit's development rights.

The tussle has already led Extell to back out of its $11 million deal with the co-op and halt work next door on what was to become a nearly 700,000-foot, snazzy glass tower at 360 Tenth Ave. between West 30th and West 31st streets.

Designed by architect **Steve Holl**, the CoStar listing pitched by Newmark Knight Frank shows a sleek angular skyscraper hovering just south of the stubby 450 W. 33rd St. that houses the Daily News and the Associated Press.

Holl's offices, coincidentally, are located right under Studio 450.

The Extell building was to have a base of 140,000 feet of offices, a hotel and 155 luxury condominiums along with a connection to the hip and coming High Line.

The optimistic Web listing now says the ground-breaking will be in the first quarter of 2011.

Brady said that prior to declaring the co-op plan effective in 1980, the sponsor inserted into the second amendment of the offering plan a footnote to the schedule of units that read, "The 12th floor and roof unit shall have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law."

Additionally, Brady's formal co-op proprietary lease states that his block of shares gives him possession of the unit as described in the offering plan.

When he bought the unit for $5 million in 2005, the building was completely developed and the rights, other than to use the roof as is, were essentially worthless.

But when the Hudson Yards rezoning plan was finally instituted that year, the building ended up with 38,500 feet for as-of-right development.

Extell contracted with the co-op board to buy those rights along with the co-op's ability to purchase more development rights through a zoning lot merger.

That effectively permitted Extell to buy an additional 131,500 feet in bonus rights from the city to construct its tall building next door.

But Brady and his wife **Jane** stepped in and said, "Not so fast!"

Brady says the co-op corporation doesn't own the roof unit and has no right to sell the development rights conveyed to him through the offering plan and his proprietary lease.

"I'm sitting on a building lot that starts 13 stories up," Brady said. "I want to use these rights. This is a strong, commercial building and can support the construction. I don't want a huge towering building over me. Studio 450 is known for its views."

Last year, courts denied motions to stop the development and on July 2 State Supreme Court Justice **Marcy Friedman** gave a summary judgment to the co-op.

Brady hired a new attorney, **John Siegal** of Baker Hostetler, who will re-argue the case tomorrow while an Appellate Division conference is scheduled for Friday.

"Our position that this question can be determined from the plain language of the property description and the law," said Siegal. "If it

cannot, then there should be discovery and the sponsor, and any other number of people may have testimony."

Meanwhile, because of the lawsuit, Extell could not close on the contract by June 30, 2008, to meet the old 421a tax program deadline, so it backed out of the project, and the co-op returned its deposit.

Extell still owns the land next door and has a $28 million mortgage from Barclay's.

**Gary Barnett**, Extell's CEO, couldn't be reached for comment.

**Stuart Saft** of Dewey & LeBoeuf, who represents many co-ops but is not involved in this matter, said Brady has a right to at least some of the new development rights and as a result the co-op should have at the very least obtained a waiver.

"The language [in the second amended offering plan] is so broad it would cover any kind of addition to the top of the building, but I don't think it gives Brady the rights to take those development rights to trade them to an adjacent property," Saft said.

155.   On the very next day, October 16, 2008, there was an Oral

Argument pertaining to a Motion to Reargue.

156.   During the Oral Argument, Judge Friedman acknowledged

reading the article from the day before in the New York Post.

157.   Since Judge Friedman acknowledged read the article, she saw

that another expert confirmed the undisputed fact that the Seventh Paragraph

Footnote was a broad grant of rights to Plaintiff's unit, and at the very least a

Waiver from the Bradys would be needed.

158.   Notwithstanding the clearly expressed intent of the parties, the expert opinion, and the fact that Extell had abandoned the deal because they could not obtain a Waiver from Plaintiff, Justice Friedman issued another corrupt decision on March 13, 2009.

159.   Justice Friedman made it a point to put all her judicial powers into making an ORDERED, ADJUDGDE and DECLARATION decision in which she ruled:

> "pursuant to paragraph 7, plaintiffs, have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be given under applicable law. _Provided that_: Nothing herein shall be construed as holding that plaintiffs have the right to use all or any part of the TDRs in connection with such construction or extension."

160.   This decision proves conclusively the corruption and retaliation of Justice Marcy Friedman against the Catholic litigant.  It was pure evil and hate.  The decision should be considered a Hate Crime against a white Catholic litigant.

161.   Justice Friedman had ruled herself that the paragraph was "not ambiguous," yet on three different occasions she rewrote the contract to void what is said on its face.

162.   As this was a different interpretation than the other, Justice

Friedman was not even consistent in her corruption.  After ruling the

contract unambiguous, she rewrote the Seventh Paragraph Footnote.

163.   The Seventh Paragraph footnote to the Schedule of Units reads

as follows:

> "Seventh Paragraph-NEW- The 12th Floor and roof Unit shall have, in
> addition to the utilization of the roof, the right to construct or extend
> structures on the roof, or above the same, to the extent that may from
> time to time be permitted under applicable law"

164.   Justice Friedman first rewrote Plaintiff's Offering Plan in the

July 2, 2008 decision, in which she wrote:

> The court finds that paragraph 7 is not ambiguous, and that it gives
> plaintiffs the right to build structures on or above the roof but does not
> convey air rights to plaintiffs.

165.   Justice Friedman's March 13, 2009 Decision quoted the

Offering Plan, which means Judge Friedman knew what she was doing, but

then added an arbitrary, judicially-created limitation on the contract that

voided its rights:

> "pursuant to paragraph 7, plaintiffs, have, in addition to the utilization
> of the roof, the right to construct or extend structures upon the roof or
> above the same to the extent that may from time to time be given
> under applicable law. _Provided that_: Nothing herein shall be
> construed as holding that plaintiffs have the right to use all or any part
> of the TDRs in connection with such construction or extension."

166.   It should be noted that in each case, Justice Friedman added her own words to reverse what she said in the same decision.

167.   Justice Friedman was well aware that her prior internally inconsistent decision was rejected by Extell Development Corp. and its title insurance company, Commonwealth Title, who abandoned the deal they were unable to obtain clear title without a Waiver from the Bradys.

168.   Any lay person fully understands that no one is permitted to rewrite a contract to void what it says on its face.  To this day, and for the benefit of Mr. Berman and his Greenberg Traurig partners, no one acknowledges anything unlawful about Judge Friedman's behavior, who remains on the bench free to be as corrupt as she wishes.

## The Appellate Division, First Department Judges Retaliated Against Plaintiff on Behalf of Justice Friedman

169.   At this point Justice Friedman made two separate interpretations of the Seventh Paragraph Footnote, and therefore Plaintiff appealed both the July 2, 2018 and the March 13, 2019 decisions.

170.   Also, after this latest stunt by Judge Friedman, Brady made multiple complaints to the Commission on Judicial Conduct, multiple law enforcement agencies, Chief Administrative Judge Ann Pfau, Chief Court of Appeals Judge Jonathan Lippman, and others.  The website

www.bullyjudges.com details all of this, and shows the only one who responded was Ann Pfau.

171.   Many of the Appellate Division judges at the First Department came from the commercial division where Justice Marcy was from, and knew about complaints Brady was making about her.

172.   In retaliation, these judges played their own games in their 2, one sentence long decisions.  The telltale signs of a corrupt decision are that they tend to be shorter than 2 two sentence long decisions.  In this case, Brady was stuck with 2 two sentence long decisions.  Two sentences pertained to its ruling in the March 13, 2009 decision and two sentences were made pertaining to the July 2, 2008 decision.

173.   Although the Appellate Divisions two decisions on February 11, 2010 were only two sentences long each, they were filled with inconsistencies and irrelevant statements that were never disputed.  For example, while speaking of the March 13, 2009 decision, the court declares that 450 West 31st Street is the "owner of the development rights", but as Judge Marcy Friedman acknowledged, in her July 2, 2008 decision, that was never the issue.

174.   Judge Friedman's July 2, 2008 decision shows that Plaintiff never asserted he owned the development rights:

Indeed, plaintiffs themselves do not take the position that they are the owners of the air rights. They clarify that they "do not contend that the 12th Floor and Roof Unit can sell or transfer these [TDR] rights to adjoining landowners, but do contend that the Cooperative Corporation cannot sell or transfer these rights to anyone without [plaintiffs'] consent."

175.    The Appellate Division First Department did not affirm the decisions of Judge Marcy Friedman in their February 11, 2010 Decision.

176.    The Appellate Division First Department February 11, 2010 Decision did not affirm Judge Marcy Friedman's March 9, 2009 decision as is shown by doing a side by side comparison.

177.    The March 13, 2009 decision stated:

"pursuant to paragraph 7, plaintiffs, have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be given under applicable law. *Provided that*: Nothing herein shall be construed as holding that plaintiffs have the right to use all or any part of the TDRs in connection with such construction or extension."

178.    The Appellate Division, First Department February 11, 2010 Decision took off the whole provision that Judge Friedman unlawfully added.

Pursuant to Paragraph 7, that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.

179.   The fact that the Appellate Division, First Department took out the words added by Justice Friedman means they reversed her decision but without acknowledging it.

180.   In removing Justice Friedman's additional provision, the Appellate Division reversed Justice Friedman's March 13, 2009 decision, whether the Appellate Division acknowledged that or not.

181.   It cannot be argued that the Appellate Division affirmed her decision when they removed the entire provision Justice Friedman had added.

182.   The words "plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law," means Plaintiff has the exclusive utilization of the premises permissible development rights in addition to having the exclusive utilization of the 12th Floor and Roof.

183.   Those words that the Appellate Division, First Department used means the air rights are appurtenant to Plaintiff's units and the Waiver would be needed in order to transfer those rights.

**The New York Court of Appeals**

184.   Plaintiff filed a *Motion for Leave to Appeal to the Court of Appeals* on June 28, 2010.

55

185.   Plaintiff went to the Court of Appeals seeking a clear, definitive determination from the Court of Plaintiff's rights pursuant to the Appellate Division, First Department February 11, 2010 Decision.

186.   There is no language whatsoever in the February 11, 2010 Decision saying that the Co-op can sell the premise development rights without a written Waiver from Plaintiff.

187.   Of course it must be implied that rights that are contractually appurtenant to Plaintiff's 12th Floor and Roof Unit apartment cannot be sold without a written waiver.

188.   The two two-sentence long decisions say two different things so plaintiff was seeking clarification.

189.   The Co-op opposed clarification because they know the decision could only be clarified against them.  If the Co-op believed it was correct, it would have joined Plaintiff in seeking clarification.

190.   The Court of Appeals wrote a letter to James Brady, dated August 16, 2010, stating, "The Court is considering your motion for leave to appeal in the above action."  The letter also asked about the status of Owners Corp.'s counterclaims against the Bradys.

191.   Four days later, on August 20, 2010, the attorney for Owners Corp., Stanley Kaufman, wrote to the Court of Appeals to say that Owners

Corp.'s counterclaims against the Bradys "have been abandoned, and although it appears that they were never technically disposed of, I am prepared to sign a Stipulation on behalf of Owners Corp. discontinuing the counterclaims."

192.   The Court of Appeals sent a second letter asking to see a copy of the stipulation cancelling all counterclaims against the Bradys.

193.   This led to a Stipulation between Plaintiff and Owners Corp. signed on September 10, 2010 in which Owners Corp. discontinued all of their counterclaims against the Brady's, with prejudice, and Plaintiff did not relinquish any of their claims against Owners Corp.

194.   After receiving the Stipulation from October 14, 2010, the Court of Appeals denied the Brady's *Motion for Leave to Appeal*.  However, it was the court's consideration of the case that prompted Owners Corp. to drop their counterclaims against the Bradys.

195.   The Court of Appeals' denial of Plaintiff's *Motion for Leave to Appeal* left the Appellate Division, First Department February 11, 2010 Decision as a "Final" Decision, which included words that could only be construed as giving Plaintiff's 12th Floor and Roof Unit the exclusive right to the utilization of the air rights owned by the co-op corporation that were appurtenant to Plaintiff's Unit.

196.   This was Plaintiff's argument since day one.

197.   It is extremely rare for the Court of Appeals to grant leave to appeal when it was denied by the Appellate Division.  The reason they broke from this standard precedent is because the February 11, 2010 decision is illogical and internally inconsistent, and left Plaintiff exposed.

198.   Plaintiff's website BullyJudges.com goes through this history with specificity.

199.   To avoid any exploitation of the confusion in the February 11, 2010 decision, Plaintiff filed a Motion for Reargument on December 2, 2010 asking the judges of the Court of Appeals to make a clear and unequitable determination on the meaning of the Offering Plan contract. (Exhibit 12):

> James H. Brady submits this reply affidavit in support of Appellant Brady's motion for reargument.
>
> A reading of Stanley Kaufman's *Affirmation in Opposition to Appellant James Brady's Motion for Reargument* shows that according to the Co-op, the only issue between the parties comes down to the interpretation of a one-sentence paragraph found in the amended footnotes to the schedule of units of the Offering Plan for 450 West 31st Owners Corp.  I agree.
>
> In paragraph three of Kaufman's Opposition Motion he asserts that the Seventh Paragraph footnote "makes no mention of developments rights, air rights, or the right to add floor area."  This is the Co-op's only assertion, and it is not supported by any legal authority.
>
> ………
>
> I ask this Court to settle the agreement within the meaning of the constitution by answering the one single question listed below:

Does the Seventh Paragraph Footnote convey development rights to the 12th Floor and Roof Unit?

I thank this honorable Court for the time you have given me.  I also want this honorable Court to know that despite my repeated feelings of disappointment in the fairness of New York State Judicial System, I have never given up hope that the New York Judicial System will protect me and my rights from being seized by the Co-op Corporation.

200.   The Court of Appeals Denied answering this Yes or No question since they know the answer was Yes.

201.   This was Jonathan Lippman's Court.  It was unconstitutional and unlawful what the Court of Appeals did.  Justice Friedman created a controversy that was not present, and the Court of Appeals refusal to answer Yes to the clarification of the decision led directly to the loss of Plaintiff's commercial co-op apartment, the $70-90 million worth of air rights contractually appurtenant to Plaintiff's 12th Floor and Roof Unit, and sanctions of over $500,000 Plaintiff had to pay the very same Greenberg Traurig attorneys who stole the air rights.

202.   The Janet DiFiore Court that followed Mr. Lippman was equally corrupt and retaliatory toward Plaintiff for his exposing of the corruption of the New York State Courts.

203.   As this *Complaint* shows, eight years after the Lippman Court refused to answer this question, Chief Justice Janet DiFiore and the NYS Court of Appeals have still not made a determination on this issue.

**IN 2012, GREENBERG TRAURIG AND CO-OP BOARD DID THE SAME THING AGAIN AND TRIED TO SELL THE AIR RIGHTS WITHOUT A WAIVER FROM THE BRADYS**

204.   In 2011, Sherwood Equities purchased the lot formerly owned by Extell, and through a realtor sent Plaintiff a message saying that they "did not want to end up like Extell Development," and that they "knew they had to pay the piped piper." Sherwood and their attorneys knew that Plaintiff had prevailed in the litigation against Extell and that the development rights were appurtenant to Plaintiff's Unit.

205.   Plaintiff later learned that Sherwood changed that position and that they determined that they would not pay anything for the waiver they requested, and instead they would argue that Plaintiff had lost the prior litigation, and argue that *res judicata* and collateral estoppel barred him from any claims against them for consummating a transaction for the rights appurtenant to Plaintiff's unit without a waiver.

206.   Plaintiff sent Brian Nelson of Sherwood Equities an email on March 16, 2012 warning Sherwood not to try to defraud Plaintiff of his

affirmed rights and to not make the false argument that Plaintiff lost the

prior litigation.  The email stated in pertinent part:

> When the lot was first purchased Mr. Katz called Brian Kanarek and said that he was not interested in finding himself in a similar situation that Extell did and said that he knew he had to "pay the pied piper". This means that according to his own words, at that time Mr. Katz acknowledged that he would need a waiver of my Unit's rights in order for any transfer of the premises permissible development right to be sold to his company.
>
> Since that time I was told by Brian Kanarek that Mr. Katz position changed and that he had taken the position that I lost the litigation and that he does not need a waiver of my rights in order for his company to purchase the air rights given to the parcel of land owned by 450 West 31st Street Owners Corp.  I believe Brian said you also took that position. This flip was upsetting to me and I hope Mr. Katz and you switch back to his original position where he acknowledged that he would need a waiver of my Unit's rights before the Co-op could transfer any of the premise permissible development rights to the adjacent building lot owned by Sherwood.
>
> This new position meant that Mr. Katz went from admitting that he needed to "pay the pied piper" to not needing to "pay the pied piper" Of course I know you will be sharing this email with Mr. Katz and I do hope that his position and yours will go back to the position of acknowledging the need to have my wife and I waive the rights given to our Unit in order for Sherwood to purchase any air rights from 450 Owners Corp.

207.   In response to this letter, Plaintiff received a letter from Stanley

Kaufman, the co-op's litigation attorney, on April 12, 2012 (Exhibit 13),

along with a Waiver (Exhibit 14) for Plaintiff and his wife to sign.  The

letter stated, among other things:

"Although the litigation resulted in the cancellation of a contract to sell 450 West's excess development rights at the time, all of the issues that you raised regarding the ownership, control and right to dispose of the building's excess development rights were resolved by the New York Courts in favor of 450 West."

208.   The lunacy of this is that Plaintiff's only objective was to prevent the sale to Extell, which means that Plaintiff won the prior litigation since enjoining the sale was his only objective.

209.   Mr. Kaufman's letter proves that Greenberg Traurig partner Deirdre Carson created another civil conspiracy and Civil RICO scheme: the new scheme was to make the false arguments that the Co-op corporation won the 2008 litigation by asserting that "all of the issues that you raised regarding the ownership, control and right to dispose of the building's excess development rights were resolved by the New York Courts in favor of 450 West."

210.   This was their new scheme, to make this false argument, which they knew to be false based on the February 11, 2010 Appellate Division decision that give Plaintiff the exclusive utilization of the premise's air rights.

211.   Another part of the madness is that Mr. Kaufman, the Co-op, and the Greenberg Traurig attorneys are asserting that if Plaintiff waives his rights for free, they will acknowledge that he had those rights.

212.   After Mr. Brady refused to waive his right to the air rights for free, the Co-op Board nevertheless closed the sale with Sherwood in secret for $11 million and distributed a small amount of money to the shareholders.

213.   Sherwood Equities promptly sold the property along with the 173,000 square feet of stolen air rights, off market, to Frank McCourt in September 2013 for $167 million.

214.   The New York State Appellate Division, First Department in a February 11, 2010 Decision affirmed that the development rights were appurtenant to the Brady's Unit:

> "Pursuant to paragraph 7, that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs."

215.   The reason Plaintiff filed a law suit in 2013 is because the express rights that the Appellate Division, First Department February 11, 2010 decision said Plaintiff had were violated by the sale of the air rights to Sherwood without a Waiver from the Bradys.

216.   The suit was not about the intent or meaning of the Offering Plan.  All the parties have always understood the meaning of the contract.

217.   The Zoning Lot Development Agreement between Sherwood and the Co-op stipulates that Plaintiff had waived his rights to the air rights

appurtenant to his 12th Floor and Roof Unit.  This was Fraud on the part of the Co-op, Sherwood Equities, and their lawyers.

218.   Clause 8.1 of the ZELDA states that "Owner" waives all objections and subordinates their interests in the newly created Zoning Lot, which is completely untrue as Plaintiff and his wife refused to sign the Waiver.

219.   The agreement further violates the February 11, 2010 decision and Plaintiff's Offering Plan:

8 Additional Parcels; Subdivision.

8.1 Owner hereby consents, and all future parties in interest to the Zoning Lot, are deemed hereby to have consented to, waived objection to, and to have subordinated their respective interest in the Zoning Lot (i) to the merger of one or more additional parcels which are contiguous with Zoning Lot for a minimum of ten (10) linear feet ("Additional Parcels") with the Zoning Lot, (ii) to any and all future enlargements to, and subdivisions of, any zoning lot which includes Owner's Land, (iii) to the transfer, utilization or redistribution by Developer of any Developer's Allowable Development Rights to such Additional Parcels, (iii) to any subsequent sale or transfer by Developer of any portion of Developer's Allowable Development Rights, and (iv) to any and all instruments and agreements, including any zoning lot and development agreements, entered into in connection with the foregoing, provided that, such merger, enlargement, subdivision, instrument or agreement does not diminish Owner's rights to utilize Owner's Allowable Development Rights.

**In November 2013 Plaintiff filed two lawsuits against those who violated the rights affirmed to be contractually appurtenant to Plaintiffs 12th Floor and Roof Unit**

220.   In November 2013, Mr. Brady filed two lawsuits against for tortious interference with contract; breach of contract; breach of covenant of good faith; negligent misrepresentation; slander of title; gross negligence; and prima facie tort, among other causes of action.

221.   The defendants in the case were the following:  Deirdre A. Carson, Esq. of Greenberg Traurig, LLP; Vincent Hanley, Esq. of Hanley & Goble; Stanley Kaufman, Esq. of Kaufman Friedman Plotnicki & Grun LLP; Frank McCourt & McCourt Global LP; Chicago Title Insurance Co.; 450 West 31st Owners Corp.; Jeffrey Katz – CEO of Sherwood Equities, Inc.; Long Wharf Real Estate Partners; and Dennis W. Russo, Esq. of Herrick Fienstein LLP.

222.   The Complaint sought compensatory relief against defendants for unjust enrichment, tortious interference with contract, conspiracy to defraud, aiding and abetting the breach of fiduciary duty, and slander of title.

223.   Part of the scheme was to go back to the Commercial Division Justice Friedman who has *carte blanche* to be corrupt and will along with the Greenberg Traurig attorneys.  Justice Friedman recused herself and the case went to Justice Shirley Kornreich.

**The Defendants Strategy was to Again Use Greenberg Traurig's Influence Over the Courts to get Away with Their Civil RICO and Civil Conspiracy**

224.   The Appellate Division, First Department, February 11, 2010

Decision clearly affirmed Plaintiff's rights under the Offering Plan:

> Pursuant to paragraph 7, that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.

225.   Plaintiff had gone to court to seek damages for the violation of the Appellate Division February 11, 2010 decision.

226.   The attorneys knew they needed a Waiver and violated the express words of both the February 11, 2010 decision and the Offering Plan contract when they closed without a Waiver.

227.   Plaintiff's suit also sought compensation for the easement created over his property.

228.   While these were clearly the issues of the case, the Greenberg Traurig attorneys created a conspiracy to have all the lawyers and law firms attack Plaintiff in unison with false and irrelevant claims and personal attacks.

229.    The strategy of the Greenberg Traurig attorneys was to steer the case back to Justice Friedman and the Commercial Division of the Supreme Court, where Greenberg Traurig has ties.

230.   In their motions to dismiss, the attorneys falsely asserted:  1) that Brady lost the prior litigation; 2) that the prior litigation was about "ownership" of the premise's development rights; 3) that collateral estoppel barred Plaintiff's claims; 4) that the creation of Brady's websites proved that he lost the prior litigation; and 5) they called for retaliation for the creation of the website.

**Below are excerpts from the attorneys' motions to dismiss making false claims and calling for retaliation against Mr. Brady proving this was their strategy**

**John R. Goldman** (Rep. Jeffrey Katz, Long Wharf, Dennis Russo, and *Pro se*) - Affirmation of in Support of Moving Defendant's Motion to Dismiss the Complaint, 12/30/13.

Annexed hereto as Exhibit H is a true copy of Plaintiffs website http://thecriminaljusticesystem.com/Bull/Home.html

**John R. Goldman** - Memorandum of Law in Support of Moving Defendants' Motion to Dismiss, 12/30/13, p.2:

"In addition, Plaintiff's allegations are belied by his personal belief (as detailed at http://thecriminaljusticesystem.com/Bull/Home.html that these prior decisions represent "an unprecedented scale of judicial misconduct involving all branches of the New York State Judicial System, including seven justices of the New York State Court of Appeals."  Accordingly, Moving Defendants seek sanctions against

Plaintiff for bringing this knowingly frivolous and harassing action, as well as a direction from the Court enjoining Plaintiff from ever again raising this issue.

Page 11:
"As detailed in Plaintiff's online manifesto of malfeasance, Plaintiff does not actually believe that the decisions rendered in Brady v. 450 West 31st Owners Corp., et al support the claims asserted herein. Rather, Plaintiff accuses Justice Friedman of "deliberately and deceptively rewriting the contract with the criminal intent of voiding the rights that she knew belonged to Brady's Unit."

(Goldman Aff., Exhibit H at p. 13).
Plaintiff goes on to allege that Chief Administrative Judge Ann Pfau "directly violated her duties" by not taking any disciplinary action against Justice Friedman, and similarly accuses the Commission on Judicial Conduct of "conducting themselves as corrupt "bullies" by also declining to take disciplinary action against Justice Friedman. (Goldman Aff., Exhibit H at p. 17).

Plaintiff then directs his ire at the five Appellate Division Justices who rendered the Appellate Division Decision, accusing them of acting with vengeance and with "criminal intentions" by affirming the trial court decisions in retaliation against Plaintiff's re. 26) request for disciplinary action against Justice Friedman." (Goldman Aff., Exhibit H at p.26).

**Mark K. Anesh** (Attorney for Vincent Hanley and Stanley Kaufman) - Attorney Affidavit Submitted in Support of Pre-Answer Motion to Dismiss, 1/15/14, p. 8:

"As a result of the aforementioned decisions rendered in the underlying action, Plaintiff filed a disciplinary grievance against Justice Friedman with the State commission on Judicial Conduct; created a website called www.bullyjudges.com wherein he attacks the justices who ruled against him during the course of the underlying litigation; and filed a disciplinary complaint with the State Commission on Judicial Conduct and the Moreland Commission on Public Corruption against of the aforementioned Justices. A copy of plaintiff's letter to the Moreland Commission is annexed hereto as Exhibit M.

<u>From the Page 8 Footnote</u>:
"In his motion in the Court of Appeals for leave to appeal, plaintiff questioned the integrity of all of the New York State Justices who had ruled against him, by stating: "This case raises many issues pertaining to the honesty and integrity of the individuals that are entrusted to be Judges that determine the fate of human beings and their property."

Page 9 footnote: "On December 6, 2013, plaintiff commenced another action in this Court (Index No. 654226/2013) against, among others, the Chief Executive Officer of Sherwood, and Sherwood's attorneys.

**Jaime R. Wozman**, Memorandum of Law, 1/15/14, p. 10 Footnote:
"Plaintiff has gone so far as to create website, http://www.bullyjudges.com, blasting the judges that rendered the decisions in the underlying action.

**Joseph Augustine** - Memorandum of Law, 2/11/14, p.3:

"Undeterred by the unequivocal language of these six decisions, Plaintiff now contends across his 105-page complaint that the decisions actually hold in his favor, such that the Owners Corp. violated his rights by transferring his TDRs without his permission. Plaintiff knows full well that these decisions held against him-indeed, he has admitted as much in the retaliatory website he launched after losing in the prior action. See www.bullyjudges.com (where Plaintiff accuses New York's Judiciary of an illuminati-style conspiracy to steal his development rights).

Undeterred by the unequivocal language of these six decisions, Plaintiff now contends across his 105-page complaint that the decisions actually hold in *his* favor, such that the Owners Corp. violated his rights by transferring *his* TDRs without his permission. Plaintiff knows full well that these decisions held against him – indeed, he has admitted as much in the retaliatory website he launched after losing in the prior action. *See www.bullyjudges.com* (where Plaintiff accuses New York's Judiciary of an illuminati-style conspiracy to steal his development rights).

Given the misuse of judicial resources presented by this action, Owners Corp. respectfully requests the Court dismiss Plaintiffs' Complaint with prejudice, issue an award of sanctions and enjoin him from relitigating these same issues yet again. (Memorandum of Law on Behalf of 450

West 31st Street Owners' Corp. and Its Directors Motion to Dismiss
Plaintiff's Complaint and For Sanctions, Augustine & Eberle LLP,
February 11, 2014, page 3).

**Herrick Feinstein LLP**, Attorneys for Jeffrey Katz, Long Wharf Real
Estate, and *pro se*
In other words, Plaintiff alleges that Moving Defendants improperly
effectuated the transfer of development rights belonging to Plaintiff
without obtaining Plaintiff's consent. However, this precise issue has
already been litigated and rejected by the courts of this state, which have
repeatedly and unanimously held that Plaintiff does not own these
development rights and no waiver from Plaintiff was required in order to
transfer those rights.

Plaintiff's contrived interpretation of these decisions as somehow
supporting his claims in this action is directly contradicted by a plain
reading of those decisions. Indeed, it is Plaintiff who has blatantly
disregarded no less than six orders of the Courts of the State of New
York by bringing this meritless litigation in order to press a claim that
has been roundly rejected by every court to ever opine in this issue.
Accordingly, the Complaint must be dismissed with prejudice.

In addition, Plaintiff's allegations are belied by his personal belief (as
detailed at
**www.thecriminaljusticesystem.com/Bully/Home.html**) that these
prior decisions represent "an unprecedented scale of judicial misconduct
involving all branches of the New York State Judicial System, including
the seven justices of the New York State Court of Appeals."
Accordingly, Moving Defendants seek sanctions against Plaintiff for
bringing this knowingly frivolous and harassing action, as well as a
direction from the Court enjoining Plaintiff from ever again raising this
issue. (Memorandum of Law in Support of Moving Defendants' Motion
to Dismiss, Herrick Feinstein LLP, December 30, 2013, page 2).

**Steptoe and Johnson LLP**, Attorneys for Greenberg Traurig LLP, and
Deirdre Carson

This belated action by Brady is a transparent attempt to re-litigate the
issues that have been fully litigated by him all the way to the Court of
Appeals. The claims against GT should therefore be dismissed on the

grounds of collateral estoppel. Moreover, even if collateral estoppel does not apply, all of the claims asserted against GT are otherwise legally insufficient and should be dismissed as explained below. (Memorandum of Law in Support of Greenberg Traurig's Motion to Dismiss, January 15, 2014, page 2).

231.   All of the above statements prove a civil conspiracy and Civil RICO.  Simply put, the evidence proves Brady did not lose the prior litigation, and Brady's website BullyJudges.com proves this fact.  Brady was suing because of the fact that all of these lawyers and law firms engaged in a scheme of stealing the rights the February 11, 2010 decision said Plaintiff had after Plaintiff refused to sign the Waiver in April 2012.

**<u>All of the above false arguments made in the attorney's motions to dismiss above collapsed at the March 18, 2014 Oral Argument (Exhibit 15)</u>**

232.   The court started the Oral Arguments with Joseph Augustine, the attorney for the Co-op Board (Exhibit 15, begins page 7):

> THE COURT: -- which means you're going to have to commit the coop board to tell me: What does Paragraph 7 mean?
>
> MR. AUGUSTINE: It means he has the right to build structures once he submits a plan. And if those structures are permissible by law, such as Department of Buildings, and those plans do not pose a structural risk or any other risk to the building in order to -- for him to service the space that he has there, then the board would be inclined to approve it.
> ...
> THE COURT: But what I'm saying is he does have that right, though, under paragraph 7.

MR. AUGUSTINE: He has - - our understanding he has a right to build structures. That's what it says. No one disagrees. The courts all said the same thing, he has a right to build structures.

THE COURT: Well, the courts didn't say that. The courts said that he has no air rights, but he has the right. But I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same thing, development rights, so - -

...

MR. AUGUSTINE: He has – our understanding he has the right to build structures. That's what it says. No one disagrees. The courts all said the same thing, he has a right to build structures.

THE COURT: Well, the courts didn't say that. The courts said he has no air rights, but he has the right. But, I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same thing, development rights, so –

MR. AUGUSTINE: Well, there are air rights that are reserved. They weren't all transferred. The building has at least –

THE COURT: So it would be your position that he does own some air rights.

Mr. AUGUSTINE: No. It wouldn't be that he owns them, but the question is that if he submits a plan and its seems reasonable -

THE COURT: What does he – What does paragraph 7 mean if he doesn't own any air rights?

MR. AUGUSTINE: It means he has the right to build a structure, that if it's approved by the governmental agencies and the board sees that it doesn't pose any harm or risk, or inordinate cost to the coop as a whole, because the coop is a corporation, he's just a shareholder.

THE COURT: What does that mean?

MR. AUGUSTINE: It means –

THE COURT: I don't understand what you are saying.

MR. AUGUSTINE: Right –

THE COURT: - which means you're going have to commit the coop board to tell me: What does Paragraph 7 mean?

…

**MR. AUGUSTINE: He has the same – anyone who buys a building, Your Honor, you have the right to build what the law permits. So if that means –**

**THE COURT: No. He has – he specifically bought a right under Paragraph 7.** And I'm asking you what that right is.

**MR. AUGUSTINE: Well, at the time that was written, the original owner, I believe, was his predecessor –**

**THE COURT: It doesn't matter. The contract is the contract. It wasn't changed when he bought it. He bought that right.** What does that right mean?

MR. AUGUSTINE: It's precisely as I said, Your Honor. Once –

THE COURT: I don't know what you said. Nor do I know what the Courts said.

…

**THE COURT: The decisions don't – don't address this, because at least in this Court's mind, I don't see how you can build and build up without going into air rights or – you know, so I don't understand the decisions. I'm asking you for guidance.**

## **Mark Anesh, attorney for Stanley Kaufman (Exhibit 15, begins page 24)**

THE COURT: How do you interpret the decision of the lower court? How would you interpret the decision of the lower court -- the decisions of the lower court and the Appellate Division?

MR. ANESH: As I just said, even though I don't have a dog in the race, "my interpretation is he doesn't have the right to transfer any air rights, he doesn't have the right to consent or obtain a waiver.

However, there is some space under applicable law that he is allowed to build or erect structures on -- under -- under the right -- under the space that was transferred.

THE COURT: Well, let me ask you this: The seventh paragraph says, "The 12th floor and roof unit shall have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law."

We know that zoning laws were changed and blah blah blah. And then the – both the lower court and the Appellate Division have held that he has those rights, but he has no air rights. If he has no air rights, how can he possibly build structures on the roof?

MR. ANSEH: I think the court is distinguishing between the air rights and the space he has to build structures.

THE COURT: I don't understand how you can build a structure on a roof if you have no air rights.

MR. ANSEH: Your Honor, with all due respect, if you put a doghouse on top of the roof that's ten feet tall, would you consider that air rights?

THE COURT: I don't know. You tell me.

MR. ANSEH: I wouldn't. I wouldn't. Based upon what I read -

THE COURT: So they gave him the ability to build a doghouse, even though -

MR. ANSEH: No, Your Honor, I used that as an example. What is was trying to say, perhaps not as adeptly as I should, is that he has the ability to build certain structures on that roof under whatever the applicable building or code – the codes that apply to building. And obviously there is a certain height that he can build, but –

THE COURT: It doesn't say that there is a certain height, it says he can build up and out.

MR. ANESH: I agree. I agree. It doesn't say, it doesn't specify.

THE COURT: And the Appellate Division and lower court didn't say, "You can only build to a certain height," they said, "yeah, he has the right to build up and out but he can't use the air rights," which is really an enigma.

## Richard Zuckerman, attorney for Chicago Title Insurance Co. (Exhibit 15, begins 30)

MR. ZUCKERMAN: Well, let me emphasize, Your Honor, this is not a Chicago Title interest issue, has no bearing on Chicago Title, but the ruling of the Court, both the lower court and the Appellate Division, was that Mr. Brady has no right to any FAR. He has no right to any FAR that existed beforehand, he has no right to any increased FAR. That's what the Court held.

THE COURT: Yes. But it also quoted that and said he has these rights. What does that mean?

MR. ZUCKERMAN: My understanding of those rights, Your Honor -- again, not a Chicago Title issue, and maybe I shouldn't have volunteered on this -- but my understanding of that, Your Honor, is that he has the same rights that are -- an owner of a fully built -- a building build to the full FAR would have.

THE COURT: But that's not what Paragraph 7 says.

MR. ZUCKERMAN: Then I can't add more light on that.

THE COURT: It doesn't say that.

MR. ZUCKERMAN: I can't -- can't shed light on that, Your Honor.

THE COURT: Okay. That's it.
(37:6 – 38:2)

**Justin Chu, attorney for Greenberg Traurig LLP (Exhibit 15, begins page 31)**

THE COURT: You were the transactional attorneys to the co-op board to Sherwood and Extell?

MR. CHU: To the coop. The seller.

THE COURT: To the coop. Oh, so your clients were the ones who interpreted these real estate contracts.

MR. CHU: Well, I'll - our clients were involved in rendering advice to the coop on land use issues and in connection with the initial sale to Extell, which did not close, and eventually in the sale to Sherwood which did close. So again, why we are here in this lawsuit, if Your Honor is wondering, we are wondering the same thing. We have no duty to the plaintiff.

THE COURT: Did your client have an opinion as to what the lower court or Appellate Division meant or what Paragraph 7 means?

MR. CHU: I suspect that my client, the attorney, has an opinion –

THE COURT: But you don't know what it is.

MR. CHU: Well, I – I wouldn't be the one to interpret. I'm not a real estate lawyer, so I would not be the best person to answer Your Honor's question on –

THE COURT: So you're just saying your client shouldn't be here.

MR. CHU: Correct.

THE COURT: Okay, I understand.


**Justin Singer, Herrick Feinstein LLC, Representing Himself (Exhibit 15, begins page 39)**

SINGER: For the record, Justine Singer of Herrick Feinstein. We are representing Sherwood and Long Wharf, who were the purchasers, Mr. Katz, who was principal of Sherwood, and Herrick Feinstein and Dennis Russo who are also named, who are the attorneys for the purchasers in this case.

I guess I'll start first with Mr. Katz and Mr. Russo.  As I said, Mr. Russo was acting as an attorney for the purchaser for the sale of the TDRs, and Mr. Katz is the principal of Sherwood.  Mr. Brady is not alleged in the alterego theory or anything else, to pierce the corporate veil.

THE COURT:  Basically they don't have anything to do with the deal.

MR. SINGER:  Correct, Your Honor.

THE COURT:  And the lawyer, again, posed no duty to –

MR. SINGER:  That's correct.  That was my next point.

THE COURT:  Now in terms of Sherwood, your argument is –

MR. SINGER:  The collateral estoppel argument.  It's very clear that Mr. Brady did not own those rights and we did not need a waiver  in order for those rights to be sold.

## Daniel Milstein, Greenberg Traurig Attorney for Billionaire Frank McCourt (Exhibit 15, begins page 41)

MR. MILSTEIN: Now, again, if you want my unsolicited opinion or maybe solicited opinion, but in which my client doesn't have an interest as to where the limits are on this, it's clear what the plaintiff is saying is not that "I can build a structure, 20 feet, 15 feet. There's something I can build that was, although I won't tell you what it is that I want to build, my rights were impinged." What he says is, "I have the right, either to control through veto authority or ownership," the Court rejected both of those, " over –

THE COURT: The sale of air rights.

MR. MILSTEIN: "--overbuilding multiple stories above my roof, adding on, "that he basically has the right to add many stories above his roof to use all of that FAR.

THE COURT: And that was rejected by both -- by the courts.

MR. MILSTEIN: Right.

THE COURT: I understand.

MR. MILSTEIN: And that's because his roof wouldn't be a roof anymore, it would be in the middle of the building. (Laughter)

MR. MILSTEIN: And I think that's fairly good guidance as to what the term meant when it said "you have the right to use the roof." And, in addition to that --

THE COURT: It doesn't say that. It doesn't say "You have the right."

MR. MILSTEIN: It says --

THE COURT: In says, "In addition to the utilization of the roof."

MR. MILSTEIN: Right. And that's the context. The context is --

THE COURT: It says in addition to the utilization of the roof he has the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law.

MR. MILSTEIN: Right, Your Honor. I think that the -- you interpret contracts in accordance with their context in the circumstances. The circumstances were that there was no more FAR at the time, so you weren't talking about building FAR, building floors.

THE COURT: But there was. When he bough it, the zoning had been changed.

MR. MILSTEIN: The contract was way before he bought it. That language was in place for years before he bought it.

THE COURT: But the language says, "From time to time be permitted under applicable law."

MR. MILSTEIN: Right. Well zoning --

THE COURT: And he bought with the contract.

MR. MILSTEIN: I understand.

THE COURT: And, at the time he bought, the applicable law allowed building on the roof.  Now, whether building on the roof meant all of the air rights, which clearly the Court says it didn't, but what does it mean?

MR. MILSTEIN: Well, again, I don't think it's necessary to resolve any of these motions, but I think the context is a clue. It says, "In addition to the utilization of the roof, you'll have the right to build and extend structures on it or above it." I think the structures that are built on or above have to be in context and supporting the use of the roof. If you're changing it and it's not going to be a roof anymore because you're building floors above it, I would say that that's not consistent. I think there's probably a lot of guidance as to what --

**THE COURT: I agree with you. I think your interpretation makes sense, but how would you possibly build structures on the roof, even if it meant just one story or extending the structure, if there is a structure already there, without the use of air rights?**

MR. MILSTEIN: Well, I think what counsel just told you, and I'm not an expert in that area of law at all, but he said --

THE COURT: Oh, so then what you're saying doesn't make -- it doesn't matter.

MR. MILSTEIN: Well, what I'm saying is that I thought his explanation was convincing, which is if you have zero extra FAR.

THE COURT: But you do have extra FAR when he bought and pursuant to the contract.  Since you're not an expert, I don't need to hear it.

MR. MILSTEIN: Okay.

THE COURT: Okay, I was just hoping that someone was. Okay, next. Who else? Is there anybody else? I guess not. (42:25 – 46:13).

233.   The above admissions from March 18, 2014 definitively prove that there was Civil RICO and a civil conspiracy.

234.   The admissions from March 18, 2014 proves that every attorney lied in their motions to dismiss when they claim that Plaintiff lost the prior litigation.

235.   The admissions from March 18, 2014 prove each and every attorney's understanding that the Offering Plan contract and February 11, 2010 decision gave Plaintiff the right to the utilization of the premises development rights "that may from time to time be permitted under applicable law."

**Justice Kornreich Also Made Admissions at the March 18, 2014 Oral Arguments that the Appellate Division February 11, 2010 Decision was Confusing and Inconsistent, Just as Plaintiff had Shown on his Website BulyJudges.com**

THE COURT:  How would you deal with the decision of the Court and say he has no development rights, he has no air rights, yet he has the right to build? What does that mean? (Transcript p. 9:17-20).

THE COURT: The courts said that he has no air rights, but he has the right. But I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same things, development rights, so – (Transcript p.12:9-13).

THE COURT: I don't know what you said. Nor do I know what the Court said.
(Transcript p. 14:12-13)

THE COURT: The decisions don't – don't address this, because, at least in this Court's mind, I don't see how you can build and build up without going into air rights or – you know, so I don't understand the decisions. I'm asking you for guidance. (Transcript p. 17:18-22).

THE COURT: <u>And the Appellate Division and lower court doesn't say, "You can only build to a certain height," they said "Yeah, he has the right to build up and out but he can't use the air rights," which is really an enigma</u>. (Transcript, p. 27:3-29:3).

**THE COURT: I don't understand how you can build a structure on a roof if you have no air rights**. (Transcript p. 28:4-5).

Mr. BRADY: So the correct reading it's an inconsistent decision. Please square the two, Your Honor. Square –

THE COURT: I don't know how. (Transcript p. 53:17-19).

THE COURT:   – it was the sponsor who put this in, it was the sponsor who owned the penthouse and roof.  <u>Perhaps that was his intent</u>. (Tr. p. 54:11-20).

236.   The March 18, 2014 Oral Arguments shows that not for one second did Judge Kornreich assert at that time that Plaintiff's claims had no merit.

237.   In fact, she made it clear in her exchange with Greenberg Traurig attorney Daniel Milstein at the March 18, 2014 Oral Arguments:

THE COURT: It doesn't say that. It doesn't say "You have the right."

MR. MILSTEIN: It says --

81

THE COURT: In says, "In addition to the utilization of the roof."

MR. MILSTEIN: Right. And that's the context. The context is --

THE COURT: It says in addition to the utilization of the roof he has the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law.

MR. MILSTEIN: Right, Your Honor. I think that the -- you interpret contracts in accordance with their context in the circumstances. The circumstances were that there was no more FAR at the time, so you weren't talking about building FAR, building floors.

THE COURT: But there was. When he bought it, the zoning had been changed.

MR. MILSTEIN: The contract was way before he bought it. That language was in place for years before he bought it.

THE COURT: But the language says, "From time to time be permitted under applicable law."

MR. MILSTEIN: Right. Well zoning --

THE COURT: And he bought with the contract.

MR. MILSTEIN: I understand.


## JUDGE KORNREICH JULY 15, 2014 DECISION (Exhibit 9)

238.   Comparing what Judge Kornreich said at the March 18, 2014

oral arguments against what she said in her July 15, 2014 Decision proved

she was totally corrupted between March 18, 2014 and July 15, 2015

82

239.   Judge Friedman went from admitting what the contract means during the March 18,2014 Oral arguments, to the about face she made in her then in her July 15, 2014 Decision.

240.   Judge Kornreich was co corrupted by the July 15, 2014 decision that she not only helped the defendants get away with stealing the $70-90 million worth of air rights which everyone admitted were appurtenant to Plaintiff's 12th Floor and Roof Unit, but she also sanctioned Plaintiff to pay the legal fees to the perpetrators of the civil conspiracy.

241.   The admission made above show that the statements made below by Justice Kornreich in her July 15, 2014 decision are complete lies:

"It is clear from the papers and the transaction's history that Brady acted in bad faith in bringing the instant cases."

"His misinterpretation of prior judgment, his feigned ignorance or the origin or the meaning of the phrase "transferable development rights," and his argument that a decision, which he appealed to no avail, is not binding are but a few examples of the frivolous arguments made in the instant actions."

"In short, Brady has dragged more than twenty parties into court to litigate matters that have already been determined and claims that lack any substance."

"The trial court and the appellate court courts in the Prior Action have denied him such control. Undeterred, he has ignored these courts' rulings and brought these meritless actions, abusing the judicial process."

"This is a near perfect example of frivolous conduct that warrants defendants request for the imposition of sanctions."

242.   The only way to get around the admissions made at the March 18, 2014 Oral Arguments was to ignore that it took place all together, and rewrite the Offering Plan contract and higher court decision to void what they said on their face.

243.   The Seventh Paragraph Footnote to the Schedule of Units reads as follows:

> "Seventh Paragraph - NEW- The 12th Floor and Roof Unit Shall have, in addition to the utilization of the roof, the right to construct or extend structures on the roof or above the same, to the extent that may from time to time be permitted under applicable law."

**244.**   The Appellate Division, First Department, February 11, 2010 Decision ended with the following words:

> Pursuant to paragraph 7, that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.

245.   On July 15, 2014, Supreme Court Justice Shirley Kornreich's filed a Decision that rewrote both the Offering Plan contract and the February 11, 2010 Appellate Division decision:

> "It has already been adjudged that while the owners of the unit *may* have the right to erect additional structures on the roof, that right does not entitle them to use any floor area in doing so (Prior Action, decision and order, Mar 13, 2009 at *2 & *4-*5 ["Nothing

herein shall be construed as holding that plaintiffs have the right to use all or any part of the TDRs in connection with such construction or extension"] *Brady v 450 W. 31st St. Owner's Corp.*, 70 AD3d 469, 470 [1st Dept 2010] [holding that the offering plan "reserves for plaintiffs the right.... to construct or extend structures on the roof that may be built without the use of the building's development rights."]"

246.   Every word from the Offering Plan Contract and a higher court decision was taken out and replaced by Judge Kornreich with 70 of her own words that created a new contract that neither party to the contract agreed to.

247.   Under the Appellate Division decision, the Bradys have the right to the utilization of the premise's $70-90 million in development rights. Under Judge Kornreich's rewording, they were left with nothing at all, and further had to pay $500,000 in sanctions who the people who committed this crime.

248.   This unconstitutional and unlawful conduct was ignored by Mr. Berman and the Appellate Division, all the way up to Chief Judge Janet DiFiore and Judge Michael Garcia of the Court of Appeals.

249.   In the July 15, 2014 decision, Justice Kornreich made the following acknowledgments regarding Plaintiff's claims that prove that sanctions were unconstitutional and unlawfully imposed given the Court's own admissions in the decision:

"Strictly speaking, Brady is correct that the question of whether such an easement interferes with his right to build structures on the roof or

otherwise permitted by applicable law has never been determined and so is not barred." (July 15, 2014 decision, p.15).

"Brady correctly notes that the issue of whether the sale to Extell violated his rights was never reached, and that the issue of whether the sale of the air rights by 450 Owners Corp. to Sherwood violated Brady's rights could not have been reached in the prior actions." (July 15, 2014 decision, p.19).

250.   The admissions above prove the statements below are lies.

"It is clear from the papers and the transaction's history that Brady acted in bad faith in bringing the instant cases."

"His misinterpretation of prior judgment, his feigned ignorance or the origin or the meaning of the phrase "transferable development rights," and his argument that a decision, which he appealed to no avail, is not binding are but a few examples of the frivolous arguments made in the instant actions."

"In short, Brady has dragged more than twenty parties into court to litigate matters that have already been determined and claims that lack any substance."

"The trial court and the appellate court courts in the Prior Action have denied him such control. Undeterred, he has ignored these courts' rulings and brought these meritless actions, abusing the judicial process."

"This is a near perfect example of frivolous conduct that warrants defendants request for the imposition of sanctions."
(Justice Shirley Kornreich, July 15, 2014 Decision)

251.   The above abusive statements are unlawful, slanderous, and

were made in collusion with Greenberg Traurig Defendants and other law

firms who sought sanctions are part of their scheme against Plaintiff.

252.   If Plaintiff had lost the prior litigation, Judge Kornreich would not have had to replace the 40 words of the Offering Plan with her own 70 words in order to void the contract.

253.   Mr. Berman knows that based on these admissions above, it was an unlawful and an unconstitutional violation that Plaintiff be sanctioned over $500,000 for exercising his First Amendment right to seek redress of a grievance in court.

254.   Mr. Berman had a duty to intervene and did not because he is part of the civil conspiracy and Civil RICO that started with his Greenberg Traurig partners back in 2007.

255.   As a result of the civil conspiracy Mr. Berman and the Greenberg Traurig attorneys masterminded, Plaintiff was forced to write checks on September 5, 2018 to the very same people who stole the air rights.

256.   It is only through Civil RICO and a civil conspiracy that Plaintiff was forced to pay these lawyers, law firms, and billionaire New York developers for refusing to sign the Waiver of his rights for free.

257.   It is criminal what happened, but Mr. Berman did nothing about it before the crime took place, and continues to litigate against Plaintiff so

that nobody is brought to justice for the crimes masterminded by Mr. Berman's Greenberg Traurig partners since 2007.

258.   Mr. Berman's actions prove religious bias, due process violations and violation of Equal Protection under the Law.

259.   It was not equal protection for Mr. Berman to disregard the constitutional and property rights of a white Catholic.

**THE SEPTEMBER 10, 2014 TRANSCRIPT (Exhibit 16)**

260.   The transcript of the September 10, 2014 Hearing shows Judge Kornreich arrogantly shrugging off her corruption because she knows that she gets carte blanche to be as corrupt and retaliatory as she likes to a white Catholic litigant.

261.   At the September 10, 2014 Hearing for an OSC Plaintiff had filed, Supreme Court Justice Kornreich did not dispute any of Plaintiff's allegations; she just confidently shrugged them off.

262.   Justice Shirley Kornreich on September 10, 2014 admitted that in her July 15, 2014 decision she deliberately took out all 40 words in the contract and replaced them with 70 different words that void what the contract and higher February 11, 2010 Appellate Division decision say on their face.

263.   She further does not deny that she issued $500,000 in sanctions to pay the attorneys and make me too weak to fight back against her unlawful actions that were done for the sake of then politically connected.

**Transcript, September 10, 2014 Hearing (Exhibit 16)**

THE COURT:  So, I have read your papers, and let me say that I stand by my decision.  I think my decision is legally required.

The same request, the same legal request, really, was made in another action in front of another judge, and I am bound by that decision.  It went all the way up to the Court of Appeals, so I stand by my previous decision.

I am not going to stay enforcement of the sanctions.  I believe, I really believe that bringing the action over and over and over again both wastes the court's time, counsel's time, and your time, and it is frivolous.  (Transcript p. 4:16-26, 5:1-6).

THE COURT:  So, I don't believe that there is any reason for me to recuse myself.  I don't believe that any decision I made previously was tainted in any way.  I believe this case is over at this point, so I am denying your application –

BRADY:  It figures.

THE COURT:  - for your order to show cause.

BRADY:  That figures, your Honor.

THE COURT:  Pardon?

BRADY:  I said that figures.  Of course you would do that.  So why don't we address the fact that it's undisputed that you falsified the prior decisions.

89

THE COURT:  That I falsified?

BRADY:  You falsified the prior decisions.

THE COURT:  Sir, at this point I would admonish you.

BRADY:  I'd like it to be on the record, you took out the part, your Honor, that said that "pursuant to paragraph 7, plaintiff has, in addition to the utilization of the roof, the right to construct or extend structures on the roof or above the roof to the extent that may from time to time be permitted under applicable law." This Court took that out of its decision to square it against me.

THE COURT:  Sir, you can say whatever you wish to say at this point.  You've said it.  At this point the record is closed.  Your application is denied.  Please step back.

BRADY:  Thank you, your Honor.  More evidence.

**The Admitted Lies of Judge Kornreich Shown Above Were Advanced as True in the Cases Shown Below**

264.   In addition to Judge Kornreich, the other judges who went along with the false personal attacks  and  false case history created by Greenburg Traurig attorneys are District Judge Ronnie Abrams in _Brady v. Schneiderman_, No. 15 Civ. 9141 (RA);

265.   District Court Judge Daniels and Magistrate Judge Sarah Netburn in _Brady v. Goldman_, 2017 WL 496083 (S.D.N.Y., Feb. 3, 2017);

266.   Magistrate Judge Barbara Moses in _Brady v. Berman_, 18-CV-8459 (VEC);

267.   New York State Supreme Court Judge Margaret Chan in *James Brady v. The New York County District Attorney's Office and the City of New York*; Index No. 154496/2015.

268.   New York State Supreme Court Judge Deborah Kaplan used the filing injunction to bar a case when Plaintiff sough clarification *Brady v. 45 West 31st St owner Corp., et al,* 654226/2013 (Document No. 249).

269.   All of these judges in the above cases had no problem advancing as true the lies and personal attacks created by Greenburg Traurig attorneys and advanced as true by of Judge Kornreich in her July 15,2014 Decision.

270.   None of the Judges above had a problem discarding the clear truth of the white Catholic Plaintiff.

271.   Former New York State Attorney General Eric Schneiderian, Manhattan District Attorney Cyrus Vance and United States Attorney Cyrus Vance and United States Attorney for the Southern District of New York Geoffrey S. Berman have also all advance as true the false defamatory statements created by Greenburg Traurig Attorneys.

272.   The July 15, 2014 Decision proves Judge Kornreich followed the directives of Mr. Berman's Greenberg Traurig partners and other politically-connected law firms.

273.   All of this is the ultimate defamation of character.

274.   Mr. Berman, through Mail and Wire Fraud, has advanced these false statements about Plaintiff that were made by his fellow Greenberg Traurig partners.

275.   To be clear, at the directive of Greenberg Traurig attorneys, all of these people participated in the criminal scheme of having Plaintiff pay over $500,000 to the lawyers and law firms that stole the $70-90 million in air rights they all know where contractually appurtenant to Plaintiffs 12th Floor and Roof Unit apartment.

> *Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence.*   -John Adams

276.   All of these judges were even given the testimony of the Sponsor of the Offering Plan, Arthur Greene, from August 15, 2016, which confirmed that the meaning and intent of the Seventh Paragraph Footnote was to convey any permissible air rights to the proprietary leaseholder of the 12th Floor and Roof Unit. (Exhibit 17).

277.   The evidence shows that the federal and state judges would do and say exactly what they are told to do at the directive of Greenberg Traurig attorneys and others.

278.   The evidence shows that the above judges have unconstitutionally abused a *Pro se* litigant rather than give "special consideration" to *Pro se* litigants.

279.   These judges and Greenberg Traurig attorneys, including Defendant Geoffrey S. Berman, embody precisely the sort of corruption warned about by President John Adams:

> *Because power corrupts, society's demands for moral authority and character increase as the importance of the position increases.*

280.   This Complaint proves that power has completely corrupted Mr. Berman, who certainly does not have the moral character to have his position, and has used his power to ensure those who acted in an unconstitutional and retaliatory way against Plaintiff are never held accountable against their unlawful acts.

281.   The Civil RICO and civil conspiracy continues to this day as federal and state justices and local state and federal law enforcement pretend to see nothing wrong, and refuse to address the fact that a crime took place under color of state law when all 40 words in Plaintiff's Offering Plan and higher court decision were replaced with 70 different words that voided what these pieces of material evidence said non their face.

282.   Federal and state judges and local law enforcement knew that it was Plaintiff was who was protected by the Rooker-Feldman Doctrine and

collateral estoppel from having a lower court rewrite what the higher court decision said on its face.

283.   Mr. Berman is the top law enforcement official in the State of New York, and he is being held personally liable in this Complaint for the causes of action in this Complaint.

## MR. BERMAN DOES NOT GIVE EQUAL PROTECTION TO WHITE CATHOLIC CITIZENS

284.   Mr. Berman's own website and press releases prove his refusal to give equal protection under the law to Plaintiff who is a white Catholic. Mr. Berman's statements in two press releases championing the return of property stolen by the Nazis over 70 years ago.

285.   On March 21, 20109, regarding his Office's role in returning art work stolen 70 years ago, Mr. Berman stated:

> "Our Office has a long history of righting wrongs, no matter how long ago a crime was committed.  Today's action is an example of our continued commitment to ensuring that art looted by Nazis more than 75 years ago is returned to its rightful owners."

286.   On April 2, 20109, Mr. Berman stated:

> "The campaign of cultural plunder that the Nazis directed against millions of innocent Jews was sadistic and unjust.  That is why restitution in this case is more than returning a material good, but restoring a physical part of lost heritage.  After nearly 80 years of being lost, this painting has been found and we are returning it to the Schloss family."

287.   Mr. Berman clearly does not think what happened to Mr. Brady was a crime.  The double standard and disparity of treatment could not be more obvious.  Mr. Berman shows no concern for the property stolen from Plaintiff on September 5, 2018, who is a white Catholic citizen of his district, and instead goes along with a crime because it is politically expedient for him to do so.

288.   Mr. Berman is engaged in the destruction of this white Catholic family.

289.   At the same time Mr. Berman and his Office spent the resources to track down the property of millionaires overseas, he and his office, with the help of Magistrate Judge Moses, are fighting against Mr. Brady so that no one is held responsible for the over $2.3 million dollars stolen from Plaintiff on September 5, 2018, which wiped out his life's savings and his occupation.

**Greenberg Traurig Attorneys Continued the Tactic of Calling for Retaliation in 2015 – 2016**

290.   The argument that Plaintiff had lost the first litigation completely collapsed at the March 18, 2014 Oral Arguments (Exhibit 15).

291.   Plaintiff appealed Judge Kornreich's refusal to sign the Order to Show Cause on September 10, 2014 leaving Plaintiff with two "final" decisions.

292.   In their courts papers, the Greenberg Traurig attorneys reverted back to the same tactic of giving a false case history and calling for the court to retaliate against Plaintiff.

293.   These are all criminal acts.  Greenberg Traurig is stealing through the courts by working in collusion with state actors.

294.   The Defendants continued the same tactics, using the same false arguments, and slandering Plaintiff by lying about the prior litigation well into 2016, as the following examples illustrate.

295.   Joseph Augustine of Augustine & Eberle LLP, *Affirmation in Opposition to Plaintiff's Motion Seeking Leaves to Appeal,* March 6, 2015:

> "The thrust of Mr. Brady's contentions before the Supreme Court and the First Department have ranged from his being the subject of a broad, illuminati style conspiracy aimed against him by the entire New York Judiciary, as summarized in his retaliatory website, www.bullyjudges.com, to his most recent contention to the First Department that it, and the Court below, were and are prejudiced against him because he is of Irish Catholic descent."

296.   Justin Singer of  Herrick Feinstein LLP, *Memo of Law in Opposition, John Goldman,* March 6, 2015:

"Plaintiff is a serial litigant whose frivolous claims have already been adjudged meritless not less than eight times by the courts of the State of New York."

297.   Defendant-Respondent Frank McCourt's *Opposition to James*

*Brady's Motion for Leave to Appeal to the Court of Appeals, Court of*

*Appeals, Steven Sinatra, Daniel Milstein, and Roy Taub, Greenberg Traurig*

*LLP*, March 6, 2015:

"This action represents the second frivolous attempt by Plaintiff to extort money from a transaction to which he is a stranger concerning the sale of real property development rights that he does not own or control."

"Plaintiff's reading of the judicial decisions is so divorced from reality that he accuses the Supreme Court of falsely attributing to the First Department the 'holding that the offering plan reserves for plaintiffs the right...to construct or extend structures on the roof that may be built without the use of the building's development rights."

Footnote 5. "It should be noted Plaintiff has not shied away from leveling charges against the judiciary. The above-referenced letter is no exception. In that letter he made the odious claim of an "ongoing violation of my civil rights at the hands of the state's judiciary" on account of his race and religion: 'Yet, when ruling on my case, the Justices of this state all agree that the words used in the seventh paragraph footnote to the Schedule of Units of the Offering Plan mean one thing for the Jewish prior tenant shareholder, and something different for me, the current white Catholic tenant shareholder of the 12th Floor and Roof Unit. This cannot be a coincidence and strikes the objective observer as a clear and ongoing violation of my federally protected, Constitutional civil rights.'"

298.   Defendant-Respondent Chicago Title Insurance Co.'s

*Memorandum of Law in Opposition to Plaintiff-Appellant's Motion for*

*Leave to Appeal and a Stay of Sanctions, Court of Appeals, Richard M.*

*Zuckerman, Dentons US LLP, March 6, 2015.*

> "Brady's motion in this Court is the latest chapter in an eight year saga in which Brady has litigated and sought to relitigate, over and over again, the same issue: Whether Brady owns the transferable development rights ("TDRs") of a building owned by a cooperative apartment corporation in which Brady is a tenant-shareholder."

> "Brady has complained about Justice Renwick on his Internet blog, www.bullyjudges.com, and to several government and judicial entities. Neither of these grounds provides any basis whatsoever for recusal."

299.   *Memorandum of Law in Opposition to Plaintiff's Motion for*

*Reargument, Court of Appeals, John Goldman, Justin Singer, Herrick*

*Feinstein LLP, May 22, 2015.*

> "Plaintiff's motion should be denied. Plaintiff is a serial litigant whose frivolous claims have already been adjudged meritless not less than eight times by the courts of the State of New York. Most recently, in granting Defendants Motion to Dismiss, the Trial Court found that 'it is clear from the papers and the transaction's history that [Plaintiff] acted in bad faith in bringing the instant cases.' (Decision at p. 21). The Trial Court also found that Plaintiff's vexatious actions were 'a near perfect example of frivolous conduct and warrant defendants' request for the imposition of sanctions.' As a result, the Trial Court expressly warned Plaintiff not to 'further test the court's patience by prosecuting claims that have...been determined.' (Decision at p. 23)."

> "Furthermore, as Plaintiff has forced the Defendants – yet again – to waste funds litigating matters that have already been determined to lack any substance, the Defendants respectfully request that the attorneys' fees and other expenses previously awarded against Plaintiff in the Decision include the reasonable attorneys' fees and other expenses expanded opposing instant Motion."

300.   *Affirmation in Opposition to Plaintiff's Motion to perfect an Appeal After the Time to do so Has Expired, Appellate Division, First Department, Jaime Wozman, Lewis Brisbois Bisgaard & Smith LLP*, July 24, 2015:

> "Plaintiff's abuse of the judiciary has to stop somewhere. It is respectfully submitted that it should terminate here and that this Court should finally put an end to plaintiff's seemingly endless filings of frivolous and harassing pleadings, motions and briefs related to the air rights appurtenant to his commercial cooperative unit and bar him from filing anything further related to those rights."

> "Justice Kornreich appropriately deemed the instant action to be frivolous and properly awarded sanctions to the Opposing Defendants in her Dismissal Order. Given the foregoing, the Opposing Defendants request additional sanctions be awarded. While a trial court's sanctioning of the plaintiff has failed to deter him from pursuing previously adjudicated baseless claims. Perhaps the appellate court's sanctioning him will prevent him from doing so."

301.   Mr. Berman knows the statements above are meant to solicit retaliation against Plaintiff.  Mr. Berman knows all of the case history asserted above is false.

302.   Mr. Berman has been a participant in all of this.  Not only has he not prevented these crimes but he has actively participated in these crimes.

303.   The Appellate Court in the Court of Appeals "denied" without explanation Plaintiff's order to show cause from September 10, 2014 and thus Plaintiff was left with the final Appellate Division, First Department decision from February 11, 2010 and the final Supreme Court decision from July 15, 2014.

**In January 5, 2016, Plaintiff demanded through formal motions that the Court of Appeals Declare which of the Final Decisions Governs (Exhibit 18)**

304.   Following are excerpts from Plaintiff's *Motion for Leave to Appeal, or Alternately for Declaratory Relief Clarifying Which Decision Governs in These Cases*, filed January 5, 2016 (Exhibit 18):

> 1. I am the Plaintiff-appellant in the above-captioned actions and I submit this affidavit in support of the instant motion for leave to file a late appeal to the Appellate Division, First Department. Plaintiff preferably seeks a declaration that the Appellate Division's February 11, 2010 decision governs in these cases over Justice Kornreich's July 15, 2014 decision.

> 6. In the July 15, 2014 decision, Justice Kornreich dismissed my claims based on *res judicata* and collateral estoppel. The application of these very principles prevents Justice Kornreich from rewriting a higher court's decision. Justice Kornreich used the Appellate Division's February 11, 2010 decision to dismiss my claims against Sherwood, the Board and other named defendants, when the whole purpose of suing them was to enforce that decision. It was the rights that the offering plan and the February 11, 2010 decision said I have that were transferred to Sherwood without a waiver from me. Collateral estoppel and *stare decisis* should have prevented Justice Kornreich from rewriting the higher court's decision.

7.  The Appellate Division's February 11, 2010 decision included the following words:

> "that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs." *Brady v. 450 W. 31st St.Owners Corp.*, 70 AD3d 469 (2010).

8.  This right is exactly what the Co-op sold to Sherwood. These words mean that plaintiff's unit has the right to utilize the premise's development rights to the extent permitted under applicable law. *Res judicata* protected plaintiff, which is why Justice Kornreich needed to rewrite the decision in order to impose sanctions of nearly $400,000. The two decisions cannot coexist. The Appellate Division decision does not simply disappear because Justice Kornreich rewrote it in order to void my rights.

9.  Again, the Appellate Division's February 11, 2010 decision stated:

> "that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs." *Brady v. 450 W. 31st St. Owners Corp.*, 70 AD3d 469 (2010).

10. The July 15, 2014 Supreme Court decision has none of these words; they were all gone, removed by the Court, and replaced with the following words:

> "It has already been adjudged that while the owners of the unit may have the right to erect additional structures on the roof, that right does not entitle them to use any floor area in doing so." *Brady v. Sherwood Equities, et. al*, Index No.654226/2013.

11.  By the time of the Justice Kornreich's July 15 2014 decision, my contract was rewritten beyond recognition and surrounded by court-created language that took out the whole grant of rights.

12.  Justice Kornreich had no legal authority to rewrite the offering plan contract and the higher court decision. The binding law and authority on contract law in New York State is as follows:

> "When parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 10 [1990]. And "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." "In the absence of any ambiguity, we look solely to the language used by the parties to discern the contract's meaning." *Vermont Teddy Bear v. 538 Madison Realty Co.*, 308 AD2d 33 (2004).

16.  Plaintiff pleads with this Court that he should not even have to undergo a complete formal appeal – yet again – in order that this Court affirm the rights specified in the Appellate Division's February 11, 2010 decision over Justice Kornreich's July 14, 2014 decision.

This is simply a Yes or No question: do the words of the offering plan and the February 11, 2010 decision mean that plaintiff's Unit has the right to the exclusive utilization of the premise's development rights? The parties to the contract, as shown above, agree it does.

## This Court Must Determine Which of the Prior Decisions Governs in This Case

37. In the July 15, 2014 decision, Justice Kornreich dismissed my claims based on *res judicata* and collateral estoppel. The application of these very principles prevents Justice Kornreich from rewriting a higher court's decision. Justice Kornreich used the Appellate Division's February 11, 2010 decision to dismiss my claims against Sherwood, the Board and other named defendants, when the whole purpose of suing them was to enforce that decision.

It was the rights that the offering plan and the February 11, 2010 decision said I have that were transferred to Sherwood without a waiver from me. Collateral estoppel and *stare decisis* should have

102

prevented Justice Kornreich from rewriting the higher court's decision.

38. The lower court decision taking away my rights that were affirmed by the Appellate Division cannot stand.

## **Conclusion**

39.  Plaintiff clearly has a meritorious claim and a very reasonable excuse for the delay in perfecting the appeal. The Court should grant this relief. In the alternative, this Court has the power to vacate the July 15, 2014 decision as it was based on an erroneous application of *res judicata* and collateral estoppel.

40.  Based solely on the information provided, this Court can make a determination that the February 11, 2010 decision governs. It is unnecessary that plaintiff have to again appeal the meaning of the seventh paragraph footnote – again.

41.  It is undisputed that the rights the Appellate Division said plaintiff has that were unlawfully transferred after defendants asked for but were unable to obtain a waiver. It is unprecedented that a Supreme Court decision govern over an Appellate Division decision. Under the lower court decision, plaintiff is being sanctioned nearly $400,000 in attorneys' fees for not waiving the rights the Appellate Division said he has in the February 11, 2010 decision.

43. The lower court should not have rewritten the rights given to plaintiff's unit through the offering plan contract, and this Court can make a determination on that without this going on any longer.

305.   Plaintiff's *Reply to Defendants' Opposition*, *or Alternately for Declaratory Relief Clarifying Which Decision Governs in These Cases*, filed on January 27, 2016, shows that it was not optional for the Court of Appeals

to decide whether the higher court decision governs; they had a duty to

simply apply the law.

The July 15, 2014 decision by the Supreme Court that effectively usurps the First Department's February 11, 2010 is a rewriting of both the Appellate Division's decision and the Offering Plan contract. Clearly, because the governing higher court decision grants Plaintiff the use of development rights, Justice Kornreich of the Supreme Court needed to rewrite it. This Court has not only jurisdiction but a proscriptive duty to rule which of the two conflicting decisions governs in these cases.

## The Court Should Sanction Defendants

In their opposition papers, the Kaufman and Hanley Defendants retrace the many court decisions and papers filed in these cases – eight since the July 15, 2014 decision. Plaintiff's website www.bullyjudges.com discusses the first eight times Plaintiff has had to return to court over the meaning of a single sentence in a real estate contract. This means that there have been sixteen occasions over the meaning of one sentence.

Defendants have filled their papers with lies, unfounded assertions, fabrications, and *ad hominen* attacks, asking for sanctions against a Plaintiff who is attempting to vindicate his claim against billionaire Manhattan developers. It is Defendants who should be sanctioned in this case, not Plaintiff. It is Defendants who have misled the courts by prejudicing Plaintiff. It is Defendants who have consistently lied about Plaintiff losing the prior litigation.

## CONCLUSION

After sixteen different motions in these related cases, this Court has a duty to rule that the higher court decision governs, and that the sale of the premise's development rights to Sherwood Equities was a violation of the Offering Plan contract and Plaintiff's rights pursuant to the Appellate Division, First Department's February 11, 2010 decision.

306.   On **February 29, 2016,** Plaintiff sent the Court of Appeals a letter reminding the judges that a lower court cannot void a higher court's decision, and demanding that the Court of Appeals do something about it as there was a motion before them *sub judice* to declare that the higher February 11, 2010 Decision Governs over the lower Court Decision.

307.   Notwithstanding the overwhelming and undisputed black and white evidence before the judges, the Court of Appeals denied Plaintiff's Motion on **March 29, 2016** in a boilerplate decision.

> "Motion for leave to appeal dismissed upon the ground that the order sought to be appealed from does not finally determine the actions within the meaning of the Constitution. Motion for a stay dismissed as academic." (March 29, 2016, Mo. No. 2016-70).

308.   That "decision" from the Court of Appeals proves Judge DiFiore and Garcia's participation in this Civil RICO scheme are following in the same exact pattern and actions as their predecessor Jonathan Lippman.

309.   This nonsensical and corrupt reply was another New York State court giving in to Mr. Berman's law partners request at Greenberg Traurig that the court avoid this issue as part of a Civil Conspiracy.

310.   Plaintiff was never appealing anything as a loser.  Instead, Plaintiff is the party holding the higher hand – the Appellate Division decision, and the Court of Appeals refuses to acknowledge the irrefutable.

311.   Mr. Berman knows the Court of Appeals' reply is unlawful, makes no sense, and in no way is addressing the issue of the crime taking place.

312.   It is not a discretionary act to decide whether or not to rule that a higher court decision governs over lower decisions.

313.   It was unconstitutional to not make a decision to which decision governs, and it was done with criminal intent as part of a conspiracy that Mr. Berman has not only condoned but participated in.

314.   The cruel, and criminal conduct and scheme that Mr. Berman has participated in have not yet been remedied.


**Plaintiff's *Motion for Clarification* in January 2016 was *Sub Judice* before the Court of Appeals at the Time Justices Janet DiFiore and Michael Garcia Were Sworn In**

315.   Janet DiFiore was sworn in as Chief Justice of the Court of Appeals in January 2016.

316.   While Plaintiff's motion was *sub judice*, Michael Garcia was being appointed to and confirmed as an Associate Justice of the Court of Appeals on February 8, 2016.

317.   Plaintiff had written to both judges prior to their confirmation hearings to make them aware that judges were rewriting contracts to void

meaning and intent of the contracts for the benefit of the politically-connected parties and law firms.

318.   Plaintiff's letters stated that he would oppose their confirmation unless they would address the corruption of their predecessors.

319.   It was the duty of the State Senators to ask the nominees the questions submitted by the public.  The Senators did not do this during either confirmation hearing.

320.   At Mr. Garcia's February 8, 2016 Confirmation Hearing, Plaintiff was again ignored by the Senators who refused to ask Michael Garcia any of the questions Plaintiff submitted, and then blocked him from asking Mr. Garcia any questions.

321.   Court of Appeals Judge Michael Garcia ran out of the room during his confirmation hearing on February 8, 2016, rather than answer Plaintiff's question.

322.   The BullyJudges.com website proves that the video of Mr. Garcia's February 8, 2016 Confirmation Hearing was edited to cut out Mr. Garcia running out of the room rather than answer Plaintiff, proving he is 100% committed to this scheme, which is why he was chosen as Associate Judge.

**SENATOR BONACIC:** Thank you, Senator Ranzenhofer. Anyone else have any other questions for Mr. Garcia?

Hearing none --

**MR. BRADY** (Off-Camera): I do.

**SENATOR BONACIC**: Oh?

**MR. BRADY** (off camera):  I do.  Mr. Garcia, would you please explain what paragraph seven means to you...

**CHAIRMAN**: No, no, no.  Mr. Brady, you're out of order.  You're out of order.  You don't have to answer that.

I'd like to call a vote now.  All those in favor of Mr. Garcia going to the floor for full confirmation say "Aye."  Anyone opposed?  Motion is passed.

**MR. BRADY** (off camera):  I can't breath; I can't breath...

**Senator Ruth Hassell-Thompson**:  Only we can ask questions.

Unintelligible.  Audio breaks off.


323.    The video on the BullyJudges.com website shows the original

video and how it was edited and cut-out by the NYS Court of Appeals on

their own version in order to hide the crime.

324.    That same day, on **February 8, 2016**, Plaintiff sent Michael

Garcia an email after the confirmation hearing:

Mr. Garcia

Congratulations  today on your confirmation and escaping having to explain your understanding of the Seventh paragraph Footnote  to the Schedule of Units for 450 West 31st Street Owners Corp. One day in

the near future a reporter will certainly be asking you that question so I would have an answer ready if I were you

It is my understanding that the tapes were cut to avoid showing how crazy things got when everyone wanted to make sure you would not give your interpretation of the Seventh paragraph footnote to the Schedule of Units. As you know, everyone did this because they all know that the Seventh paragraph footnote to the Schedule of Units can only be construed as giving what is now my 12th Floor and Roof Unit the express and exclusive utilization any permissible development rights that "may from time to time be given to the premises." It really was funny seeing all the Senators screaming for you not to answer my question and instead completely ignore me and rush to vote you in and then have everyone rush to run out of the room.

For sure I am acting as my own investigator and adding so many layers of evidence proving that even the Senate Judicial Committee is fully aiding and abetting fraud and obstruction justice.

I do hope for both of our sake and the sake of both of our families that you do follow through on your promise of being independent, just and truthful. Surely your children were very proud of you today I if I had to guess you cast me as being a crazy person when though undoubtedly asked you about what happened when I asked you to explain what the ONE sentence long contract meant to you.

I doubt very much that you explained to them the truth that I suffered for yours as justices kept rewriting or permitting other justices to rewrite my contract in attempts to void my contractual rights.

I won't stop till I get justice and it is my hope that you will me one of the people credited for that.

Sincerely,

James Brady


325.   On **April 4, 2016**, Plaintiff filed a *Motion for Reargunment and Demand for Clarification* with the NYS Court of Appeals again asking the court to clarify that the higher court decision governs over the lower court, and that a lower court cannot rewrite a higher court decision. **(Exhibit 19)**.

326.   A summary of *Plaintiff's Affidavit in Support of Motion for Reargument* is quoted below:

> 4. Nothing in this Court's March 29, 2016 decision would justify this court ignoring the threshold issue that there are enormous discrepancies between a final Appellate Division, First Department decision from February 11, 2010, and a final Supreme Court decision from July 15, 2014.
>
> The Appellate Division, First Department "Denied" answering the threshold question of which decision governs, though *stare decisis* mandates that the prior, higher court decision governs.
>
> 5. Thus, this Court must finally determine and state in express language if the description of the rights given to plaintiff's Manhattan apartment in the Amended Offering Plan, and according to certain words used in the final Appellate Division February 11, 2010 Decision govern over the lower Supreme Court Decision from July 2014 which voids and eliminates every word that was used in the Offering Plan Contract, and every one of the final Appellate Division Decision that adjudged that my apartment was given the express and exclusive "right to construct or extend structures on or above the roof, to the extent that may from time to time be permitted under applicable law."

……

9. There is a clear conflict in the decisions, and this is certainly an issue of state-wide importance. This Court must finally clarify in express language which decision governs since again the First Department has gone along with the lower court's rewriting of their decision.

10. The Supreme Court violated the ancient legal principle of *stare decisis* by departing from a higher court precedent which is not afterwards to be departed from.
………

16.  Contrary to the March 29, 2016 decision, this Court would in fact be making a final determination on whether Appellant has a right to file an appeal of the July 15, 2014 decision. That ruling would be the final action within the meaning of the Constitution

17.  There are five questions that this Court must answer and cannot use procedural niceties to avoid:

> 1. Does a lower court judge have the right to rewrite a higher court decision to void the rights the higher court said Appellant had?

> 2. Does the higher court's description of Appellant's rights govern?

> 3. Were sanctions warranted or Constitutional when none of the criteria for them was remotely reached?

> 4. Does the Seventh Paragraph Footnote and certain words in the affirmed First Department give Plaintiff the right to utilize the premise's permissible development right "to the extent that may from time to time be permitted under applicable law."

> 5. Were the rights that the higher court decision said Plaintiff had violated by the transaction between the Co-op and Sherwood?

18.  These are all Yes or No questions that this Court must answer. Within the meaning of the Constitution, a party has a right to a decision that is coherent and makes sense, fair and just and based on the evidence.

These ambiguities and questions of state-wide importance must be addressed in a coherent decision. Thus, Plaintiff requests that this Court rule in express language that February 11, 2010 decision governs, that the July 15, 2014 decision is vacated in its entirety, and refer the case back to the lower courts for damages.

21.  To an objective observer, it would appear that this Court is advancing the underlying fraud and deceit in this case.  That suspicion would become concrete if this Court were to again answer with "Denied" as if the Court were untouchable and Plaintiff and his family are garbage.

22.  Plaintiff attended the Senate Judiciary Hearing of Janet DiFiore on January 20, 2016.  The issues Plaintiff raised were not addressed, which is very disappointing as I was told by Justice DiFiore's husband that the court is on it.  "On it" means using express language to admit that the higher court decision governs and the lower court decision and the sanctions imposed are vacated.

So I am asking you Chief Justice of the Court of Appeals what the Seventh Paragraph Footnote means to you, because your current decision is ambiguous.

327.   On **April 20, 2016** again wrote a letter to the Court of Appeals demanding that the court acknowledge and rule that the higher court decision of the Appellate Division, First Department governs.

328.   The Court of Appeals' **June 9, 2016** decision denied Plaintiff's request for clarification of which decision governs with the one-word "Denied." (**Exhibit 20**).

112

329.   Just like the Lippman, the Judges refused to acknowledge the indisputable most basic legal principle that the higher court decision governs.  This was not a question they needed to answer.  It was a declaration that they were legally required to make.

330.   This scheme included Mail and Wire Fraud.  The Court's June 9, 2016 refusal was posted on the Court's website, and the decision was also sent across state lines to Plaintiff's home in New Jersey.

331.   This second decision from the Court of Appeals proves Judges Janet DiFiore and Michael Garcia were in collusion and wanted this outcome to bankrupt and destroy Plaintiff, and as part of the Civil RICO, Mr. Berman's part was to do nothing about it and let it all happen.

332.   The Court's reply was an open slap in the face telling Plaintiff the corrupt judges and the politically-connected law firms and clients could do whatever they wanted and be as corrupt as they want together.

333.   The Judges did precisely what Plaintiff had said in his *Motion for Reargument* on April 4, 2016 (Exhibit 19):

> To an objective observer, it would appear that this Court is advancing the underlying fraud and deceit in this case.  That suspicion would become concrete if this Court were to again answer with "Denied" as if the Court were untouchable and Plaintiff and his family are garbage.

334.    On June 9, 2016, the Court of Appeals did exactly what Plaintiff had they would do and filed a one-word decision: "Denied." (Exhibit 20).

335.    This act by the Court of Appeals was an abuse of power and Civil RICO, and shows the absolute insanity of the Janet DiFiore Court of Appeals.  The Courts of Appeals refused to adjudicate an issue they had a judicial duty to decide.  Mr. Berman has condoned these crimes and ignored addressing.

336.    Retired Appellate Division Justice David Saxe, now a partner at Morrison Cohen LLC, offered an assessment of the New York State Courts in a June 2017 New York Post article:[1]

> "Our state court system is absolutely insane.  It has enabled political people to control the courts, and they don't want to give up – so it's very hard to get legitimate change that would be beneficial to the public."

337.    Plaintiff's *Motion* shows clearly that Plaintiff was never appealing a final decision but demanding a declaration from the courts that the higher court decision governs.

338.    Mr. Berman was shown after he became U.S. Attorney for the Southern District of New York.

---

[1]    https://nypost.com/2017/06/07/how-the-politically-connected-control-the-new-york-court-system/

339.   Plaintiff has been robbed of his First Amendment right to a remedy, and has been barred from seeking redress for a grievance, all in violation of Plaintiff's Constitutional rights, and all done with the blessing and consent of Mr. Eric Schneiderman and Mr. Geoffrey S. Berman.

## THE FOURTH TIME GREENBERG TRAURIG ATTORNEYS USED THEIR POWER TO CORRUPT JUDICAIL EMPLOYEES

340.   On March 29, 2016, Plaintiff filed suit in the Southern District of New York against the lawyers and law firms who conspired to defraud Mr. Brady.  The defendants were the following:

Defendants John Goldman, Esq. and Justin Singer, Esq. are attorneys at Herrick Feinstein LLP., a full service, New York-based law firm with principal address at 2 Park Avenue, New York, NY 10016.

Defendants Daniel R. Milstein, Esq. and Steven Sinatra, Esq. are attorneys at Greenberg Traurig, LLP, a full service law firm with principal address at 200 Park Avenue, New York, NY 10166.

Defendant Richard M. Zukerman, Esq. is an attorney at Dentons US LLP, an international law firm with New York offices at 1221 Avenue of the Americas New York, NY 10020.

Defendant Joseph P. Augustine, Esq. is an attorney at the law firm of Augustine & Eberle LLP, located at 90 Broad Street, 25th Floor, New York, NY 10004.

Defendants Mark K. Anesh, Esq. and Jaime Wozman, Esq. are attorneys at Lewis Brisbois, Bisgaard & Smith LP, located at 77 Water Street, 21st Floor, New York, NY 10005.

Defendant Justin Y.K. Chu, Esq. is an attorney at the law firm Steptoe & Johnson, located at 1114 Avenue of the Americas, New York, NY 10016.

Defendant Adam Richards, LLC is an attorney at the law firm of O'Reilly, Stoutenburg, Richards LLP, located at 1180 Avenue of the Americas, 8th Floor, New York, NY 10036.

341.   The first three paragraphs of Plaintiff's complaint succinctly states the nature of the case:

> The lawyers and law firms listed as Defendants in this Complaint were hired by their clients to conspire and collude to defraud Plaintiff of $100 million dollars worth of development rights that according to the Amended 1980 Offering Plan for a commercial co-op named 450 West 31st Street Owners Corp., and according to certain words in an Appellate Division, First Department, February 11, 2010 decision, were appurtenant to Plaintiffs 12th Floor and Roof Unit apartment in a commercial co-op named 450 West Owners Corp., located at 450 West 31st Street, New York, NY 10001.

> The named Defendants were hired to repeatedly prejudice the courts against Plaintiff and litigate that Plaintiff had lost the prior litigation pertaining to his 12th Floor and Roof Unit's right to have the utilization of the premise's development rights, and argue that he was barred by *res judicata* and collateral estoppel from initiating any lawsuit against the Defendants' clients.

> Defendants were hired to collude and defraud Plaintiff, and argue that he had lost the prior litigation, when in fact Defendants knew that their clients were involved in seizing the exact development rights that the affirmed Appellate Division decision stated belonged to Plaintiff's 12th Floor and Roof Unit.

342.   The case was assigned to Judge Daniels and Magistrate Judge Sarah Netburn.

343.   The Greenberg Traurig *Motion to Dismiss* shown below prove Mr. Berman's partners went back to regurgitating arguments that were proven false during the March 18, 2014 Oral arguments. (Exhibit 15).

344.   A review of the Greenburg Traurig *Motion to Dismiss* also shows Mr. Berman's partners 1) again making totally false personal attacks against Plaintiff 2) again giving a totally false litigation history, 3) again calling for sanctions against plaintiff to silence him and break him 4) again calling for filing injunctions, and 4) again calling for retaliation against Plaintiff for the creation of the website bullyjudge.com.

345.   Greenberg Traurig filed a *Memorandum Pursuant to Rule 12(b) Fed.R.Civ.P. in Support of Motion by Greenberg Traurig LLP, Steven Sinatra, and Daniel R. Milstein to Dismiss the Complaint and for Injunctive Relief* on May 19, 2016:

> The Greenberg Defendants also seek by this motion an order enjoining the plaintiff from commencing any further actions in connection with the subject matter of this action.  This is a case of a litigant who won't take "no" for an answer.

> The Complaint recites the history of plaintiff's litigations and acknowledges that plaintiff has lost every case, every motion, and every appeal he has filed beginning in 2007. The Complaint is a blunderbuss attack blaming plaintiff's litigation losses on corruption or deceit by anyone and everyone who has ever participated in the litigations. The roster of  those whom the Complaint charges with corruption includes:

> -- New York Supreme Court Judge Marcy Friedman (Complaint, ¶s 36, 37 and 39) (Plaintiff also accused Justice

Friedman of "literally foaming at the mouth" during oral argument of a motion [Complaint, ¶36]) and exhibiting "disdain" toward plaintiff (id.);

-- Justice Shirley Kornreich of the New York State Supreme Court whose "fraud includes a false argument…" (Complaint, ¶66) and who "falsified her prior decisions." Because Justice Kornreich imposed sanctions on plaintiff for "having acted in bad faith" and having engaged in a "near perfect example of frivolous conduct" (Complaint, ¶68), plaintiff also alleged that Justice Kornreich had "adopted and advanced fraud on the Court." (Complaint, ¶70);

-- Judicial Hearing Officer (and former Justice) Ira Gammerman, who, plaintiff claims, went along with the fraud committed by Justice Kornreich (Complaint, ¶71);

-- Justices of the Appellate Division, First Department who plaintiff claims were motivated by "retribution and retaliation" because they were "friends" with Justice Friedman (Complaint, ¶s42 and 45);

-- The Commission on Judicial Conduct, alleged to be "corrupt" for failing to pursue corruption charges against the state court judges (Complaint, ¶41).

"The only specific description of the defendants' alleged "deceit" is at paragraph 92 of the Complaint which reads as follows:

'92. These are deceit and fraud violations pursuant to Judiciary law §487 for treble damages. Comparing Defendants multiple court papers in multiple courts, where they asserted res judicata barred Plaintiff's claims, with what they said at the March 18, 2014 Oral Arguments where, under oath, each named Defendant admitted the contract and Appellate Division decision gave Plaintiff the right to utilize the premises (sic) development rights, proves their fraud upon the court and deceit.

As to the Greenberg Defendants, Greenberg's first (and only) appearance as litigation counsel in this series of cases was in 2013. Greenberg represented the company which purchased the adjoining property after the air rights had already been transferred, as well as the CEO of that company. As noted above, the 2013 action was dismissed on several grounds including collateral estoppel and, as to Greenberg's clients, on the ground that plaintiff was a "stranger" to them.

As evidence of the Greenberg defendants' alleged deceit, the Complaint cites defendant Milstein's oral argument before Justice Kornreich of defendants' motion to dismiss (Complaint, ¶80, pp. 20-22).

Contrary to plaintiff's claim (Complaint, ¶92), Mr. Milstein did not admit during this argument that plaintiff's contract with the co-op gave him the right to use its development rights. Rather, in the quoted excerpt, Mr. Milstein discussed his understanding of how plaintiff might build a "structure" on the roof without using development rights.

Plaintiff's track record plainly shows that the strongest possible injunctive relief in this court is warranted. Plaintiff has displayed a propensity for expanding his roster of defendants, having progressed from suing the co-op corporation to suing attorneys representing defendants in prior cases, and public officials who have failed to investigate to plaintiff's satisfaction his claims that several members of the New York judiciary are "corrupt." Plaintiff's nine lawsuits and numerous appeals and motions to reargue have involved substantial cost to dozens of litigants, at virtually no financial cost to plaintiff himself and without the filter of an attorney's advice. He has twice been sanctioned for this conduct, but shows no sign or relenting or forbearing. Enough is enough.

The motion by the Greenberg defendants to dismiss the Complaint should be granted.  The Court should issue an injunction barring plaintiff from commencing any actions concerning the subject matter of this action. *Memo of Law in Support of Motion to Dismiss Plaintiff's Complaint*, Greenberg Traurig LLP, May 19, 2016).

345.   The above paragraphs prove it is Mr. Berman's partners at Greenberg Traurig who were asking for a filing injunction so they could get away with the crimes Defendant's company participated in.  They sought a filing injunction so no one is ever held accountable for their stealing private property that belonged to someone else.

346.   In the same *Motion to Dismiss*, the attorneys for Greenberg Traurig are again completely lying, this time in District Court, by giving a false case history asserting that Plaintiff had lost a litigation in which he successfully prevented the sale of the air rights to Extell:

Plaintiff's Prior State Court Litigations (Document 19/21)

In 2007, plaintiff commenced an action in the Supreme Court, New York County2 seeking to enjoin a West 31st Street commercial co-operative corporation from transferring the building's air rights to the owner of adjoining property.

Plaintiff was a shareholder in the co-op and occupied the penthouse floor and roof. A footnote in the Offering Plan for the co-op gave the penthouse occupant the right to build or extend a "structure" on the roof in compliance with applicable law. Plaintiff claimed that this meant that he had the right to control all of the air rights to the building and that these rights could not be sold without his consent.

The Supreme Court, New York County (Friedman, J.) dismissed plaintiff's claim, holding that, while plaintiff had the right to build a "structure" on the roof of the building, the transferable development rights (air rights) were owned by the co-operative corporation, and not by the plaintiff. (2008 N.Y. Misc. Lexis 9943, Exhibit B to the Asche Affirmation).

347.   Similarly, the other law firms colluded with Greenberg Traurig and filed similarly outrageous motions to dismiss.  Samples from the Lewis Brisbois, Herrick Feinstein LLP, and Litman, Asche & Gioiella LLP:

> Plaintiff has now commenced ten patently frivolous lawsuits. Plaintiff has forced dozens upon dozens of litigants to incur hundreds of thousands of dollars to defend against these meritless claims.  Moreover, these lawsuits have resulted in a significant waste of judicial resources.  Such conduct should not be permitted and instead should be punished.  (*Memo of Law in Support of Motion to Dismiss Plaintiff's Complaint*, Lewis Brisbois, May 18, 2016).

> This action, like the 2013 actions before it, is yet another 'near perfect example' of frivolous and abusive conduct."  (*Memo of Law in Support of Motion to Dismiss Plaintiff's Complaint*, Herrick Feinstein LLP, May 20, 2016).

> This is a near perfect example of frivolous conduct and warrants defendants' requests for the imposition of sanctions." (*Memo of Law in Support of Motion to Dismiss*, Litman, Asche & Gioiella LLP, May 17, 2016).

**Plaintiff's Opposition to the Attorney Defendants' *Motion to Dismiss*, July 5, 2016**

348.   Plaintiff's *Opposition to the Attorney Defendants' Motion to Dismiss*, filed July 5, 2016, gives succinct proof that Plaintiff did not lose the litigation against Extell, the Co-op, and their Greenberg Traurig

attorneys, and reminds Judge Netburn that the February 11, 2010 Appellate

Division decision is the governing, FINAL decision in that case.

349.   Judge Netburn was repeatedly reminded of what occurred at the

March 18, 2014 Oral Arguments during which all of the lies collapsed and

the attorneys were forced to admit the plain meaning of the Offering Plan

contract.

350.   Judge Netburn was reminded Collateral Estoppel protected

Plaintiff from a lower court decision that rewrote the Offering Plan contract

and the higher court decision in order to void the rights affirmed as

belonging to Plaintiff.

351.   As Plaintiff stated on page 6 of his *Opposition*:

**Collateral Estoppel Barred Justice Kornreich from Rewriting a**
**Higher Court Decision and Making It the Governing Decision.**

The highest court decision pertaining to Plaintiff's contract rights in
these cases is the February 11, 2010 Appellate Division, First
Department ruling that "pursuant to Paragraph 7, Plaintiff has the right
to construct and erect structures on the roof or above the same to the
extent that may from time to time be permitted under applicable law."

In her July 15, 2014 decision, Justice Kornreich rewrote the
description of Plaintiff's rights as follows:

> It has already been adjudged that while the owners of the unit
> *may* have the right to erect additional structures on the roof, that
> right does not entitle them to use any floor area in doing so
> (Prior Action, decision and order, Mar 13, 2009 at *2 & *4-*5
> ["Nothing herein shall be construed as holding that plaintiffs
> have the right to use all or any part of the TDRs in connection

with such construction or extension"] *Brady v 450 W. 31st St. Owner's Corp.*, 70 AD3d 469, 470 [1st Dept 2010] [holding that the offering plan "reserves for plaintiffs the right.... to construct or extend structures on the roof that may be built without the use of the building's development rights."]

This is a brand new interpretation; a whole new contract put together piecemeal by using different parts of past decisions. Every word of the original contract is gone. This Court must make a Declaration stating that the higher court Appellate Division February 11, 2010 Decision governs in this case.

These two decisions cannot coexist. And the Court of Appeals knows this fact and refuses to answer the question which final decision governs because under New York Law, the higher court decisions governs, namely the Appellate Division, First Department February 11, 2010 Decision.

352.   Plaintiff's *Opposition* further explained to Judge Netburn why the Rooker-Feldman doctrine could not apply to the case as Plaintiff had not lost the prior litigation and was not attempting to appeal a state court decision (Opposition, p. 7):

Plaintiff is not a Supreme Court loser. This has been the biggest of the Big Lies Defendants have advanced in this case. Nor is the present action an appeal under cover from a New York State court's ruling, as Attorney Defendants state in their respective memorandums of law. The criteria comprising the Rooker-Feldman Doctrine simply do not apply to this case.

Plaintiff did not lose in state court. Plaintiff was left with a series of internally contradictory decisions which nevertheless affirm his right "to construct and erect structures on the roof or above the same to the extent that may from time to time be permitted under applicable law. The governing February 11, 2010 Appellate Division decision is clear on this, which is why Attorney Defendants' clients twice asked for a Waiver.

Plaintiff is seeking the protection of the February 11, 2010 Appellate Division against the unlawful rewriting by the lower court of a higher court decision.  This is not about reversing the lower court decision but about enforcing and protecting the higher court decision.

353.   Plaintiff's *Opposition* showed Judge Netburn how the

Greenberg Traurig attorneys were using a corrupt strategy to steal the

development rights through litigation (*Opposition*, p. 8):

**Herrick Feinstein LLP Openly Admits Attorney Defendants' Corrupt Strategy in their Motion to Dismiss in the 2013 Action**

A *Request for Judicial Intervention* filed on December 30, 2013 by John Goldman of Greenberg Traurig LLP shows that Defendants attempted to put the case before Justice Marcy Friedman in the Commercial Division in order to have it dismissed instantly.  The case was removed to Justice Kornreich, a judge of "similar integrity."

Thus, the strategy form the beginning was not only to litigate rather than pay, but to steer the case to a friendly judge in the Commercial Division because Defendants knew those judges would be corrupt. Herrick Feinstein LLP admits as much in their May 20, 2016 Motion to Dismiss:  "John Goldman, as litigation counsel to the Katz Defendants in the 2013 *Brady v. Katz* Action, requested that the action be moved to the Commercial Division in New York and placed before Justice Friedman, who issued the decision in 2007 state court litigation brought by Brady." (*Memorandum of Law in Support of John Goldman, et al. Motion to Dismiss the Complaint and for Injunctive Relief*, p. 3).

354.   Plaintiff's *Opposition* also reminded Judge Netburn that the

Greenberg Traurig attorneys had requested a Waiver from Plaintiff and then

closed the transaction without it (*Opposition*, p. 8):

**The Waiver Requested Proves Defendants and their Clients
Understood a Waiver Was Needed**

Based on a review of the waiver The Waiver Form and Letter
sent by Stanley Kaufman to the Bradys in April 2012, and the
enclosed record, this Court can declare in a summary fashion that
those rights were violated by Defendants and their clients.

Based on the Appellate Division, First Department's February 11,
2010 decision, the Co-op, Sherwood Equities, Heinrich Feinstein
LLC, Greenberg Traurig LLC, Stanley Kaufman, Vincent Hanley, and
Chicago Title Insurance Co. all knew that it was necessary to send
Plaintiff and his wife to waive their rights in order for the co-op to be
able to pass clear total to Sherwood Equities.  The Co-op twice asked
for a Waiver because everyone knew they needed it.

Attorneys Defendants are liable for closing without the Waiver.  By
requesting it – twice, they acknowledge they needed it.  In New York,
a waiver is a relinquishment of a known right.

A review of a Waiver Form shows that the rights defined in the Waiver
were taken away from Plaintiff; they are precisely the rights the
Appellate Division's February 11, 2010 Decision states belong to
Plaintiff's Unit.  The Waiver state, *inter alia*:

(1)    Waives any right they may have to execute that certain
Declaration of Zoning Lot Restrictions to be entered into by
and between 450 Corp. and Sherwood respecting the Premises
and certain adjoining properties (…)

(2)    Waives any right Releasor may have to execute that
certain Zoning Lot Development and Easement Agreement (the
"ZLDEA") to be entered into by and between 450 Corp. and
Sherwood respecting the Premise's and Adjoining Property and
consents to the execution of same;

(3)    Without limiting the foregoing, (a) releases of Excess
Development Rights (as defined in the ZLDEA) from any
claims, right, title or interests Releasor may have in same, (b)
waives any right to construct improvements in the Developer's

125

Easement Area (as defined by the ZLDEA); and (c) waives any claim, at law or in equity, that Releasor may have against 450 Corp. and/or Sherwood (i) asserting that Releasor is entitled to compensation on account of 450 Corp.'s sale of the Excess Development Rights, (iii) asserting that Releasor is entitled to compensation for the purchase or use of the Reserved DIB FAR.

Defendants admit on the one hand that they asked Plaintiff for a Waiver detailing specific rights they sought he and his wife waive, and on the other hand that he has no rights to waive.  This is not only absurd; it is criminal for Officers of the Court to close the transaction without the requisite closing documents, which included the Waiver they requested and then fights in court and litigate that Plaintiff had no rights at all.

355.   Court papers show that Greenberg Traurig was the ringleader among defendants, urging the court to issue a filing injunction to prevent Mr. Brady from seeking any redress from the courts.

**Plaintiff's Letter-Motion to Judge Sarah Netburn, July 20, 2016 (Document No. 48)**

June 11, 2016

James H. Brady
510 Sicomac Ave.
Wyckoff, NJ 07481
bradyny@gmail.com
(201) 923-5511

Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York
Thurgood Marshall United States Courthouse
Courtroom 219

40 Foley Square
New York NY 10007

Re: <u>Brady v. John Goldman Esq. *et al.*</u>, 16-CV-02287

Dear Honorable Judge Netburn:

This is an emergency letter-motion to request Oral Arguments that
will expose Attorney Defendants' fraud and deceit, and expose the
false assertions made their motions to dismiss.

This request is being made in an emergency basis because Attorney
Defendant Herrick Feinstein has filed a Sheriff's Levy for
garnishment against my property on July 1, 2016, attempting to
collect over $70,000 in sanctions they know are not remotely
warranted and were the result of their own collusion and fraud.
(Exhibit A). This Court must take immediate action to prevent this
gross injustice.  There is something very wrong with this picture,
when the very law firm that requested a Waiver from me and my wife
to waive our rights in 2012 is now filing a Levy attempting to seize
my property.

The highest court decision pertaining to Plaintiff's rights is the
Appellate Division's February 11, 2010 decision. (Exhibit B).
Defendants are now trying to collect on sanctions issued in a lower
court decision by a Justice who completely rewrote the higher court
decision in order to void the rights given in the higher court decision,
and issue sanctions not found in the higher court decision.

Oral Arguments are necessary in this case so this Court can see what
happens when Attorney Defendants try to explain how they
interpreted the Appellate Division's February 11, 2010 decision to say
the things they assert it says, when none of those words were in the
decision.  The decision stated that "plaintiffs have the right to
construct or extend structures upon the roof or above the same to the
extent that may from time to time be permitted under applicable law,
unanimously affirmed, without costs." *Brady v. 450 W. 31st Owners
Corp.,* 70 AD3d 469, February 11, 2010.

Defendants knew the February 11, 2010 decision means that the
utilization of the premise's development rights are part of Plaintiff's

lease, and therefore they and their clients needed a Waiver in order to transfer the premise's development rights to Sherwood Equities, which why they requested the enclosed Waiver from my me. (Exhibit C).

In their opposition papers, Greenberg Traurig make the following comment:

> "Plaintiff was the subject of two final orders in the Court. In the 2007 case, the Appellate Division ruled that he is not entitled to own or control the co-op's air rights. In the two 2013 cases, Justice Kornreich ruled that plaintiff was estopped to claim any entitlement to the air rights. The judgment in those state actions are final" [citations omitted]. (Memo in Support of Greenberg Traurig's Motion to Dismiss the Complaint and for Injunctive Relief, Richard Asche, May 17, 2016).

<u>There cannot be two final orders on the meaning of a one-sentence contract provision in an offering plan</u>. In her July 15, 2014 decision, Supreme Court, New York County Judge Shirley Kornreich ignored the entire testimony given at the March 18, 2014 Oral Arguments, rewrote the offering plan contract and the Appellate Division decision, and at the encouragement of these named Defendants, <u>deliberately misrepresented indisputable facts</u>.

The Appellate Division February 11, 2010 decision does not state what Attorney Defendants and Justice Kornreich assert what it states. For example, that Plaintiff's claims are "near perfect example of frivolous conduct that warrants defendants request for the imposition of sanctions," or "meritless actions, abusing the judicial process." None of this is found in the higher court decision.

Nor does the Appellate Division state what Attorney Defendants assert in their moving papers. The admissions made by defendants and their clients at the March 18, 2014 Oral Arguments betray every claim made in their motion papers. Justice Kornreich acknowledged this at Oral Arguments:

THE COURT: - is an acknowledgment by all the courts that

you have certain rights under paragraph 7.  The question left open is what are those rights. (p 69:19).

BRADY: Okay.  What are my rights?  Please define them. What are my rights?  **They said I have a right to build structures as long as zoning said so.  All of these attorneys said it.  You can ignore that, pretend they didn't make those acknowledgments?**

**THE COURT: They did make those acknowledgments.** (Tr. p.  70:20-25)

For the foregoing reasons, this Court has a duty to act, and should schedule Oral Arguments in this case so Defendants' ongoing fraud and collusion can be exposed by having them answer the most basic questions relations relating to the Offering Plan Contract and the Appellate Division's February 11, 2010 decision, and for any other issues this Court may deems just and proper.

356.   Prior to the Oral Arguments scheduled for September 7, 2016,

Plaintiff wrote Judge Netburn on August 26, 2016 showing her the

testimony of the Sponsor of the Offering Plan contract, which was definitive

proof of what the Seventh Paragraph Footnote means.  The letter included a

transcript of Mr. Greene's deposition, which is Exhibit 17 attached, and the

letter is reproduced below:

August 26, 2016

Dear Honorable Magistrate Judge Netburn:

Enclosed is the deposition transcript from the sponsor Arthur Greene taken on August 15, 2016.

This transcript proves that the meaning and intent of the Seventh Paragraph Footnote was to convey any permissible development rights that may from time to time be permitted under applicable law to my 12th Floor and Roof Unit.

Q.      Yes.  It's the seventh paragraph.  It's a new paragraph seven footnote to the schedule of units.  And it says:  The 12th floor and roof unit shall have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law.

        Now, to refresh your memory, this footnote change was a modification that was made in this second and final amendment to the offering plan.  It states that it was a final term in which you agreed to declare the foregoing plan effective.

        I can show you the second paragraph footnote to the schedule of units, because you made two other changes at the time.  So if you were to interpret the whole communication that would be great.

        This is the second amendment, and these are the amended footnotes found on page 2.

(Witness peruses document.)

A.      I believe at the time there was a limitation on what you could add to the building.  The building had reached its maximum limit for construction.  Probably the intent was to, if you could build more than – if they approved, you can build more than – you still have to go through co-op to get approval to build, but you can add on if the co-op will give it to you.

Q.      Does it say here anything permitting under applicable law is reserved for the 12th floor and roof unit, was that your intent?

A.      In the existing space, yes.

Q.      And the purpose of reserving this floor area was so that, just to be clear, any permissible development rights or zoning changes or for other purposes that is permitted it was for the exclusive use of that particular 12th floor which I believe you reserved for yourself; is that true?

A.    Yes.
      (Transcript p. 4:19 – 6:16).

This transcript proves that the dozens of attorneys, judges, law enforcement officials and other public officials that argued otherwise were all wrong.

The pain and suffering that my family and I suffered was unconscionable and criminal.  There is no line of reasoning that would explain why all of these individuals argued that they believed my contract did not mean what it said on its face.

I demand justice and this Court must address this issue during the September 7, 2016 Oral Arguments.

Thank You,

357.   The transcript below shows that Judge Magistrate Netburn refused to addressed the threshold issue that Plaintiff's contract and higher court decision were replaced by a lower court decision that voided Plaintiff's rights, and instead went into her own agenda at the Oral Arguments.

358.   It was Plaintiff who had asked for Oral Arguments, and its is clear by reading the transcript that Judge Netburn did not want a repeat of what happened on March 18, 2014 Oral Arguments, where every attorney admitted in court that the Offering Plan contract and Appellate Division, First Department decision of February 11, 2010 gave Plaintiff the right to have the utilization of the premise's development rights.

**Oral Arguments September 7, 2016, Transcript of Excerpts
(Page 4 Line 10 through Page 13 Line 9) (Exhibit 21)**

**THE COURT**:  I wanted to have this conference for two reasons, maybe for three reasons:

The first reason was because Mr. Brady had filed a number of letters seeking emergency relief, and I wanted to hear him on those applications.

The second is, we have numerous motions to dismiss filed in the case – I believe the count is something like seven -- and so to the extent either side wanted to present any arguments orally to me, I was prepared to hear those.

And my third purpose for the conference is sort of pulling back the lens a little bit and trying to figure out what is going on here, what exactly, Mr. Brady, you are seeking with this litigation.  I know that this is one of many litigations that you have filed in connection with the underlying events.  Many of them have been in state court, some of them have been in federal court.  They have occupied a substantial amount of certainly the judiciary's time and that's not to mention all of the time of all of the lawyers who have been involved here.  I think the goal should be to resolve this matter once and for all.  That may not be possible but I want to hear from you as to whether or not there is some relief that you believe has not been litigated already that you believe you are entitled to or need to be heard on because my hope is that we can resolve this issue so that there is not additional and further litigation, so that you can occupy your time and energy in things other than pursuing the claims that are in this litigation and all of the other litigations, and move on with your life, your family's life, so that the parties in the case as well can close this chapter.

So those are my three goals for today's conference.  Maybe I'm being ambitious.  Why don't I hear from you first, Mr. Brady, and you can tell me both what relief you are seeking on an emergency basis and the grounds for that relief, and also, to the extent you can, what you're really hoping to achieve with this new litigation and whether or not there is a way to conclude these proceedings so that this chapter of your life and everybody else's life can close.

You can begin, Mr. Brady.

**MR. BRADY**: Sure.  Thank you, your Honor.

As far as the case itself, I have been a victim for nine years with this. I bought a unit.  It came with certain rights pursuant to the offering plan.  It's undisputed between the parties to the contract that that means any permissible development rights that may from time to time be given to the premises belong to my unit.

One of the things, when you say about being heard, one of my goals is to be heard and is to be treated fairly.  We bought an apartment, it came with those rights.  It's undisputed between the parties that the intent of that is to give any permissible development rights to my unit.

Furthermore, you talk about all the different litigations, and you're right, there's been many of them.  One of the things I need is a declaration from you as to which decision governs.  There's been many different decisions, as you've said, but the highest court decision pertaining to my rights is the Appellate Division February 11th, 2010, decision.  It's higher than any other decision, and that one includes the words that pursuant to paragraph 7, plaintiff has, in addition to the utilization of the roof, the right to construct or extend structures on the roof or above the roof to the extent that may from time to time be permitted under applicable law.

It was those rights that were transferred after this second round of litigation, when they asked for a waiver and they didn't get it.  That difference, between what is permitted and what is built, the development rights, I no longer have those rights, they're gone, they sold them after asking for the waiver.  It was strategic move to litigate, that I lost the prior litigation, which was not true.  Those words mean I have the premises development rights.  That's why they asked for the waiver.  I never lost the prior litigation.

**THE COURT:** I know you know this record maybe better than anybody in the room here, but I am sure you also appreciate the way the court system works.  I don't have the power to interpret a state court decision or tell you which state court decision is correct or issue any opinion whatsoever on what those state court decisions were, I simply don't have the power to do that.

**MR. BRADY:** But somebody has to.

**THE COURT:** Maybe the New York State Court of Appeals.

**MR. BRADY:** Somebody has to, and they won't answer that question, which is also a constitutional right, to a fair trial, a fair something.  I mean the highest court decision, the highest court decision is the February 11th, 2010, decision.  There's no higher court.  And those rights that that decision said I had are gone.  And it's not okay for anybody to make up false issues, such as who owns the development rights.  It's not the case.  I need to be heard.  They're part of my demised premises.  They have no right to take them without a waiver, and they did.

So you're asking what I'm seeking.  I'm seeking damage for that.  I'm one person compared to a whole bunch of people but I'm entitled to equal protection under the law.  Under the Fifth and Fourteenth Amendments, okay, my property was taken from me.  It's not okay to take a part – this is a very important case for you, your Honor.  People from around the world are putting fortunes into apartments because they believe that if a state court doesn't protect them, surely a federal court would.

So, as far as what they did and what I'm seeking, I'm seeking the damages for that part of my demised premise, which was taken away form me.

**THE COURT**: Okay.

**MR. BRADY:** As far as two, the other things that we're speaking about, including the -- which I mentioned in my oppositions and mentioned about the 487 violations, these things have to be taken seriously, when somebody presents to your Honor false statements.  Constantly, they all point to pretending that the issue was ownership when it was never about ownership.  Justice Freedom mentions, in one of her earliest decisions, that we do not state that we own the air rights and we do not state that we can sell the air rights.

All we state is that they can't just take away part of our demised premise and sell it, which is what they did but they they a fake issue, they make it a fake issue that I lost the prior litigations.  If you read the March 18, 2014, transcript, they just trip over themselves, on after another, admitting that it means what it says, it means that all the

development rights are mine to utilize.  So, when they say that, it's a big problem.

A strategic move was made by these people and I needed justice from this Court –

**THE COURT**: Who are "these people," when you say "a strategic move was made by these people"?

**MR. BRADY**: The defendants and their clients, when they first – as I had said the first time around, the building was never built.  That's the only thing I sought, was to enjoin the sale and get a declaration of my rights and if it was flawed, it still included words that can only be construed as giving me the right to have the utilization of the premises, development rights.

When Sherwood first bought the lot, after that first deal fell through, I was contacted and they said, we know we have to pay the piper, which was me – they don't want to wind up like Extell – and meanwhile they made a strategic move after that to switch it to argue that I lost the prior litigation.  It's not okay to make a false claim like that and false res judicata collateral estoppel argument.

Okay, the words in it meant what they said -- that was proven -- and then they make false arguments.  I'm the one protected by collateral estoppel.  And it's not okay for a lower court judge to rewrite a contract and then issue sanctions.  So, when you ask about what protection under sanctions that were then issued, a sanction is when something is meritless and frivolous.  I'm the victim here, I'm the one who had to go through this thing.  So, when you talk about so many times in court, you're right -- 16 times over one sentence that can only be construed as giving me development rights.

I sent you a copy of the transcript of the deposition of Arthur Green, the sponsor, and it took a minute -- right away I got right to it.  What do those words mean?  It means you have a right to use any development rights if zoning changes and permits more building.  Everybody knows what that means.  I'm sure you know what that means too.  There's no other way of construing this paragraph and it's part of a whole communication, the final term that the sponsor agreed to declare the offering plan effective.  There's no alternative meaning that exists.  The parties to the contract say it means we have the

development rights.  Everybody admitted and then they turned around and use their influence and their relationships to have it rewritten to void its rights.

So, in other words, they use their quid pro quo relationship to try to rewrite it, nobody does anything about it and as if it's just going to be taken away from me, and that's why I'm in front of you right now. And you're a federal judge, as you know, and you're supposed to protect everybody evenly.  So, I'm the one person fighting against much richer people, much more powerful people.  Okay?

And they took this most valuable component and then the judge sanctions me as if my claims are meritless and frivolous in an effort to try to destroy me.  I'm never going to quit.  The rights are mine, nobody has a right to take away --  I'm doing this, it's much bigger than me, I'm doing this for everybody because this is so clear, clearly a violation, and if lawyers engage in criminal activity, they should be punished.  They've got their client off, so it's like, well, you pay, if you're going to try to steal something that belongs to me.

And that's what this case is about, your Honor.

**THE COURT:** Okay.  If I can offer unsolicited advice, sometimes parties come before me and they have genuine issues and disputes and the parties have truly been wronged, and sometimes what I find is that this Court is not the place to seek remedy and maybe litigation is not the way to seek a remedy.  There are many wrongs in the world and there are times where the courts can be incredibly effective and, you are correct, everybody is entitled to be treated equally under the law and I will make sure that that happens in my courtroom, but there are issues and problems that arise where litigation is not the solution or not the way to achieve the solution.

So, sometimes there are other mechanisms, like speaking with the legislature if there are problems about how these types of transactions happen, speaking with your representatives, lobbying the legislature for better protections for people like yourself.

**MR. BRADY:** I don't need that, your Honor.  I need you to be just. For example -- and it was several times, but in the plaintiff's joint opposition to attorney defendants' motion to dismiss, it gives you the examples of the other party at page 12 of that -- I'd like you to refer

136

back to it -- the intent, evidence, by the decision of the original owner of the 12th floor unit to build an 1800-square-foot penthouse on the roof.

Thus, the intent of the amendment is clear on its face. That was from Extell Development, that first time in litigation, and Stanley Kaufman, won for the co-op, stated at that time the clear intent was to grant the 12th floor unit owner some latitude in adding additional space or structures as long as in doing so he did not violate the local building code, zoning code or other ordinances. And he further said the clear and logical meaning of the added seventh paragraph footnote to the second amendment was to grant the owner some latitude in adding additional structures so long as in doing so, the owner did not endanger anyone else's health or safety or violate a building code, zoning law or any other laws or ordinances.

Now, I'm concerned about that. I read this to you. The intent is clear. I have no intention of going to a legislature at all. I'm going to you as a court. Something was taken from me and where you go when something like that is stolen, when property rights are taken, when judges are rewriting contracts, regardless of that, still don't lose the highest court decision, is the Appellate Division one, and it says words that can only be construed as giving me development rights and they were taken from us with the help of the defendants in this case.

**THE COURT:** Okay. Thank you very much, Mr. Brady

## Page 15 Line 24  - Page 19 Line 25

**MR. ASCHE:** He this afternoon said he's not going to quit. So, we're asking the Court to intervene in that limited sense and require that before he causes anyone else anyone else any more trouble, that he seek permission from the court.
Unless your Honor has any questions, I think our briefs cover everything. So, thank you very much.

**THE COURT:** Thank you. Mr. Brady, would you like an opportunity to respond?

**MR. BRADY**: Yes. A few things I'd like to respond to, your Honor.

First of all, as far as the decisions again and the false claims that they're making, the highest court decision was the appellate court February 11, 2010, decision.  It did not have the words in it that they're adding.  The court took out those added words when they gave it.  They did not add a provision.  And it's not okay to not being treated fairly.  As you know, you're not allowed to rewrite a contract.

**THE COURT:** Can you remind me, the 2011 – you said there's a February 11, 2010 --

**MR. BRADY**: February 11, 2010 decision.

**THE COURT:** -- by the appellate division.  And that was an appeal from what decision?

**MR. BRADY:** That was an appeal from the two earlier decisions.

**THE COURT**: From Justice Freedman?

**MR. BRADY:** Correct.  It's the highest court decision.  You could absolutely –

**THE COURT**: Was it affirming Justice Freedman?

**MR. BRADY:** It actually did not – it eliminated the words that she added.  It eliminated the provision and it gave my rights without the added provision that she put in.

**THE COURT:** So, she, as I understand it -- I don't have the decision in front of me right now --

**MR. BRADY**: That's okay, your Honor.

**THE COURT**:  -- she, I'm told from the defendants, said that the corporation was the owner of these transferable development rights and that you were not, and it was represented to me that the Appellate Division affirmed that decision.

You're saying that, in doing so, it did something different?

**Mr. BRADY:** It did, your Honor, yes, as far as the ownership issue. As I mentioned, that wasn't the issue. The issue was that we were given particular rights and they belonged to us and they affirmed and used words that can only be construed as giving us the development rights. And that's why, too -- so, for him to add stuff about what you said earlier, she also said I was given the right to construct or extend structures on the roof –

**THE COURT**: I'm sorry, you spoke too fast there.

**MR. BRADY:** -- which means you have development rights. She also said it's undisputed that those rights were -- the rights being transferred would have affected that, and she never reached the issue of whether or not it would affect or violate my rights since the transaction didn't take place.

So, he's adding language that was not in the affirmed decision. So, the affirmed decision words, what that decision said I have, I no longer have. That's what was sold, and they know this. The difference -- and they know that they would litigate and argue in the same way Mr. Asche is saying look at what he said, look at what he said. Yeah, I mean what I said to Justice Abrams, this is what happens because when a judge takes a really long time to make a decision, when a judge doesn't permit oral arguments and when a judge doesn't permit subpoenas, those are they type of things to happen. As you may know, Justice Fox did permit the subpoena of different depositions and we got it form the sponsor proving the intent.

As far as with Mr. Asche asking for these different things and asking for sanctions, it's really outrageous, considering his law firm and the other law firms were the ones that stole from us. And he knows that. What I ask for, your Honor, is that you also deny the motion and that you permit the discovery. The thing, the best proof of all that would prove that they know that they were acting with criminal intent? We have the subpoena out from Chicago right now. It would make sense that you -- I could ask you too permit the files to be produced. Chicago Title, they knew they had no right signing that we waived our rights when we didn't. I sent you the contracts, which they have hidden from us. They said we waived our rights, and we didn't.

And, also to prove my point, your Honor, not to jump on a bandwagon and act like we lost when we didn't, they wouldn't ask for a waiver in 2013 if they didn't need it.  That's why they asked for it.  And specifically, please go back and look at the waiver.  It was very specific about what I asked us to waive.  A waiver is a relinquishment of a known right.

So, here we are again, now that my wife and I didn't waive it, they're asking you to pretend you don't need one, our claims are meritless and frivolous, you don't ask for a detailed waiver that you are going to waive your right to build, that you're going to waive your right to use the unused development rights, that you're going to waive your right to the easements placed above your unit if you didn't need it.  And when they didn't get it, they proceeded to sign a contract saying that we waived our rights when we didn't.

One of the pieces of information you have is a waiver form that's not signed and they're asking you to jump on the bandwagon now and pretend you don't need it, the claims were meritless and frivolous, and go with the majority to make the majority happy.

**Page 20 Line 9-18**

**Mr. BRADY:** I'm the victim.  Our rights were stolen.  It's not okay.  Everybody here knows it.  They just took them after the waiver and litigated.  He lost, res judicata.  If we had lost, Justice Kornreich wouldn't have had to take out every single word of that contract and rewrite it, every word.

"Plaintiff has a right to construct or extend structures on the roof or above the roof to the extent from time to time permitted under applicable law" was taken out.  Every word of that contract and replaced with "may have a right to build structures but not with the use of development rights."  It doesn't say that.

**THE COURT:** Okay.

359.   The above text from the September 2016 transcript shows as

clear as day that there was a Civil RICO and civil conspiracy going on.

There was not a single assertion of Brady engaging in any wrongdoing whatsoever.

360.   The above text shows Magistrate Judge Netburn telling Plaintiff to go on with his life and allow Greenberg Traurig to steal the air rights.

361.   Two days later, on September 9, 2016 Judge Netburn granted Greenberg Traurig's *Motion to Stay Discovery*, barring Plaintiff from seeking any redress from the attorneys who stole his property rights. (Exhibit 22).

**Plaintiff's Letter to Judge Sarah Netburn, October 13, 2016, (Document No. 65)**

Re:  <u>Brady v. John Goldman Esq. *et al*.</u>, 16-CV-02287

Dear Honorable Judge Netburn:

Oral Arguments were held on September 7, 2016.  The official transcript shows my claims of wrongdoing were proven and/or undisputed at the Oral Arguments.  For example:

It was proven that the highest court decision was the Appellate Division, First Department February 11, 2010 decision.

It was undisputed that the rights sold were those rights that the Appellate Decision stated I had.

It was also undisputed that I was asked to sign a Waiver of my rights in 2012 because the parties to the transaction knew they need one based on the contract and the February 11, 2010 decision.

The transcript of the September 7, 2016 hearing shows that it was undisputed that the Waiver of my rights was not signed yet the clients of the Defendants stated in closing documents that I waived my rights.

The Court also saw first-hand how the Defendants quoted a lower court decision and claimed it was affirmed by the Court of Appeals, when the statement was totally false.

The Court saw first-hand how the Defendants were making the false argument that I had lost the prior litigation.

Finally, the transcript shows the attorneys using the same tactic of repeating what I said to and about a judge (this time about judge Ronnie Abrams) to create an obligation to retaliate and then asking that the court retaliate by issuing sanctions against Plaintiff.

Furthermore, the transcript of the deposition of the sponsor of the Co-op, Arthur Greene, proved that the "meaning and intent" of the Seventh Paragraph Footnote was to convey permissible air rights to the 12th Floor and Roof Unit to the extent that may from time to time be permitted under applicable law.  These attorneys and their clients have always known this fact, and have always been shown to be using their "relationships" and false arguments to steal rights that belong to my apartment.  Both these attorneys and their clients must compensate me right now, so I can move on with my life, for their unlawful actions and the rights they stole.

I ask that the Court submit its Report and Recommendation without additional delay.

Sincerely,
James H. Brady

362.   Nearly two months after Plaintiff's letter, Magistrate Judge Netburn issued an *Order to Show Cause* on **December 5, 2016** ordering Plaintiff to answer why Magistrate Judge Netburn should not recommend a filing injunction be imposed on Plaintiff:

142

Why the Court should not recommend that the Honorable George B. Daniels issue a filing injunction that would require Plaintiff to seek leave of Court before he commences any new action in the Southern District of New York that relate in any way to the air rights appurtenant to his cooperative unit at 450 West 31st Street, New York, NY, or the conduct of any attorney, judicial officer, government official, or other third party in relation to such rights."

363.   Plaintiff responded to the *OSC* on **December 14, 2016** with an

*Objection:*

Plaintiff sued in 2013 because the Co-op and Attorney Defendants violated and seized the rights the February 11, 2010 Decision said Plaintiff had.

The March 29, 2016 suit before this Court pertained to the fact that while these Attorney Defendants admitted during March 18, 2014 Oral Arguments that the February 11, 2010 Decision gave Plaintiff the right to utilize the premise's permissible development rights to construct or extend structures on or above the roof, in their Court papers they fiercely argued otherwise.  In their papers, Defendants argued that Plaintiff lost the litigation and was barred by collateral estoppel from claiming that he had a right to utilize the premise's permissible development rights.

Attorney Defendants in this case stole through litigation plaintiff's contractual rights as stated in the February 11, 2010 decision. Defendants used false arguments, false instruments and *quid pro quo* relationships to carry-out this crime.

This Court unjustly dismissed this very serious crime as "statements made within the bounds of vigorous advocacy in an adversarial proceeding may not generally be the basis for liability."  What Defendants did was criminal, and to minimize it as vigorous advocacy is very disingenuous.

**Greenberg Traurig's Joint Memorandum in Response to Plaintiff's Objection to this Court's Order to Show Cause, December 28, 2016 (Document No. 74)**

364.   Greenberg Traurig filed a *Joint Memorandum in Response to Plaintiff's Objection*, filed December 28, 2016, in which Greenberg Traurig again lies about the prior litigation and urges the court to impose a federal filing injunction:

> Most important, plaintiff does not dispute that multiple dismissals of his claims by state and federal courts, the imposition of sanctions and the issuance of a filing injunction by the state courts have not had any deterrent effect on plaintiff.
>
> Plaintiff is apparently obsessed with the notion that all of the judges and all of the parties and their attorneys are corrupt, that he has a right to compel law enforcement authorities and media outlets to investigate the alleged corruption, and that he is entitled to litigate his claim to the co-op's air rights ad nauseum. Indeed, at oral argument before this Court, in response to the Court's suggestion that he put an end to litigation, Plaintiff acknowledged "I'm never going to quit…" (Transcript, September 7, 2016, p. 11).
>
> In short, there is every reason to believe that, absent a filing injunction, plaintiff will continue his crusade against every individual and institution he perceives deprived him of the coop's air rights. Absent a filing injunction, he will continue to invent frivolous claims and will continue to find new individuals or institutions to sue. A filing injunction should be issued.

**Greenberg Traurig's *Memorandum in Response to Plaintiff's Objection to this Court's Order to Show Cause*, December 28, 2016 (Document No. 73)**

365.   On the same day, Mr. Berman's co-partners at Greenberg Traurig filed a *Memorandum* again regurgitating the false assertion that Plaintiff lost the litigation against Extell Development Corp. and that the Co-op had won the State Court litigation

366.   *Defendants' Memorandum in Response to Plaintiff's Objections to the Report and Recommendation,* December 5, 2016 (Document No. 73):

> Plaintiff cannot plausibly assert that he was not the loser in state court: his 2007 case was dismissed on the merits by the Supreme Court and the dismissal was affirmed by the Appellate Division with leave to appeal to the Court of Appeals denied.

367.   Mr. Berman's Greenberg Traurig Partners outrageously further asserted that there is no legal distinction between the "ownership" of development rights, versus the exclusive utilization of the development rights being appurtenant to Plaintiff's commercial co-op apartment (Document No. 73, page 6 of 12):

> Without explaining its significance, Plaintiff, claims that Judge Netburn erred by characterizing plaintiff's claim as a claim that he "owns" the air rights. According to plaintiff, he does not claim "ownership" but rather claims that the air rights are "appurtenant" to his apartment (Complaint, ¶42) and that he was given the "exclusive right to utilize any development rights…" (Complaint, ¶25).

Even if there were a legal difference between "owning" air rights and having the exclusive right to use them, the distinction is completely irrelevant to the issues determined by Judge Netburn.

368.   These above arguments made by Greenberg Traurig and the other lawyers proves the attorneys are using the courts to steal property rights, which makes it a mandated duty of Mr. Berman to take action.

369.   It is clear and obvious that Judge Netburn is being every bit as corrupt as Judge Kornreich for the benefit of the politically connected law firms.

370.   Judge Netburn is shown completely ignoring the fact that Plaintiff's Offering Plan contract and higher court decision govern over the lower court decision, and instead attacked Plaintiff like an animal, just as Justice Kornreich had done.

371.   To argue that there is no difference between something being appurtenant to an apartment and the ownership of that right is outrageous, and are false arguments designed to steal, and further proves collusion between Judge Netburn, Greenberg Traurig, and the other law firms.

372.   Mr. Berman's inaction through all of this is his direct involvement in this criminal fraud scheme against Plaintiff.

## Magistrate Judge Netburn's January 10, 2017 *Report and Recommendation*

373.   On January 10, 2017, Magistrate Judge Netburn wrote a scathing *Report and Recommendation* attacking Plaintiff like a wild animal, never addressing which decision governs, and asking the District Judge to issue a filing injunction against Plaintiff. (Exhibit 23).

374.   A review of Judge Netburn's *Report and Recommendation* proves that like everyone else completely avoids addressing the indisputable fact that Plaintiff's prior Appellate Division, First Department decision of February 11, 2010 governs over the lower Supreme Court decision of July 15, 2014.

> All of Brady's subsequent cases, including the case before the Court, have been a series of collateral attacks on the initial litigation by impugning the motivations and integrity of all of the actors involved, and even those of government and private entities wholly unrelated to his case. This is not how our judicial system works. While a litigant is entitled to all of the appellate remedies provided for by law, he is required to abide and respect the judgment entered once it has become final. Indeed, the judiciary has an abiding interest in finality. See Taylor v. Sturgell, 553 U.S. 880, 892 (2007).

> "Brady has now presented a long series of lawsuits that could only be considered vexatious, harassing, and duplicative, and which he has no objective good-faith expectation of prevailing."

> Finally, there is strong evidence that other sanctions, including monetary penalties, would not be sufficient to deter further litigation from Brady. Indeed, he has twice been sanctioned by New York state courts. See 450 West 31st Street Owners Corp, 2014 WL 3515139 (referring to Brady's "meritless actions, abusing the judicial process,"

stating that "this is a near perfect example of frivolous conduct and warrants defendants' requests for the imposition of sanctions"); New York County District Attorney, Index No. 154496/15. (referring to Brady's "pattern of vexatious conduct and repetitive litigation, including his penchant to inflict hagride on those who do not do his bidding" and enjoining him from further litigation).

Instead of accepting the finality of the state courts' adjudication of his rights, however, he has merely proceeded on to the federal forum from which he has not yet been barred. On this record, the Court finds any sanction lesser than a filing injunction would be insufficient to protect the court, the parties, and the public interest.

375.   Every word above by Judge Netburn is untrue on its face and the ultimate defamation of character because they are being made by a federal judge.

376.   The false statements above proves the control Greenberg Traurig attorneys have over the State and District courts, where they will repeat any lie they are directed to state.

377.   Judge Netburn knew that in truth the finality is that Plaintiff had a contract and a higher court decision that governed over the unlawful and unconstitutional lower court that voided the rights of the contract affirmed by the higher court decision.

378.   The above statements made by Judge Netburn in her *Report and Recommendation* proves she has no problem advancing as true the lie of

Greenberg Traurig attorneys and Judge Kornreich while ignoring every single truth stated by the Catholic Plaintiff.

379.   Since becoming United States Attorney, Mr. Berman has not only permitted these constitutional violations against Plaintiff, he has used the filing injunction as a shield and excuse to deprive Plaintiff of his First Amendment right to seek redress and file a criminal complaint.

380.   Magistrate Judge Netburn saw the Arthur Greene testimony, and the transcript of the September 7, 2016 Oral Arguments.  She knew that the entire case history Greenberg Traurig presented in their court papers was false, yet she followed the lies of the debunked and irrelevant to the case comments made by State Actors.  Nothing quoted by Judge Netburn in her Report addressed the fact that a higher court decision was replaced by a lower court decision, which is not a matter of opinion but a fact proven by simply reading each decision.

381.   A comparison of Magistrate Judge Netburns' initial response to Plaintiff's *Complaint* compared to her January 10, 2017 *Report and Recommendation* proves she was dirtied by the Greenberg Traurig

382.   In her personal attacks against Plaintiff, Judge Netburn was following the orders of Mr. Berman's partners at Greenberg Traurig.

383.   This is another judge without any hesitation to steal from a

Catholic, and another judge lying in order to benefit Greenberg Traurig.

384.   The *Report and Recommendation* of a filing injunction on its

face was an obstruction of justice, and was called such in Plaintiff's

*Opposition to the Filing Injunction*, January 18, 2017 (Exhibit 24).

**Plaintiff's *Opposition to the Filing Injunction*, filed January 18, 2017 (Exhibit 24)**

385.   Plaintiff's *Opposition to the Filing Injunction* in *James H.*

*Brady vs. John Goldman, Esq, et al*, Case 1:16-cv-02287-GBD-SN (Exhibit

24) (Document 81, Page 1 of 18):

> The transparent motive of the filing injunction that Judge Netburn seeks in her January 10, 2017 Report and Recommendation is to obstruct justice and aid and abet in the scheme to help all the parties that participated in the corrupt scandal to seize the air rights that were "appurtenant" to my 12th Floor and Roof Unit get away with the crime.
>
> The Court's endorsement of a filing injunction would be obstructing justice and aiding and abetting in the fraud scheme to help those responsible for seizing the very valuable air rights that EVERYONE agrees were "appurtenant" to my unit in the commercial co-op located at 450 West 31st Street in New York get away with the crime.
>
> The lawyers' admissions on March 18, 2014 that the premises permissible air rights were appurtenant to Plaintiff's unit completely conflicts with that they wrote in the papers submitted in the 2013 litigation and they totally conflict with the papers submitted in this litigation.  That does prove that they know what they wrote in their papers was false which means they were guilty of perjury and 487 violations.  The fact that attorneys argued in their 2013 papers and the

150

papers submitted to this Court that Plaintiff "lost" the litigation that ended in 2010 when they admitted otherwise during the March 18, 2014 oral arguments proves Plaintiff's common law fraud claims and the Defendants intentional infliction of emotional Distress.

Despite everyone's agreement on March 18, 2014 that the premises permissible air rights were "appurtenant" to Plaintiff's 12th Floor and Roof Unit, the Attorney Defendants and their rich and powerful clients were able to secure a Decision that was totally corrupt on its face.

Clearly the attorneys and their rich and powerful clients used their power, influences, false legal arguments, *ad hominem* attacks, calls for retaliation for Plaintiff's www.bullyjudges.com website, their "*quid pro quo* relationships," and most likely more than that to have Supreme Court Justice Kornreich adopt their false legal arguments and persuade her to unlawfully rewrite a governing Appellate Division, First Department February 11, 2010 Decision to void the air rights it states Plaintiff's Unit has the express right to utilize.

Specifically the February 11, 2010 Decision said "pursuant to paragraph 7 Plaintiff had a right to construct or extend structures on the roof or above the same to the extent that may from time to time be permitted under applicable law."  All of these words were removed from Judge Kornreich's July 15, 2014 Decision.

The unlawful acts of the Attorney Defendants were done so that their clients could get away with seizing the air rights that they knew were contractually appurtenant to Plaintiff's 12th floor and roof unit at 450 West 31st Street in New York, NY.  Indeed it is undisputed that in 2012, the scheme was created that if Plaintiff did not agree to waive his rights "for free" the Co-op, its attorneys, the developer Sherwood Equities and their attorneys and their title insurance company would use their power, influence, "quid pro quo relationships" and most likely more then that to have a Court adopt their false legal arguments that Plaintiff lost the litigation that ended with the Appellate Division First Department February 11, 2010 Decision.  It's obvious that the attorney defendants and law firms did the exact same thing again. This time the persons they persuaded to make deliberately wrong Decisions are Judge Netburn and Judge Daniels.  Indeed, just as they had Judge Kornreich rewrite the Appellate Division February 11,

2010 Decision Judge Netburn does the same exact thing in her December 5, 2016 report and recommendation.  And just like Judge Korenreich, Judge Netburn makes fierce *Ad hominem* attacks on Plaintiff that she knows to be totally false.

---

Indeed, the *ad hominem* attacks in Judge Netburn's January 10, 2017 Report and Recommendation are so fierce that its clear they were written by the attorney defendants.  Its objectively impossible that the rage against Plaintiff that Judge Netburn presented in her January 10, 2017 Recommendation and Report were her actual feelings and evaluations since she knows all Plaintiff did was continually try to seek justice against those who seized his unit's rights.  Her attack on Plaintiff in her January 10, 2017 Report and Recommendation were so over the top that it's hardly believable.

Judge Netburn goes so far as to blatantly falsify what the Appellate Division First Department Devision says on its face.  Among other things, she keeps arguing that the Appellate Division Discussion said Plaintiff was given ONLY the right to build structures on the roof when she knows that claim is false.

Judge Netburn's statements get more crazy and deranged when she argued on page two of her January 10, 2017 Report and Recommendation that she compared the February 11, 2010 Appellate Division Decision against the July 15, 2014 lower court decision and said she saw "no inconsistencies" and that my claim that they said different things was "unavailing."   Pursuant to the February 11, 2010 Decision I was given the right to have the express and exclusive utilization of the premises permissible development rights, which is why the co-op and developer asked for a waiver in 2012 pursuant to the July 15, 2014 Decision I have no right to the utilization of the development rights, I am persecuted as being a person bringing meritless claims to court, and in the July 15, 2014 Decision I am required to pay over $500,000 in sanctions to the attorney's who helped seized my rights.  So how can Judge Netburn claim to see "no inconsistencies" between the February 11, 2010 and July 15, 2014 Decisions?

**The Court Adopted Defendants' Arguments as Part of a quid pro quo Relationship**

Additionally, a review of Sarah Netburn's December 5, 2016 and January 10, 2017 Report and Recommendations and a review of Judge Daniels' January 10, 2017 Decision show them both fiercely and repeatedly arguing on behalf of the Attorney Defendants that Plaintiff "plainly lost" the litigation that ended with the Appellate Division First Department February 11, 2010 Decision when she knows there is no factual basis whatsoever to make that claim.

More than anything is VITAL to the defense of the attorneys that Judge Netburn and Judge Daniel's stick to the story that Plaintiff lost the February 11, 2010 Appellate Division Decision, although they know the claim is plainly false and even though that they know that false argument collapsed during the March 18, 2014 Oral Arguments when attorney after attorney admitted, one after the other that, "as written", the February 11, 2010 Appellate Division Decision gave Plaintiff the right to have the utilization of all permissible development rights that may from time to time be given to the premises.

The magnitude of the corruption and injustice that I am being subjected to by Judge Netburn and Judge Daniel's is best proven by reviewing Plaintiff's James H. Brady's January 4, 2017 Reply to Defendants Response to Magistrate Judge Netburn's December 5, 2016 Report and Recommendation: EXHIBIT A) Every single undisputed thing that I said was completely discarded with a single word "overruled" as if I am a piece of garbage unworthy of the court's protection.

**Greenberg Traurig's Response to Plaintiff's Objection to the Report and Recommendation That the Court Issue a Filing Injunction, January 27, 2017**

386.   In response to Plaintiff's objections, Greenberg Traurig continued to make false assertions about the prior litigation in their January

27, 2017, *Defendant's Response to Plaintiff's Objection to the Report and*

*Recommendation*:

> Judge Netburn's two Reports and Recommendations recite the facts and applicable law and correctly conclude that absent an injunction, the plaintiff will continue to bring frivolous lawsuits concerning his air rights claim. In plaintiff's Objection to the Report and Recommendation, plaintiff does not take issue with the legal standard enunciated by Judge Netburn. Rather, plaintiff has doubled down, arguing the merits of his air rights claim and again asserting that he did not "lose" in the state courts, even though his claims were dismissed and the dismissal was affirmed on appeal.

> In his prior actions, plaintiff has accused all of the state court trial and appellate judges, as well as numerous state officials, of being corrupt because they did not agree with his views of the law and has charged the lawyers who represented individuals and entities whom plaintiff sued in state court with "deception."

> Now, plaintiff accuses Judge Netburn of "participation in the fraud scheme…" (Objection, p. 2) and he accuses both Judge Netburn and this Court of making "deliberately wrong decisions" (pp. 4-5). He characterizes Judge Netburn's statements as "crazy and deranged" (p. 7), and claims that he is being subjected to "corruption and injustice by Judge Netburn and Judge Daniels" (p. 8). Plaintiff also asserts that defendants will never "settle" with him "as long as they find it cheaper to have judges made (sic) deliberately deceptive decisions for them." (Objection, p. 16).

> Given this mindset, it is unlikely that, absent an injunction, plaintiff will abandon his crusade against judges, lawyers and public officials. Indeed, plaintiff commenced his federal actions even after the state courts had imposed hundreds of thousands of dollars of sanctions and had barred him from bringing another case in state court without permission.

> Any doubt as to plaintiff's intention to pursue his claims – which have been decided against him by each of the nine courts to have considered the matter -– was put to rest during the September 7, 2016 oral argument of defendants' motion to dismiss this case. During

colloquy, Judge Netburn suggested that plaintiff end his litigation quest, to which plaintiff responded: "I'm never going to quit." (Docket #63 p. 11). In his Objection, Plaintiff reiterated his position by stating "I will not back down…" (Objection, p. 16).

The filing injunction recommended by Judge Netburn does not leave plaintiff without a remedy. He may appeal the decision in this case to the Second Circuit without the need to first seek permission to do so. And he has the right to seek permission from the Court to commence new actions, by demonstrating that they have potential merit and that they state claims that have not already been adjudicated against him. What a filing injunction will do, however, is prevent any further unnecessary burden and expense on the court, its personnel, and the defendants.

387.   Mr. Berman's Greenberg Traurig Partners knew that Mr. Brady had successfully prevented the sale of the air rights to Extell, and they knew the Appellate Division, First Department had affirmed Plaintiff's rights under the Offering Plan contract, which is why Extell abandoned the deal after they were unable to obtain a Waiver from Plaintiff, and why Sherwood Equities asked for a Waiver when they initially sought to purchase the air rights.

388.   As usual, the truth of a white catholic is discarded and the lies of the Greenberg Traurig Attorneys are ruled to be true.

389.   The *Report and Recommendation* proves Judge Netburn and Judge Daniels followed the express directives of Mr. Berman's Greenberg Traurig Partners and attacked plaintiff personally with the false case history

155

that they needed to assert as true in order to impairment a filing injunction

that the Greenberg Traurig Attorneys gave the Court as a directive to follow.

390.   Regardless of any of the slanderous and defamatory assertions

made against Plaintiff he still was a victim of a Civil Conspiracy and to the

end still possessed the higher Court Decision and was forced to pay over

$500,000 to the people that stole the air rights the higher Court Decision said

were appurtenant to Plaintiffs 12th Floor and Roof Unit.

391.   Through this lawsuit Plaintiff seeks to hold Mr. Berman

responsible for this Civil RICO and Civil Conspiracy.

392.   Through this lawsuit Plaintiff seeks to hold Mr. Berman

responsible for his criminal indifference to the fact that he know Plaintiff

was being forced to have his life destroyed to pay over $1.7 million dollars

to a landlord who admitted himself was not entitled to a penny.

### District Court Judge Daniels' Memoranda Decision and Orders

393.   Notwithstanding Plaintiff's objections African-American

District Judge George B. Daniels filed two *Memorandum Decision and

Order* on January 11, 2017 and February 3, 2017 are filled with personal

attacks and facts that he knows are false.

394.   Just like Judge Netburn, Judge Daniels is completely silent on

the fact that a higher court decision was replaced by a lower court decision

that voided the property rights affirmed by the higher court.  This was a criminal act.

395.   Judge Daniels has no problem advancing these same lies against a white Catholic litigant.

396.   Criminal corruption in the Southern District of New York Courts is precisely what Mr. Berman has a duty to investigate.

397.   The corruption of Judges Daniels and Netburn could not have been more obvious.  For example:

398.   a) Plaintiff's *Complaint* was dismissed "with prejudice" through a pre-answer motion to dismiss, which violated the court's duty to allow a *Pro se* Plaintiff to amend the complaint.

399.   b) Both judges dismissed the *Complaint* claiming lack of subject matter jurisdiction "with prejudice" because complete diversity between the parties was not fully pled when that could have been easily cured through amendment.

400.   c) Once the Complaint was ruled outside the court's jurisdiction, it should have been dismissed without prejudice and without giving any other opinion as to the merits of the claims the court had just ruled they had no jurisdiction to hear.

401.   d) After ruling the court had no subject matter jurisdiction, both judges found the jurisdiction to issue a filing injunction in order to block Plaintiff from the courts so he may not seek redress.  This was an intentional act to cover-up the crimes and an unconstitutional form of retaliation.

402.   This *Complaint* proves with specificity what is probably the largest corruption scandal in New York history, and it is blatantly obvious.

403.   Every single perpetrator in this case is a lawyer.

## Summary of Defendant Geoffrey S. Berman's Unlawful Acts

404.   This Complaint seeks to hold Mr. Berman personally accountable for the ruthless atrocities he has personally participated in.

405.   The *Complaint* against Mr. Berman is <u>not</u> solely based on his actions and inactions as a United States Attorney for the Southern District of New York.

406.   The claims against Mr. Berman are equally asserted based on his actions as a corrupt partner of the law firm Greenberg Traurig LLC.

407.   As this Complaint details with specificity, on four different occasions, Mr. Berman or his Greenberg Traurig partners participated in Civil RICO and civil conspiracies against Plaintiff.

408.   At the Directive of Mr. Berman's Greenberg Traurig partners Plaintiff has been falsely described as a serial litigator and, as such, is

the subject of two filing injunctions. *Brady v. Goldman*, 2017 WL 496083

(S.D.N.Y., Feb. 3, 2017); and *Brady v. New York County District Attorney's*

*Office*, Index No. 154496/2015 (Sup. Ct. N.Y. Cty., Nov. 30, 2015) (ECF.

No. 29).

409.   Plaintiff is being called a "serial litigant" so no one is ever held

responsible for the fraud scheme of replacing his Offering Plan contract and

Appellate Division, First Department decision with a lower court decision

that rewrote the Offering Plan in order to void the plain meaning of contract,

which was agreed to by the parties.

410.   The above checks from September 5, 2018 prove Plaintiff was

forced to pay $535,234.92 because he *refused* to wave his rights to the $70-

90 million in air rights for free in April of 2012.  Plaintiff refused to sign the

waiver from April of 2012 that is shown here (Exhibit 14).

411.   This outcome can only explained through a civil conspiracy and

Civil RICO.

412.   The admissions made during the March 18, 2014 Oral

Arguments prove that the statements made below during the 2013 litigation

was civil RICO and a civil conspiracy to steal the development rights

through false legal arguments and false claims.

**413.**   Fact 1: The March 18, 2014 Oral Argument transcript proves all of the above claims are false, and that these attorneys listed above all know their claim that Plaintiff lost the prior 2007 litigation was false.

**414.**   Fact 2: The March 18, 2014 Oral Argument shows the attorneys admitting one after the other, their understanding that the Offering Plan contract and the Appellate Division First Department February 11, 2010 decision gave Plaintiff the right to have the utilization of the premises permissible development rights to the extent that may from time to time be permitted under applicable law.

**415.**   Fact 3: The fact that the Co-op corporation and the other defendants in the 2013 litigation asked for a waiver in 2012 proves that they understand Plaintiff did NOT lose the prior 2007 litigation.

**416.**   Fact 4: All of the above attorneys know that Extell Development cancelled the deal even *before* Judge Friedman made a summary judgment decision in 2008, a fact admitted to by the Co-op attorney in 2013.

**417.**   Fact 5: This fact is fully admitted to by the co-op litigation counsel, Stanley Kaufman, in a subsequent Affirmation in opposition to *Appellant's Motion for Resettlement and/or Clarification*, April 2, 2013, Index No. 603741/2007.

"At the time that the Bradys commenced this law suit in 2007, Owners Corp. was in contract to sell a portion of its transferable development rights to an entity affiliated with Extell Development Company ("Extell"). While the parties' respective motions for summary judgment were pending, Extell terminated the contract based upon its assertion that Owners Corp. was unable to deliver title to the development rights free and clear of all claims."

418.   It is seen above that the attorneys above are again pretending

that the issue is one of determining who "owns" the air rights when they

knew that this was *never* the issue.

419.   As is shown below in Judge Friedman's July 2, 2008 decision

where she states the following:

Indeed, plaintiffs themselves do not take the position that they are the owners of the air rights. They clarify that they "do not contend that the 12th Floor and Roof Unit can sell or transfer these [TDR] rights to adjoining landowners, but do contend that the Cooperative Corporation cannot sell or transfer these rights to anyone without [plaintiffs'] consent."

420.   Mr. Berman's Greenberg Traurig partners were the

masterminds in the Civil Conspiracy including the repeated lying that

Plaintiff lost the prior 2007 litigation.

421.   Mr. Berman's Greenberg Traurig Partners and all the other

lawyers and law firms fully admitted at the March 18, 2014 oral arguments,

that the Offering Plan Contract and Appellate Division First Department

February 11, 2010 Decision included words that could only be construed as

giving Plaintiff the premises permissible development rights as is shown below:

> Pursuant to Paragraph 7, that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.

422.    Mr. Berman's Greenberg Traurig Partners listed knew that the Appellate Division First Department Decision said Plaintiff was given the right to build structures with development rights and without development rights, any structure permitted under applicable law.

423.    Mr. Berman and his partners at Greenberg Traurig knew more than anyone that Plaintiff did not lose the prior litigation, and they knew more than anyone that Extell Development cancelled the transaction in 2008 because the corporation did not receive a waiver from the Brady's.  This means Plaintiff did not lose the prior 2007 litigation.

424.    Mr. Berman and his Greenberg Traurig Partners knew Appellate Division First Department February 11, 2010 decision does not say and could not say that the Co-op Corporation can sell the premises permissible development rights without a waiver.

425.    Mr. Berman and his Greenberg Traurig Partners fully understood   premises permissible development rights, which are owned by

the corporation, are appurtenant to Plaintiff's 12th Floor Roof Unit, to the extent that may from time to time be permitted under applicable law.

426.   Mr. Berman knows that this was a crime that Plaintiff was forced to pay $535,234.92 to the developers and lawyers, including Greenberg Traurig Lawyers that stole the 70-90 million in air rights appurtenant to plaintiffs 12th Floor and Roof Unit Apartment.

427.   Mr. Berman *still* refuses to do anything because his knows his company Greenberg Traurig was the mastermind of this conspiracy starting back from 2007.

428.   This *Complaint* proves with specificity that four of Mr. Berman's partners at Greenberg Traurig was part of this civil RICO and civil conspiracy.

429.   This *Complaint* proves that there were four Greenberg Traurig partners involved in the conspiracy before Mr. Berman joined the conspiracy as the fifth perpetrator, partners Deirdre Carson, Steven Sinatra, Daniel Millstein, and Roy Taub were the first four partners engaged in the Civil Conspiracy against Plaintiff.

430.   Mr. Berman, along with Chief Judge Janet DiFiore and Judge Michael Garcia discarded Plaintiff's repeated pleas for justice and their mandated duty to act.

431.   Mr. Berman colluded with state actors including Chief Judge Janet DiFiore and Associate Judge Michael Garcia and together they permitted in the crime of forcing Plaintiff to sell his apartment and pay the perpetrators (including Greenberg Traurig attorneys) listed above over $500,000 in sanctions in addition to discarding their duty to prevent plaintiff from being forced to pay over $1.7 million dollars to a landlord that admittedly was not owed a penny.

432.   As a result of the civil conspiracy Mr. Berman and the Greenberg Traurig attorneys masterminded, Plaintiff was forced to write checks over $530,000 on September 5, 2018 to the very same people who stole the air rights appurtenant to his apartment after Plaintiff refused their threats to waive his rights for free in April 2012.

> James H. Brady paid Greenberg Traurig $106,664.84 to be paid to 360 10th Ave LLC on behalf of Frank McCourt.

> James H. Brady paid Augustine & Eberle LLP Escrow $146,513.03 to Mr. Joseph P. Augustine on behalf of the Co-op Board.

> James H. Brady paid Herrick Feinstein $82,821.73 on behalf of Sherwood Equities and its CEO Jeffrey Katz.

> James H. Brady paid Lewis Brisbois $68,315.62 on behalf of Lewis Brisbois Bisgaard & Smith LLP

> James H. Brady paid $22,288.85 to O'Really Stoutenberg Richards LLP as Attorneys.

James H. Brady paid $108,630.85 to Marshal Stephen W. Biegel on behalf of Richard M. Zuckerman from Dentons U.S. LLP on behalf of Chicago Title Insurance

433. **Mr. Berman could see that these are the same parties who asked Plaintiff and his wife for a Waiver in 2012.**

434. Mr. Berman knew that part of the retaliation schemes against me for my exposure on the website www.bullyjudges.com was to be forced to pay a landlord over $1.7 million dollars without there being any adjudication that the landlord was entitled to a penny.

435. Mr. Berman was presented with the taped evidence where four Appellate Division, First Department judges colluded in a scheme to sit silent and never say a word because they knew the landlord's illegal conduct voided the personal guarantees in the case of *IGS Realty v James H. Brady*.

436. Mr. Berman was part of a willful and malicious conspiracy that ruined the career and reputation of Plaintiff, and destroyed his ability to make a living.

437. Mr. Berman knew that over $2.3 million that Plaintiff was forced to pay on September 5, 2018 was to perpetrators who were not lawfully or constitutionally entitled to a penny.

438. Mr. Berman's unlawful and unconstitutional acts has caused irreversible economic damage to Plaintiff and his family.  His unlawful

inactions cause Plaintiff and his wife to have their jobs and incomes

completely cut-off.

439.   Mr. Berman's actions and inactions were intentional and

malicious.


## FIRST CAUSE OF ACTION

## VIOLATION OF DUE PROCESS PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS; 42 U.S.C §1983

440.   Plaintiff restates and incorporates by reference each and every

allegation of the preceding paragraphs.

## SECOND CAUSE OF ACTION

## CIVIL CONSPIRACY PURSUANT TO 42 U.S.C. §1983

441.   Plaintiff restates and incorporates by reference each and every

allegation of the preceding paragraphs.

## THIRD CAUSE OF ACTION

## CONSPIRACY TO INTERFERE WITH

## CIVIL RIGHTS 42 .S.C. §1985

442.   Plaintiff restates and incorporates by reference each and every

allegation of the preceding paragraphs.

## FOURTH CAUSE OF ACTION

## CIVIL RICO 18 U.S.C. §1961

443.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## FIFTH CAUSE OF ACTION

### DEFAMATION (Reputational Risk & Defamation of Liberty)

444.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## SIXTH CAUSE OF ACTION

### COHESIVE CENSORSHIP-AND-RETALIATION CAMPAIGN

445.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## SEVENTH CAUSE OF ACTION

### PRIMA FACIE TORT

446.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## EIGHTH CAUSE OF ACTION

### AIDING AND ABETTING

447.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## NINTH CAUSE OF ACTION

### FAILURE TO INTERVENE

448.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TENTH CAUSE OF ACTION

### VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS TO FILE A COMPLAINT

449.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## ELEVENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF EQUAL PROTECTION UNDER 1983

450.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWELFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

451.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## THIRTEENTH CAUSE OF ACTION

### FIFTH AMENDMENT DUE PROCESS

452.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## FOURTEENTH CAUSE OF ACTION

### THE FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM

453.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## FIFTEENTH CAUSE OF ACTION

### VIOLATION OF PROCEDURAL DUE PROCESS

454.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs

## SIXTEENTH CAUSE OF ACTION

### CIVIL CONSPIRACY

455.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.


## SEVENTEENTH CAUSE OF ACTION

## EQUAL PROTECTION VIOLATION

456.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.


## EIGHTEENTH CAUSE OF ACTION

## DEFAMATION OF LIBERTY

457.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.


## NINETEENTH CAUSE OF ACTION
## DEFAMATION PER SE

458.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.


## TWENTIETH CAUSE OF ACTION

## PRIMA FACIE TORT UNDER SECTION 1983

459.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY FIRST CAUSE OF ACTION

### GROSS NEGLIGENCE

460.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY SECOND CAUSE OF ACTION

### FAILURE TO SUPERVISE

461.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY THIRD CAUSE OF ACTION

### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS 42 U.S.C. §1985

462.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY FOURTH CAUSE OF ACTION

### ACTION TO NEGLECT TO PREVENT 42 U.S.C. §1986

455.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY FIFTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMTOTIONAL DISTRESS

456.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY SIXTH CAUSE OF ACTION

## FAILURE TO PROTECT

457.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY SEVENTH CAUSE OF ACTION

## VIOLATION OF VICTIM AND WITNESS PROTECTION ACT OF 1982

458.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY EIGHT CAUSE OF ACTION

## CRIMINAL INDIFFERENCE TO CIVIL OBLIGATIONS

459.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## TWENTY NINTH CAUSE OF ACTION

### MAIL FRAUD 1962 UNDER RACKETEERING AND CORRUPT ORGANISATIONS ACT

**460.**   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## THIRTIETH CAUSE OF ACTION

### WIRE FRAUD 1962 UNDER RACKETEERING AND CORRUPT ORGANISATIONS ACT

461.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendant Geoffrey S. Berman as follows:

A.      Compensatory damages, including lost compensation, damage to career path, damage to reputation, and pain and suffering damages;

B.      Damages for mental anguish;

C.      Punitive damages;

D.      Such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff James H. Brady hereby demands a trial by jury on all issues so triable.


Respectfully submitted,

DATED:  May 11, 2020

James H. Brady
510 Sicomac Avenue
Wyckoff, NJ 07481
(201) 923-5511
bradyny@gmail.com